MOBIL OIL CORPORATION, Plaintiff,

v.

AMOCO CHEMICALS CORPORATION,
Defendant.

Civ. A. No. 83–207 LON.

United States District Court,
D. Delaware.

Dec. 27, 1991.

Charles S. Crompton, Jr. and William J. Marsden, Jr. of Potter Anderson & Corroon, Wilmington, Del. (John A. Diaz, Stephen R. Smith, Christopher K. Hu, Bartholomew Verdirame and Bruce P. Radin of Morgan & Finnegan, New York City, on brief), for plaintiff.

Richard K. Herrmann of Bayard, Handelman & Murdoch, P.A., Wilmington, Del. (D. Dennis Allegretti, John J. McDonnell, Paul H. Berghoff, Jamie S. Smith and Alvin Dodek of Allegretti & Witkoff, Ltd., on brief), for defendant.

## OPINION

LONGOBARDI, Chief Judge.

The Plaintiff Mobil Oil Corporation ("Mobil") alleges that Defendant Amoco Chemicals Company ("Amoco") is infringing patents owned by Mobil. These patents cover compositions known as ZSM–5 zeolites and their use as catalysts. Amoco denies that it infringes Mobil's patents and also alleges that Mobil's patents are invalid.

## I. TECHNICAL AND FACTUAL BACKGROUND

### A. Zeolites

Natural and synthetic zeolites are crystalline materials with a variety of useful characteristics. They currently are used in a wide variety of applications including: catalytic cracking in the petroleum industry, catalysis of hydrocarbon reactions, drying of refrigerants, removal of carbon dioxide and sulfur compounds from natural gas, recovering radioactive ions from radioactive waste solutions, curing of plastics and removal of atmospheric pollutants. D.W. Breck, Zeolite Molecular Sieves 2 (1974) Defendant's Exhibit ("DX") 1122.

The study of zeolites began in 1756 with the discovery of stilbite, a naturally occurring zeolite. The word zeolite means "boiling stone" and refers to the fact that naturally occurring zeolites contain water which vaporizes or boils when the zeolites are heated. R.M. Barrer FRS, Hydrothermal Chemistry of Zeolites 2 (1982) (DX 1125); Docket Item ("D.I.") 126 at 693.

Further studies indicated that zeolites exhibited other remarkable properties. In 1840, it was discovered that zeolite crystals could be dehydrated and then rehydrated without changing the transparency or morphology of the crystal. The adsorption of gases by dehydrated zeolites was discovered in 1909. In 1925, a publication taught that dehydrated chabazite, a naturally occurring zeolite, would absorb vapors of some liquids but not vapors of other liquids. D.W. Breck, Zeolite Molecular Sieves 14 (1974) (DX 1122). Researchers also discovered that certain zeolites, such as gmelinite and chabazite, had similar adsorption properties while other zeolites, such as mordenite, exhibited different properties. Id. at 18. The ability of certain naturally occurring zeolites to selectively adsorb certain vapors, as well as their ability to act as catalysts and cation exchangers, made them valuable candidates for commercialization.

These properties are largely attributable to the structure of the zeolites. Zeolites are crystals made up of three dimensional networks of atoms. These networks are largely open structures containing cavities and channels of various sizes. Currently at least sixty-four different zeolite networks or topologies are known to exist. W.M. Meier & D.H. Olson, Atlas of Zeolite Structure Types 1 (2nd ed. 1987), Plaintiff's Exhibit ("PX") 857. Any sample of a particular zeolite will always have the same topology as any other sample of the same zeolite.

In naturally occurring zeolites, the networks are primarily made from three elements: oxygen ("O"), silicon ("Si") and aluminum ("Al"). More precisely, these three elements are arranged in tetrahedral units of $SiO_4$ and $AlO_4$ and these units are linked together to form the network of the crystal.

In an individual $SiO_4$ tetrahedron, the silicon is at the center of the tetrahedron and is bonded to four oxygen atoms which make up the corners of the tetrahedron. An $AlO_4$ tetrahedron is analogous except that aluminum rather than silicon occupies the center of the tetrahedron. The atom in the center of each tetrahedron was referred to as the "t-atom" by several of the witnesses at the trial and the Court will adopt that nomenclature.

These t-atoms and their corresponding oxygens combine in different ways to produce a variety of network structures. A

visible zeolite crystal is made up of millions of repetitions of a basic network pattern. The smallest piece of the crystal that can be repeated to produce the entire network is called the "unit cell." Therefore, the unit cell of a zeolite defines its crystal structure. Although the technique was not available when the study of zeolites began, today researchers can determine if a structure of new zeolite matches one of the known topologies. This is done by taking an X-ray diffraction pattern of the new zeolite and comparing it to known patterns inherent in other zeolites.

The composition of any given zeolite is not as constant as its crystal structure. Unlike compounds such as water or carbon dioxide, zeolites cannot be assigned specific chemical formulas. Each t-atom shares its oxygen atoms with an adjacent t-atom. The common oxygen atoms link the tetrahedra into a network. When the t-atoms in a zeolite are solely aluminum and silicon, the ratio of the aluminum atoms plus silicon atoms to oxygen atoms is one to two. However, the ratio of silicon atoms to aluminum atoms may not be exactly the same for two samples of a given zeolite.

Originally, it was not possible to directly measure the aluminum and silicon content of zeolites. In order to measure the silicon and aluminum in a sample, the sample would be heated in the presence of air to convert the elements to their oxides. D.I. 126 at 633. Using this method, silicon is converted to silica, $SiO_4$ and aluminum is converted to alumina, $Al_2O_3$. Researchers expressed the amounts of silicon and oxygen in a zeolite sample in terms of a silica to alumina ratio and this practice is still the standard practice in the field. *Id.* at 635. In order to calculate the silicon to alu-

minum ratio for a sample, one must divide the silica to alumina ratio by two. It is also important to note that the high silica to alumina ratios indicate low amounts of aluminum and low silica to alumina ratios indicate high amounts of aluminum.[1]

A discussion of zeolites would not be complete without referring to the non-framework components of zeolites, namely water and associated cations. If a zeolite is not dehydrated it will contain a certain amount of water within the channels and pores of the framework. Zeolites also contain positively charged species called cations. Zeolites require non-framework cations to maintain electrochemical neutrality. Oxygen ions each carry a formal charge of negative two. Silicon, when it is bonded to oxygen, generally carries a formal charge of positive four. In a zeolite with no aluminum atoms, the ratio of silicon atoms to oxygen atoms would be 1 to 2. Each silicon with its formal charge of positive four would balance two oxygen atoms with their individual formal charges of negative two. Therefore, such a zeolite would be electrochemically neutral.

The introduction of aluminum into the zeolite crystal structure makes things more complicated from the electrochemical point of view. Aluminum atoms in zeolites carry a formal charge of positive three. Unlike silicon, a single aluminum ion cannot completely balance the charge from two oxygen ions; one negative charge will remain. Therefore, the framework of a zeolite is generally anionic, that is, it carries a negative charge. Each aluminum t-atom contributes to this overall deficit of positive charges in the structure. In order to correct this deficit, zeolites contain non-framework positive species called cations. The

---

1. For example, assume a zeolite sample heated in air generated four billion silica molecules and one billion alumina molecules. Such a sample would have a silica to alumina ratio of four. An equation for such a calculation would be written as follows: (number of silica molecules)/(number of alumina molecules) = 4,000,000,000/1,000,000,000 = 4.

Each silica molecule contains one atom of silicon and each alumina molecule contains two atoms of aluminum. Therefore, the silicon to aluminum ratio for such a sample would be

two. (4,000,000,000 silica molecules × 1 silicon atom/silica molecule)/(1,000,000,000 alumina molecules × 2 aluminum atoms/alumina molecule) = 4,000,000,000 silicon atoms/2,000,000,000 aluminum atoms = 2.

If a sample generated four billion silica molecules and five hundred million alumina molecules, it would have a silica to alumina ratio of eight and a silicon to aluminum ratio of four. Thus, in comparing two samples, the one with the higher silica to alumina ratio has a lower aluminum content.

number of positive charges that must be supplied by the cations is directly proportional to the number of aluminum t-atoms in the zeolite.

Naturally occurring zeolites are all aluminosilicates. Therefore, discussing their structure and composition solely in terms of silicon, aluminum and oxygen is appropriate. However, with the advent of synthetic zeolites, the story becomes a bit more complicated.

Researchers attempted to synthesize zeolites as early as the 1800s. D.I. 124 at 252–53. A entirely new zeolite named zeolite A was synthesized by researchers at Union Carbide in 1948. Zeolite A is used in detergents, in thermopane windows and in automobile air conditioners. D.I. 127 at 917. The next synthetic zeolites were zeolite X and zeolite Y which were also synthesized by scientists at Union Carbide. *Id.* at 918. Zeolite X and Y have the same structure but different compositions. Zeolite X has a silica to alumina ratio of about two and Zeolite Y has a silica to alumina ratio between roughly four and seven. *Id.* at 919–20. Zeolite X is used in separating nitrogen from oxygen to produce oxygen used for medical purposes. Zeolite Y is used as a cracking catalyst to convert crude oil to petroleum products. *Id.* at 921.

Another notable synthetic zeolite is ZK–4 which was synthesized by Mobil researchers. This zeolite represented an advance in zeolite synthesis because it was the first time that a zeolite material was made in the presence of an organic cation. Prior to that time zeolites were synthesized by mixing a source of silica, a source of alumina and a source of sodium or potassium. *Id.* at 923. ZK–4 has the same structure as Zeolite A but has a higher silica to alumina ratio. *Id.* at 924. The organic cation used in the synthesis of ZK–4 was tetramethylammonium. *Id.* at 923.

Zeolite Beta was synthesized by Mobil researchers and patented in 1967. *Id.* at 927. It was also synthesized by using an organic cation. The organic cation used was tetraethylammonium which is the next member in a series of amines which begins with tetramethylammonium. *Id.* at 926.

Zeolite beta was an important development in the field of zeolites because it could be synthesized with a very high silica to alumina ratio from 5 to 150. *Id.* at 928. Before the synthesis of zeolite beta, mordenite with a silica to alumina ratio of approximately 11 was the most silica rich zeolite known. *Id.* at 931–32. A high silicon content is desirable because it increases the thermal stability of the zeolite. *Id.* at 921. A higher silicon content can also correspond to a higher catalytic activity. *Id.* at 922.

Using tetrapropylammonium, the next member in the series of amines, researchers at Mobil synthesized and patented a new zeolite called ZSM–5. Although the preparation of ZSM–5 is similar to the preparation of zeolite beta, the two zeolites have different topologies. The ZSM–5 zeolites possess a topology which had not been previously discovered. The framework of ZSM–5 exhibits channels which run in two directions. In one direction the channels are relatively straight and in the other direction the channels are undulated. The size of the pores in ZSM–5 makes it an ideal catalyst for many reactions.

Mobil researchers applied for and obtained patents on the ZSM–5 family of zeolites and their use as catalysts. These ZSM–5 patents also taught that other elements could be incorporated into the zeolite framework. Specifically, gallium ("Ga") could be substituted for aluminum and germanium ("Ge") could be substituted for silicon. PX 1 at 729.

Researchers began exploring other elemental substitutions. In 1981, a researcher at Amoco received a patent for materials which have boron incorporated into the ZSM–5 framework. DX 1. In 1982, researchers at Union Carbide patented a family of crystalline materials which contain aluminum and phosphorous and no silicon. D.I. 127 at 953. In 1983, a United States Patent was issued on an titanosilicate material with the ZSM–5 structure. Mt. Tarasmasso et al, U.S. Pat. No. 4,410,501. Since that time, materials have been prepared which incorporate many other elements, such as chromium, manganese and

sulfur into zeolite frameworks. *Id.* at 961–62.

These new compounds have apparently created a nomenclature problem in the zeolite field. Because naturally occurring zeolites were all aluminosilicates, experts in the field disagree as to whether the term zeolite can be applied to substances which have a zeolite-like crystal structure but contain little or no aluminum or silicon. At least one expert has suggested that it is more appropriate to call these materials molecular sieves and reserve the term zeolite for only those materials which have the appropriate topology and are aluminosilicates. R. Szostak, *Molecular Sieves Principles of Synthesis and Identification* 2 (1989). The Court declines to accept this suggestion and will use the term zeolite to denote only a characteristic topology.

## B. *Zeolites as Catalysts*

Catalysts are materials which facilitate chemical reactions but remain essentially unchanged as a result of the reactions. For example, the addition of a catalyst to a mixture of substances may allow a reaction to take place which would have not occurred in the absence of the catalyst. In other cases, the presence of a catalyst may allow a reaction to proceed more quickly, proceed at a lower temperature or produce higher yields of desired products.

The suitability of a zeolite as a catalyst for a particular reaction depends upon the topology and the composition of the zeolite. The topology of a zeolite provides a means to sort a mixture of various compounds and allows only certain molecules in the mixture to undergo reactions. For example, a zeolite with a channel size of 5 angstroms will allow molecules smaller than 5 angstroms to enter the zeolite and will exclude molecules which are larger than 5 angstroms. In addition, if two or more small molecules react inside the channels of the zeolite to produce a molecule which was larger than 5 angstroms, the large molecule will be trapped inside the framework of the zeolite. *See* D.I. 126 at 621–23. The ability of a zeolite to exclude or retain

molecules of a certain size is referred to as shape selectivity.

In an effort to classify zeolites according to their topologies, researchers sometimes divide zeolites into three categories: small, medium and large pore zeolites. D.I. 127 at 915. Researchers can also conduct experiments to determine the constraint index of a zeolite. The constraint index is a number which gives scientists information about the ability of certain sized molecules to pass through the channels and pores of a zeolite. PX 725, col. 3. This information about the structure of a zeolite is helpful in determining if the zeolite might be a useful catalyst for a particular reaction. *Id.*

The composition of a zeolite also plays a role in determining its effectiveness as a catalyst. The framework and non-framework components of a zeolite can provide an active site for chemical reactions. In the zeolite ZSM–5, the framework aluminum atoms with their associated non-framework cations are thought to provide acidic sites which can catalyze many different reactions. D.I. 124 at 88.

## C. *Hydrocarbon Conversion Reactions*

Zeolite catalysts are used to aid the production of certain compounds from petroleum refining. The reforming process used in oil refining generates, among other things, a mixture of compounds called the $C_8$ aromatic stream. D.I. 124 at 218. The main components of the $C_8$ aromatic stream are para-xylene, ortho-xylene, meta-xylene and ethyl benzene. *Id.* at 218–19. All of these compounds are hydrocarbons, that is, they contain only the elements hydrogen and carbon. Para-xylene is a valuable compound because it is used to manufacture polyesters such as Dacron. *Id.* at 217. The other components in the $C_8$ aromatic stream are not used for this purpose. *Id.* at 218.

The three xylenes are closely related compounds; they are called isomers of each other. *Id.* at 216. Conversion of ortho-xylene and meta-xylene into para-xylene was accomplished on a small scale as early as 1890. The reaction, called xylene isomerization, used a non-zeolite aluminum

containing catalyst. D.I. 130 at 1432. When the demand for para-xylene became great enough, plants were designed to allow continuous xylene isomerization of the $C_8$ aromatic stream. The first plant was built in the mid–1950s by Imperial Chemical Industries Company ("ICI"). *Id.* at 1432–33. Following each reaction, the para-xylene would be stripped from the mixture and the compounds which were not converted to para-xylene would be returned to the reaction vessel for another reaction. The ICI process used a silica/alumina catalyst, also a non-zeolitic material.

Unfortunately, the presence of ethyl benzene in the mixture interfered with the xylene isomerization process. D.I. 124 at 219. If the ethyl benzene were left in the $C_8$ aromatic stream, it would eventually build up to a point where it would cause the plant to shut down. *Id.* 221. The ethyl benzene was removed from the $C_8$ aromatic stream before conducting the xylene isomerization reaction. This was done by distilling the ethyl benzene from the $C_8$ aromatic stream. Due to the similarity in the boiling points between ethyl benzene and the xylenes and, due to the large scale of these reactions, this distillation step required very tall distillation towers and was extremely expensive. D.I. 124 at 220; D.I. 130 at 1434. Another problem with this process was that the catalyst became fouled very quickly and the plant had to be shut down every few days to clean the catalyst. D.I. 130 at 1434.

Eventually, a new process called Octafining was commercially installed in 1958. PX 727, col. 1, lines 4–5. Octafining uses a catalyst containing platinum on silica and alumina. D.I. 130 at 1435. A second generation Octafining catalyst also contained the zeolite mordenite. *Id.* at 1437. Octafining had two advantages over the method used by ICI. The Octafining process consumes or converts the ethyl benzene in the reactor simultaneously with the xylene isomerization reaction. This eliminated the need to use the expensive distillation step. D.I. 124 at 223; D.I. 130 at 1435. In addition, the catalyst does not foul as quickly as the catalyst used by ICI. Typically, plants using the Octafining process could

run for about three months before the catalyst needed to be cleaned. D.I. 124 at 228–29.

Although Octafining was an improvement over the previous technology, it still had many limitations. The process is expensive because it has to be run at fairly high temperatures, 830 to 900 degrees Fahrenheit ("°F") and requires the use of relatively large quantities of hydrogen. *Id.* at 225. In addition, platinum, one of the components of the catalyst, is quite expensive. *Id.* at 227. The Octafining process has to be run at relatively low space velocities or rates of feed which means that the production rate is low. D.I. 124 at 226. The plants using the Octafining process had to be shut down for a period of several days three or four times a year to clean the catalyst. Eventually, cleaning would not restore the catalyst and it had to be replaced perhaps as often as once a year. *Id.* at 228–29.

In an effort to avoid some of these disadvantages, several companies developed alternative processes for simultaneous xylene isomerization/ethyl benzene conversion. For example, UOP developed a process called ISOMAR which currently is used in approximately twenty-four units world-wide. The temperature and pressure used in the ISOMAR process are described as moderate. D.I. 130 at 1439–40.

Amoco developed a process for simultaneous xylene isomerization/ethyl benzene conversion called Amocofining. Amoco used the Amocofining process from 1973 until 1977. The Amocofining catalyst contained alumina, platinum and mordenite, a zeolite. Pretrial Order, D.I. 107, Stipulated Fact Number 17, Exhibit G.

Mobil also developed a process for simultaneous xylene isomerization/ethyl benzene conversion which used a catalyst containing one of the members of the patented ZSM–5 family of zeolites. D.I. 124 at 233. A patent issued to a Mobil scientist on this process in December of 1974. One embodiment of this process is called MVPI. MVPI refers to "Mobil Vapor Phase Isom-

erization." D.I. 107, Stipulated Fact Number 20.

MVPI represented an improvement over Octafining because the MVPI catalyst ages at a much slower rate than the Octafining catalyst. It has a lifetime of up to six years. D.I. 124 at 235. The MVPI catalyst also requires less frequent regenerations than the Octafining catalyst. *Id.* at 236. The MVPI process uses less hydrogen than the Octafining process and has a greater throughput. *Id.* at 236–37. In addition, the shape selectivity of the MVPI process gave greater yields of desired products than the Octafining process. *Id.* at 243.

On October 22, 1976, Mobil granted to Amoco a license to practice the patented MVPI process and a license of Mobil technical information. The agreement is entitled the "VPI Process License Agreement." D.I. 107, Stipulated Fact Number 18, Exhibit G. On the same date, Mobil granted a lease for VPI catalysts to Amoco. That agreement is entitled simply "Lease." *Id.*, Stipulated Fact Number 19, Exhibit G.

Amoco used the leased MVPI catalyst in xylene isomerization/ethyl benzene conversion process at Amoco's Decatur Number 2 facility from August, 1978, to May, 1980, at the Texas City Number 1 facility from October, 1976, to April, 1983, and at Amoco's Texas City Number 2 facility from February, 1977, to February, 1984. *Id.*, Stipulated Fact Number 21, 22, 23.

Thereafter, using its own AMS–1B family of zeolites, Amoco developed three commercial zeolites called AMS–1B–1, AMS–1B–2 and AMS–1B–3. The "1" preceding each B represents the ZSM–5 type topology. AMS stands for "Amoco Molecular Sieve" and the B represents boron. The number following each B represents a particular molecular sieve. *Id.*, Stipulated Fact Number 27. There are also three commercial Amoco catalysts. The catalyst containing AMS–1B–1 is called AMSAC–1203M. AMSAC–2400 contains AMS–1B–2,

and AMSAC 3400 contains AMS–1B–3. *Id.*, Stipulated Fact Number 28.

In May of 1980, Amoco changed the xylene isomerization/ethyl benzene conversion process used at its Decatur Number 2 facility from a process using MVPI catalyst to a process using AMSAC–1203M catalyst. *Id.*, Stipulated Fact Number 24. In April of 1983, Amoco began practicing a xylene isomerization/ethyl benzene conversion process at the Texas City Number 1 facility using AMSAC–2400 catalyst. *Id.*, Stipulated Fact Number 25. In February of 1984, Amoco replaced the MVPI catalyst at the Texas City Number 2 facility with AMSAC–3400. *Id.*, Stipulated Fact Number 26. Therefore, each of Amoco's AMS–1B zeolites or sieves and each of Amoco's AMSAC catalysts has been used commercially. *Id.*, Stipulated Fact Number 29.

## II. PROCEDURAL HISTORY

Mobil's complaint alleges that Amoco infringed two of Mobil's United States Patents relating to ZSM–5. D.I. 1. The complaint also alleged that Amoco's infringement of these patents was willful. Mobil also alleged that this was an exceptional case. The answer denied that Amoco infringed Mobil's patents. Amoco's counterclaim sought a declaration of non-infringement, invalidity and unenforceability with respect to the two patents in the complaint and seventeen other Mobil patents.[2] In addition, Amoco asked this Court to enjoin Mobil from terminating the license agreement and award Amoco costs and reasonable attorney's fees.

This Court has jurisdiction over the subject matter of the claims and counterclaims in this action pursuant to 28 U.S.C. § 1331, § 1338(a) and § 2201. Venue is proper under 28 U.S.C. § 1391 and § 1400(b).

Pursuant to a stipulation and order dated July 28, 1987, all claims and counterclaims based on twelve of the nineteen patents were dismissed.[3] D.I. 54. Another stipula-

---

**2.** The nineteen United States Patents originally at issue were numbers: 3,702,886; 4,049,573; Re. 29,857; 3,856,872; 3,856,873; 3,856,874; 3,948,758; 4,100,214; 4,101,595; 4,152,363; 4,158,676; 4,159,282; 4,159,283; 4,163,028; 4,218,573; 4,224,141; 4,211,886; and 4,086,287.

**3.** The claims and counterclaims based upon the following patent numbers were dismissed:

tion and order dated May 31, 1988, severed and stayed all claims and counterclaims relating to three of the remaining patents and claims relating to Amoco's alleged use of Mobil technical information.[4] The issue of the amount of damages was bifurcated and stayed. D.I. 80.

On February 25, 1991, the Court granted Mobil's motion to amend the complaint to include counts of infringement and willful infringement with regard to two of the four remaining patents which were not identified in Mobil's original complaint. D.I. 124 at 4.

In a three week trial, the Court heard testimony from seventeen witnesses appearing at trial and received deposition excerpts from at least ten other witnesses into evidence. The trial transcript exceeds thirty-three hundred pages and the exhibits admitted into evidence number more than eight hundred. It is upon this record that the Court bases its decision.

## III. ISSUES PRESENTED AT TRIAL

Mobil is the sole owner of the four disputed patents. D.I. 107, Stipulated Fact Numbers 6, 9, 11, 14. Two of the patents were issued to Robert J. Argauer and George R. Landolt. Patent number 3,702,-886 ("the '886 patent") is a compostion patent directed toward the ZSM–5 family of zeolites while patent number Re. 29,857 ("the '857 patent") is concerned with the catalytic conversion of hydrocarbons through use of the ZSM–5 zeolites. Patent number 3,856,872 ("the '872 patent"), issued to Roger A. Morrison, claims a xylene isomerization process which uses ZSM–5 catalysts. A patent issued to Warren W. Kaeding, number 4,049,573 ("the '573 patent"), is directed toward a zeolite catalyst compositions which contain oxides of boron or magnesium.

Mobil alleges that Amoco literally infringes claim one of the '886 patent, claim one of the '857 patent, claim six of the '872 patent and claims one, two and eight of the '573 patent. Mobil also alleges that Amoco infringes claims one and three of the '886 patent, claims one and two of the '857 patent, claim six of the '872 patent and claims one, two and eight of the '573 patent under the doctrine of equivalents. Mobil alleges that Amoco's infringement of all four patents was willful. Mobil also asserts that three of the patents, the '886,- '857 and '872 patents, are pioneer patents.

Amoco denies infringing any of the patents willfully, literally or under the doctrine of equivalents. In addition, Amoco asserts that the '886 and the '857 patents are invalid under 35 U.S.C. § 102(b). Amoco alleges that the '573 and the '872 patents are invalid under 35 U.S.C. § 103. Amoco also alleges that all four patents, if construed to cover Amoco's zeolites and catalysts, fail under 35 U.S.C. §§ 112 para. 1 and 112 para. 2.[5]

The Court also heard evidence on the issue of whether the licensing agreement between Mobil and Amoco was still in effect. Mobil alleges that the license was not in effect because it had been breached by Amoco. Amoco denies breaching the license and contends that it was still in effect because Mobil had never terminated the license. In addition, Amoco alleges that even if its AMS–1B zeolites or AMSAC catalysts are determined to infringe Mobil's composition patents, the existence of the MVPI licensing agreement between Mobil and Amoco prevents a finding that Amoco infringed Mobil's process patents.

## IV. INFRINGEMENT

Section 271 of Title 35 of the United States Code provides in pertinent part that "whoever without authority makes, uses or sells any patented invention, within the United States during the term of the

---

3,856,871; 3,856,873; 3,856,874; 3,948,757; 4,100,214; 4,101,595; 4,158,676; 4,159,283; 4,218,573; 4,224,141; 4,211,886; and 4,086,287.

**4.** Claims and counterclaims involving patent numbers 4,152,363; 4,159,282 (Re. 31,782) and 4,163,028 were severed and stayed.

**5.** Before trial, Amoco also asserted that the '872 patent was invalid because the wrong inventor was named on the patent. However, no evidence was presented on this issue at trial so the Court will deem this defense waived.

patent therefor, infringes the patent." Infringement may be found only if every limitation in a claim is found in the accused product or process. *Jurgens v. McKasy*, 927 F.2d 1552, 1560 (Fed.Cir.1991). Literal infringement occurs when every limitation in the claim is found in the accused product or process. Even if there is no literal infringement, infringement under the doctrine of equivalents may be found if an equivalent of every limitation in the claim exists in the accused product or process. *Id.*

■ "The issue of infringement raises at least two questions: (1) what is patented and (2) has what is patented been made, used or sold by another." *Fromson v. Advance Offset Plate, Inc.*, 720 F.2d 1565, 1569 (Fed.Cir.1983). In order to resolve the issue of infringement, a court must initially determine the proper scope of the claims of the patent. Once the claims have been construed, the court must examine the defendant's allegedly infringing activity to determine if it falls within the scope of the claims. *Jurgens*, 927 F.2d at 1560; *American Standard, Inc. v. Pfizer, Inc.*, 722 F.Supp. 86 (D.Del.1989). Claim construction is a question of law and the application of properly construed claims to a defendant's product or process is a question of fact. *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 866 (Fed.Cir.1985). A plaintiff must establish infringement by a preponderance of the evidence. *Phillips Petroleum Co. v. United States Steel Corp.*, 673 F.Supp. 1278, 1344 (D.Del.1987), *aff'd*, 865 F.2d 1247 (Fed.Cir.1989). Even if a patented invention is entitled to "pioneer" status, the method used to determine infringement remains the same. *Texas Instruments, Inc. v. U.S. Int'l Trade Com.*, 846 F.2d 1369, 1370 (Fed.Cir.1988).

## A. *Scope of the Claims*

■ The claims of a patent should be construed as they would have been understood by one of ordinary skill in the art at the time the invention was made. *Loctite Corp.*, 781 F.2d at 867. In interpreting the claims, a court should consider several sources of information including: the literal language of the claims, the patent specification, the prosecution history of the patent and the testimony of experts. *Id.* at 866–67; *American Standard, Inc.*, 722 F.Supp. at 92.

## 1. One of Ordinary Skill in the Art

■ The person of ordinary skill in the art is a hypothetical person who is placed in the enviable position of being aware of all of the relevant prior art. *Custom Accessories, Inc. v. Jeffrey–Allan Industries, Inc.*, 807 F.2d 955, 962 (Fed.Cir. 1986). The level of skill of the inventors of the patents at issue is not a determinative factor. *Id.* In determining the level of ordinary skill in the art, a court may consider several factors. These include the kinds of problems existing in the art, the known solutions to the problems, the rate at which new inventions are made in the field, the complexity of the technology and the educational level of working scientists in the field. *Id.* Of course, all of these factors may not always be present and the importance of each factor will vary from case to case. *Id.* at 962–63.

■ In the present case, the art was concerned with synthesizing and characterizing zeolites with new topologies and new compositions. The petroleum refining art was concerned with finding zeolites which would be useful catalysts for reactions. Increasing the yields of the xylene isomerization/ethyl benzene conversion process was one specific concern. New zeolites were being synthesized quite quickly. It took longer to develop commercial processes which used the new synthetic zeolites. For example, Mobil began licensing the MVPI process approximately ten years after the discovery of ZSM–5. Following the discovery of AMS–1B, it took Amoco approximately three years to begin commercial use of the AMSAC catalysts.

Even in 1969, the technology in the field was quite complex. For example, characterization of new synthetic zeolites required knowledge of X-ray diffraction techniques and methods of conducting elemental analysis. Formulation of zeolites into commercially viable catalysts and under-

standing their activity was, and still is, a difficult task. D.I. 138 at 3308. The plants used to conduct the hydrocarbon conversion reactions on a commercial scale were also quite sophisticated. *See* PX 727 schematics.

Apparently, the level of education of scientists working in the field ranged from individuals with a bachelor of science degree to those with doctoral degrees. One expert witness for Mobil testified that one of ordinary skill in the art would have a bachelor's degree in chemistry or engineering and two to three years of experience in the field. D.I. 124 at 103. One expert witness for Amoco testified that one of ordinary skill in the art would have a doctorate or the equivalent of a doctorate in chemistry and several years of experience. D.I. 128 at 1138. Another expert for Amoco described one of ordinary skill in the art as someone with a Masters degree in chemical engineering and a few years of experience. D.I. 130 at 1459–60.

Based upon the problems in the field, the complexity of the equipment and techniques used and the evidence that many of the workers in the field had either advanced degrees or many years of experience, the Court believes that a chemist with a bachelor's degree and two years of experience would generally not possess the level of ordinary skill in the art. On the other hand, someone with a Ph.D. and several years of experience would probably have much more than the ordinary level of skill. Therefore, the Court concludes that the hypothetical person of ordinary skill in the art should be someone with at least a Masters degree in chemistry or chemical engineering or its equivalent, two or three years of experience working in the field.

## 2. Claims of the '886 Patent

The '886 patent was filed as application number 865,472 on October 10, 1969. It is a continuation-in-part ("c-i-p") of abandoned application Serial Number 630,993 which was filed on April 14, 1967. The patent, entitled "Crystalline Zeolite ZSM–5 and Method of Preparing the Same", issued on November 14, 1972.

Claim one of the '886 patent states:
[What is claimed is a] crystalline aluminosilicate zeolite having a composition in terms of mole ratios of oxides as follows:
$0.9 \pm 0.2\ M_{2/n}O{:}Al_2O_3{:}Y\ SiO_2{:}z\ H_2O$
wherein M is at least one cation having a valence n, Y is at least 5 and z is between 0 and 40, said aluminosilicate having the X-ray diffraction lines of Table 1 of the specification.

Argauer '886 Patent, PX 1, col. 14, lines 50–57.

Claim three is dependent upon claim one and provides:
[What is claimed is a] crystalline aluminosilicate zeolite according to claim 1 having a composition, in terms of mole ratios of oxides, as follows:
$0.9 \pm 0.2\ M_{2/n}O{:}Al_2O_3{:}5{-}100\ SiO_2{:}z\ H_2O$
wherein M is at least one cation having a valence n, and z is between 0 and 40.

*Id.* at lines 60–67.

The claims contain two main limitations. The claims specify that the aluminosilicate zeolites must have certain X-ray diffraction lines and a certain formula. The X-ray diffraction pattern identifies the crystalline structure of the compounds. The formula defines their chemical composition.

Claims one and three cover only those zeolites having all of the X-ray diffraction lines identified in table 1 of the '886 patent. Table 1 specifies several lines and a margin of error for each one. The relative intensity of the lines is also identified. The parties do not seriously dispute that the X-ray pattern defined in Table 1 correlates to the ZSM–5 structure. Therefore, this limitation requires little construction by the Court.

Recently, the ZSM–5 crystal structure has been designated as "MFI." W.M. Meier & D.H. Olson, *Atlas of Zeolite Structure Types* 100 (2nd ed. 1987). This term was not used at the time the patents were issued. In the interests of avoiding confusion between the structure and the claimed materials, however, the Court will use the term MFI to denote the structure of ZSM–5

compounds or any other compounds with the same topology.

It is the composition limitation of the claims which is vigorously disputed. Although there were a multitude of arguments presented, these arguments were directed toward two main issues: (1) Do the claims require that a minimum amount of aluminum be present in the compositions, and (2) do the claims cover compositions containing framework elements other than silicon, aluminum and oxygen.

### (a) *The Minimum Aluminum Requirement*

■ Claim one recites a silica to alumina ratio, expressed as Y, of "at least five" while claim three specifies a silica to alumina ratio of 5 to 100. As discussed *supra*, a low aluminum content corresponds to a high silica to alumina ratio and a high aluminum content corresponds to a low silica to alumina ratio. For example, an aluminosilicate zeolite with a silica to alumina ratio of 100 would contain less than 1 percent of aluminum. D.I. 126 at 639. Claim three expresses a lower and an upper limit for the silica to alumina ratio. Claim one expresses only a lower limit which corresponds to a maximum amount of aluminum. The question before the Court is whether claim one should be construed to require a minimum aluminum content or upper limit on the silica to alumina ratio. If the Court determines that an upper limit is required, then the Court must determine what value to assign the upper limit.

Both claims one and three are directed toward an "aluminosilicate zeolite." Amoco contends one of ordinary skill in the art in 1969 would understand this term to limit the claims to zeolites containing substantial amounts of aluminum. Amoco suggests that the upper limit on claim one should be construed to be approximately 200. Mobil objects to this construction of the claim.

Claim one contains both the term "aluminosilicate" and the phrase "silica to alumina ratio" which the Court believes would imply to one of ordinary skill in the art in 1969 that the claimed zeolites contained some aluminum. The "alumino" in "aluminosilicate" refers to aluminum. Further-

more, a silica to alumina ratio would be meaningless if a compound contained no aluminum. *Id.* at 721–22. Therefore, the language of claim one indicates that it is limited to materials containing some amount of aluminum.

A review of the patent specification also supports this conclusion. The summary of the invention describes the invention as "a novel family of ultrastable synthetic siliceous materials hereinafter designated as 'Zeolite ZSM-5' or simply 'ZSM-5.'" PX 1, col. 2, lines 13–14. The summary of the invention states that ZSM-5 can be formed using either aluminum or gallium. *Id.* at lines 24–25. The specification states that "ZSM-5 is preferably formed as an aluminosilicate." *Id.*, col. 5, line 74. This suggests that "aluminosilicate ZSM-5" is a subset of ZSM-5 zeolites, specifically a ZSM-5 zeolite containing aluminum and silicon. Therefore, the Court concludes that claim one covers only compounds containing some amount of aluminum.

■ In determining what is the upper limit on the silica to alumina ratio recited by claim one, the Court begins its analysis by examining the language of the claim. The claim specifies a silica to alumina ratio of "at least 5." This implies that there is no upper limit or a limit of infinity on the silica to alumina ratio. Since the presence of some minimal amount of aluminum is required for a compound to be an aluminosilicate, the silica to alumina ratio must have some upper limit that is not infinity. In determining what one of ordinary skill in the art would consider as the upper limit of the ratio, the Court next refers to the remainder of the patent. Claim three, which is dependant upon claim one, recites a silica to alumina ratio of 5 to 100. Because claim one should be construed as providing broader coverage than claim three, the Court concludes that the upper limit on the silica to alumina ratio recited in claim one must be greater than 100.

Nothing in the remainder of the patent states or suggests a specific upper limit for claim one. The summary of the invention states in pertinent part:

The family of ZSM–5 compositions has the characteristic X-ray diffraction pattern set forth in Table 1, hereinbelow. ZSM–5 compositions can also be identified in terms of mole ratios of oxides, as follows:

$$0.9 \pm 0.2 \quad M_{2/n}O{:}W_2O_3{:}5{-}100YO_2{:}z\ H_2O$$

wherein M is at least one cation, n is the valence of said cation, W is selected from the group consisting of aluminum and gallium, Y is selected from the group consisting of silicon and germanium, and z is from 0 to 40.

*Id.*, col. 2, lines 17–27.

The summary of the invention also states that in a preferred form ZSM–5 has the formula "$0.9 \pm 0.2 \quad M_{2/n}O{:}Al_2O_3{:}5{-}100\ SiO_2{:}z\ H_2O$." *Id.*, col. 2, lines 27–30. From this summary, one might conclude that the preferred range for the silica to alumina ratio was 5 to 100.

The table discussing the broad, preferred and particularly preferred embodiments of the compositions, however, does not support this conclusion. The table describes silica to alumina ratios of 5 to 100 as broad and states the preferred range is 10 to 60. *Id.*, col. 5, table 3. The Court concludes that the range of 5 to 100 should be considered the broad range of the silica to alumina ratios. The preferred formula recited in the summary of the invention should be interpreted as a statement that aluminum and silicon are preferred over gallium and germanium for ZSM–5 compositions rather than a statement about preferred silica to alumina ratios.

The examples of the patent support this interpretation. All of the examples of synthesis in the patent recite the addition of an independent aluminum source to the reaction mixture. If one exactly follows the examples set out in the patent, the zeolites produced will have silica to alumina ratios

between approximately 11 and 83. D.I. 129 at 1234.[6]

Based upon the patent as a whole and the differences between claim three and claim one, one of ordinary skill in the art would also understand that the upper limit on silica to alumina ratio of claim one should be greater than 100 and less than infinity. No specific number between these values is suggested by the language of the patent.

The prosecution history of the '886 patent contains information which is relevant to this analysis. PX 723. Prior to the second office action, claim one did not contain a composition formula or the term aluminosilicate. That form of the claim was rejected, *inter alia,* on the ground of insufficient disclosure. The examiner stated the claim placed "no limit on the composition of the zeolite product whereas the specification only discloses the preparation of zeolites having a composition, for example, comprising silica and alumina in molar ratios of from 5 to 100." D.I. 124 at 69.

In response to the examiner, claim one was amended in several respects. The phrase "crystalline aluminosilicate zeolite" was substituted for the phrase "crystalline zeolite compositions", and a composition formula reciting a silica to alumina ratio of "at least 5" was added to the claim. *Id.* at 75. The attorney prosecuting the patent stated:

It is noted that the silica to alumina ratio is recited as being "at least 5" rather than inserting in these claims an upper limit of 100. It is respectfully submitted that to require the applicants to place an upper limit on the silica to alumina ratio would deprive them of a potentially important part of their inventive contribution.

*Id.* at 79.

Claim one eventually issued without an upper limit on the silica to alumina ratio.

---

**6.** The Court's interpretation is also supported by a memorandum dated June 11, 1970, which was written by one of the inventors of the '886 patent. DX 261. The inventor states in pertinent part:

The compositional limits for synthesis of ZSM–5 according to the Patent Information

... have been investigated.... It was found that ZSM–5 can be synthesized easily at [silica to alumina ratios of 5 to 1 and 100 to 1.] Thus, ZSM–5 can be synthesized over the full compositional ranges reported in the patent information.

DX 261.

From this exchange the Court finds support for the proposition that the upper limit on claim one should be substantially higher than 100.

A consideration of the prior art is also helpful in setting an upper limit on the silica to alumina ratio of claim one. Prior to the synthesis of ZSM–5, zeolite beta was the most aluminum poor zeolite known in the art. Zeolite beta can be synthesized with silica to alumina ratios which range from 5 to 150. D.I. 127 at 928. The broadest composition claim for zeolite beta recites a silica to alumina ratio of greater than 5 but less than 100. DX 9, col. 10, lines 38–47. A comparison of claim one of the zeolite beta patent to claims one and three of the '886 patent would suggest to one of ordinary skill in the art that claim one of the '886 patent covered zeolites with silica to alumina ratios which were substantially higher than 100. Amoco relies on the Dwyer and Jenkins patent, U.S. Patent Number 3,941,871, for the proposition that one skilled in the art in 1969 would interpret claim one of the '886 patent to cover only compounds with silica to alumina ratios of 200 or less. The Dwyer and Jenkins patent was filed in 1973 and issued in 1976. DX 59. It is owned by Mobil and is entitled "Crystalline Silicates and Method of Preparing the Same." The Dwyer and Jenkins patent is directed toward MFI zeolites which are essentially free of Group IIIA metals, such as aluminum or gallium. DX 59, col. 2, lines 8–10. The zeolites claimed in the Dwyer and Jenkins patent have silica to alumina ratios in excess of 200. *Id.,* col. 11, lines 45–50.

If the Court could rely on this subsequently filed patent to aid it in interpreting the claims of the '886 patent, this opinion would be substantially shorter. However, the Court believes that such a reliance would be improper. This patent does not fit under any of the sources this Court is to use in construing claims; it is not prior art to the '886 patent nor is it expert testimony of what one of ordinary skill in the art would have known in 1969. Although the facts in this case are distinguishable from the facts in *Water Technologies,* the Court finds the language of the Court of Appeals for the Federal Circuit persuasive:

> We must construe claims "in light of the claim language, the other claims, the *prior* art, the prosecution history, and the specification." We see no reason why arguments made by a different attorney prosecuting *later* patent applications for a different inventor should be used to issue an earlier-issued patent. . . .

*Water Technologies Corp. v. Calco, Ltd.,* 850 F.2d 660, 667 (Fed.Cir.) (citation omitted, emphasis in original), *cert. denied,* 488 U.S. 968, 109 S.Ct. 498, 102 L.Ed.2d 534 (1988). Similarly, this Court sees no reason why the later filed patent should be used to limit the claims of the '886 patent.[7]

The Court also heard expert testimony regarding how one of ordinary skill in the art would have understood these claims. An expert called by Amoco, Dr. Szostak, testified that one of ordinary skill in the art would believe that attempts to synthesize ZSM–5 with silica to alumina ratios above 150 would produce amorphous or non-crystalline material. D.I. 129 at 1236–37. Upon cross examination, this expert conceded, however, that there was nothing in the '886 patent which discouraged one of ordinary skill in the art from attempting such syntheses. *Id.* at 1235.

This expert called by Amoco also testified that one definition of aluminosilicate zeolite requires that there be on average at least one aluminum atom per unit cell of the zeolite. D.I. 130 at 1393–95. The MFI structure has 96 t-atoms in the unit cell. *Id.* at 1400. Therefore, in order for an MFI zeolite to have approximately one aluminum per unit cell, the silica to alumina ratio would have to be approximately 190 or less. D.I. 128 at 1013. If the Court accepted this definition of aluminosilicate,

---

7. While the '886 patent and the Dwyer and Jenkins patent are both owned by Mobil, they have different inventors and were prosecuted by different attorneys. During trial the Court ruled that the prosecution history of the Dwyer and Jenkins patent was not admissible. It was not prior art to the '886 patent and did not qualify as an admission against interest. D.I. 128 at 981–82.

the Court would construe claim one of the '886 patent to have an upper limit on the silica to alumina ratio of approximately 200.

Cross-examination of this witness revealed that the unit cell definition was not widely used in the art in 1969. D.I. 129 at 1218–26. For example, the zeolite beta patent filed in 1964 refers to zeolite beta as an aluminosilicate. DX 9. It is now known that some of the zeolite Beta compositions described in that patent have less than one aluminum atom per unit cell. D.I. 129 at 1226. The witness testified that the issue of what should be properly called an aluminosilicate zeolite did not present itself until 1977 when researchers began making zeolites which contained little or no aluminum. *Id.*

An expert witness called by Mobil, Dr. Cotton, disagreed with much of this testimony. The expert for Mobil testified that a silica to alumina ratio of 100 corresponded to a sample which contained less than one percent of aluminum. D.I. 126 at 639. The expert stated that one of ordinary skill in the art would assume that the aluminum played a negligible role in stabilizing the structure of ZSM–5 because it was present in such small amounts. *Id.* at 643. This expert also disagreed that a unit cell definition was appropriate. He testified that there is no real world significance that can be attached to the value of an average of 1 aluminum atom per unit cell. D.I. 138 at 3245–46.

Construing the upper limit on the silica to alumina ratio of claim one as 200 based upon the evidence presented at trial would be improper. The unit cell of ZSM–5 was not known at the time the '886 patent application was filed or even at the time the patent issued. *See* PX 626. The testimony offered by Amoco did not suggest that anything known in 1969 would lead one of ordinary skill in the art in 1969 to believe that claim one should be limited to that particular number. Therefore, the Court

must reject Amoco's argument that the upper limit of claim one should be construed to be 200.

Nor can the Court accept Mobil's argument that a material is an aluminosilicate if it contains "a detectable amount" aluminum. Due to the advances in the art of chemical analysis, what is detectable in 1991 may not have been detectable in 1969. Allowing the upper limit of claim one to be "the silica to alumina ratio corresponding to a detectable amount of aluminum" would create a claim with a scope that improperly grows over time. *Cf.* 35 U.S.C. § 251 (no reissued patent shall enlarge the scope of claims unless applied for within 2 years of the grant of original patent).

Dr. Cotton testified that one of the characteristic properties of aluminosilicate zeolites is ion exchange. D.I. 126 at 720. It was known in the art in 1969 that the exchangeable cations were associated with the aluminum in aluminosilicate zeolite structures.[8] *See, e.g.*, DX 9, 170; PX 1, background of the invention section. Therefore, if zeolite contained enough aluminum to render the material capable of ion exchange or catalytic activity, then one of ordinary skill in the art in 1969 would be likely to identify the material as an aluminosilicate zeolite.

The Court does not have enough evidence to find the absolute minimum amount of aluminum which would cause this level of activity or the corresponding absolute upper limit on the silica to alumina ratio of claim one. However, the Court did hear evidence indicating that the difference between a silica to alumina ratio of 100 and 2,000 would correspond to only a small difference in the composition of an aluminosilicate zeolite. An aluminosilicate zeolite with a silica to alumina ratio of 100 would contain 46.268 percent silicon and 0.445 percent aluminum by weight; an MFI aluminosilicate zeolite with a silica to alumina ratio of 2300 would contain 46.689 percent silicon and 0.039 percent aluminum

---

8. Cations will associate with other Group IIIA elements which are incorporated into a zeolite framework. That association is discussed in the issue dealing with whether or not the claims are limited to MFI zeolites without significant amounts of framework elements other than aluminum, silicon and oxygen.

by weight. D.I. 126 at 564; PX 1302. The expert also testified that an MFI aluminosilicate zeolite with a silica to alumina ratio as great as 2,000 would exhibit catalytic activity. *Id.* at 655.

Based on this evidence the Court construes the upper limit on the ratio of silica to alumina ratio in claim one to be on the order of 2,000. The Court realizes that an MFI aluminosilicate zeolite with a significantly lower aluminum content might exhibit ion exchange capability or catalytic activity and would be recognized by one of ordinary skill in the art in 1969 as containing aluminum. However, there was insufficient testimony offered at trial to allow the Court to choose any higher silica to alumina ratio.

### (b) *The Absence of Other Framework Elements Requirement*

The next claim construction issue is whether the term aluminosilicate and the compositional formulas in claims one and three of the '886 patent limit the claims to MFI zeolites without substantial amounts of framework elements other than aluminum, silicon and oxygen. Of particular interest to the parties is whether MFI zeolites with framework boron are covered by the claims. Amoco contends that the claims do not cover MFI zeolites with significant amounts of other framework elements. Mobil argues that the claims are open to the inclusion of other framework elements, specifically boron.

### (i) Is "Aluminosilicate Zeolite" Exclusionary?

■■■ The term aluminosilicate zeolite is used many times throughout the patent. The specification of the '886 patent indicates that the term "aluminosilicate zeolite" is a narrower term than "zeolite." *See, e.g.,* PX 1, col. 1, lines 43–45 ("Certain zeolitic materials are ordered porous crystalline aluminosilicates...."); *id.,* col. 5, lines 74–75 ("ZSM–5 is preferably formed as an aluminosilicate").

The patent contains the following description of aluminosilicate zeolites:

Such molecular sieves include a wide variety of positive ion-containing crystalline aluminosilicates, both natural and synthetic. These aluminosilicates can be described as a rigid three-dimensional network of $SiO_4$ and $AlO_4$ in which the tetrahedra are cross-linked by the sharing of oxygen atoms whereby the ratio of the total aluminum and silicon atoms to oxygen is 1:2.

*Id.,* col. 1, lines 55–61.

Amoco argues that the ratio of the total number of aluminum and silicon atoms to oxygen atoms in a zeolite cannot be one to two unless there are no other atoms within the zeolite framework. Mobil contends that this part of the specification merely explains how the t-atoms in zeolites share oxygen atoms to form the framework. Mobil argues that reading this portion of the specification to require the exclusion of other framework atoms would improperly impose a stoichiometric theory of chemistry on zeolite which are non-stoichiometric materials.

The term aluminosilicate is used in all of the claims of the '886 patent including claim fifteen which states in pertinent part: "A method of preparing a crystalline aluminosilicate zeolite as defined in claim 1 which comprises preparing a mixture containing ... an oxide of a metal selected from the group consisting of aluminum and gallium, [and] an oxide of a metal selected from the group consisting of silicon and germanium." *Id.,* col. 15, lines 32–38. Mobil contends that this claim, which contemplates the use of gallium or germanium to synthesize an aluminosilicate zeolite, indicates that aluminosilicate zeolite is not an exclusionary term.

The Court concludes that the term aluminosilicate zeolite is not used in a consistent manner throughout the patent. Part of this inconsistency may be due to the fact that the term aluminosilicate zeolite was added to all of the claims of the '886 patent rather late in the prosecution history of the patent. PX 723 at 75–78. The prosecution history of the '886 patent reveals that claim one was originally rejected under sections 102, 103 and 112. Claim three, which was claim four in the original application, contained a compositional formula when the application was filed. *Id.* at 40. This claim

was rejected under only sections 102 and 103. *Id.* at 67–73. Following the final rejection, the application was amended to insert aluminosilicate throughout the claims. *Id.* at 75–78. The compositional formula was also added to claim one. *Id.* at 77–78. These additions overcame the section 112 rejection but did not overcome the section 102 and 103 rejections. *Id.* at 91.

Amoco contends that this history indicates that the inventors were required to narrow their claims to cover only aluminosilicate zeolites. Citing *Mannesmann Demag Corp. v. Engineered Metal Products Co.*, 793 F.2d 1279 (Fed.Cir.1986). Amoco argues that the claims cannot be construed to cover zeolites containing other framework elements. Mobil denies that the amendments worked a prosecution history estoppel. Citing *Environmental Designs, Ltd. v. Union Oil Co.*, 713 F.2d 693 (Fed. Cir.1983), *cert. denied*, 464 U.S. 1043, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984), Mobil argues that limiting the claims is inappropriate because the amendments were made to overcome the section 112 and not the section 102 or section 103 rejections.

The extent to which a claim is narrowed by an action taken before the Patent and Trademark Office depends upon the nature of the action and the reasons for it. *See Mannesmann Demag Corp.*, 793 F.2d at 1284–85. Because claim three, which contained a compositional formula, was never rejected under section 112, the Court concludes that the formula was more important than the term aluminosilicate in overcoming the section 112 rejection of claim one. Although it is clear that claim one would not have issued without reciting a more definite composition, there is nothing in the prosecution history which indicates that the addition of the term aluminosilicate was a required amendment. Nor is there any indication in the prosecution history of whether the term is open or exclusionary.

A study of the prior art indicates that if other framework elements were present in an aluminosilicate zeolite, then it was customary to specifically mention those elements. For example, the introduction to U.S. Patent Number 3,328,119 issued to Robson in 1967, states that the invention relates to "synthetic crystalline aluminosilicate zeolites containing minor proportions of boria incorporated within their crystal lattice structure." DX 119, col. 1, lines 13–15. In that patent, claim one refers to "a synthetic crystalline aluminosilicate zeolite containing boria as an integral part of its crystal framework." *Id.*, col. 8, lines 38–39. This patent did not use the term aluminosilicate zeolites in an exclusionary manner. However, claims of the patent specifically indicated that the boron was incorporated into the zeolite framework.

The term galliosilicate zeolite as used in U.S. Patent Number 3,431,219 also illustrates this principal. In March of 1969, the patent directed toward galliosilicate zeolites issued to one of the inventors of the '886 patent. DX 180. In that patent, the inventor used the term galliosilicate zeolite to refer to zeolites which contained some gallium and which might or might not contain aluminum. *See, e.g., id.*, col. 1, lines 12–15. Some of the claimed galliosilicates had very small amounts of gallium incorporated into the framework. For example, the number of framework gallium atoms might be as little as one ninth of the number of aluminum atoms.[9] The claims were directed toward galliosilicates which expressly indicates the presence of gallium in the framework of the zeolites.

The expert opinions offered on what one of ordinary skill in the art would have understood by the term aluminosilicate zeolite were contradictory. The experts called by Mobil testified that the term aluminosilicate zeolite did not preclude other elements from being present in the framework. *See, e.g.,* D.I. 124 at 191; D.I. 126 at 657–58. Experts called by Amoco testified

---

9. According to the formula expressed in the summary of the invention, if the mole ratio of gallium oxide was 0.1, then the mole ratio of alumina would be 0.9. Therefore, this particular galliosilicate would have nine times as many framework aluminum atoms as framework gallium atoms.

that aluminosilicate zeolite as used in the '886 patent would exclude the presence of other elements in the zeolite framework. *See, e.g.,* D.I. 133 at 2056; D.I. 137 at 2944–45. It is not clear from the testimony whether the experts were giving their definitions of an aluminosilicate zeolites or the definition that would have been understood by one skilled in the art in 1969. Therefore, the expert witness testimony on this issue was of limited usefulness to the Court.

Although the term aluminosilicate would not suggest that there were absolutely no other framework atoms in the zeolite, it is likely that one of ordinary skill in the art would expect another term such as borosilicate or galliosilicate to be used if the framework of the zeolite contained substantial amounts of other framework elements. This is especially true in light of the fact that the naturally occurring zeolites have substantially only aluminum, silicon and oxygen in their framework. The Court is mindful that this interpretation of aluminosilicate zeolite does not harmonize all of the uses of aluminosilicate zeolite in the '886 patent. However, given contrasting uses of crystalline zeolite and aluminosilicate zeolite in the specification and the practice in the prior art of specifically mentioning other framework elements, the Court believes that the term aluminosilicate would imply to one of ordinary skill in the art in 1969 the absence of substantial numbers of other framework elements.[10]

### (ii) Are the Compositional Formulas Exclusionary?

■ Both claim one and claim three of the '886 patent recite a zeolite having a composition in terms of mole ratios of oxides. These ratios are expressed as formulas. The formula recited in claim one is:

$$0.9 \pm 0.2 \quad M_{2/n}O : Al_2O_3 : Y \quad SiO_2 : z \quad H_2O.$$

The formula recited in claim three is:

$$0.9 \pm 0.2 \quad M_{2/n}O : Al_2O_3 : 5\text{--}100 \quad SiO_2 : z \quad H_2O.$$

The compositional formulas list only aluminum, silicon and oxygen as framework elements of the claimed composition. The expression "$0.9 \pm 0.2 \ M_{2/n}O$" found in both claims refers to the non-framework cations in the zeolite. This expression requires that the claimed zeolite must have 0.7 to 1.1 cation oxides for each alumina. As previously discussed, the "Y" in the formula for claim one and the "5–100" in the formula for claim three, refer to the required silica to alumina ratios.[11] The "$zH_2O$" refers to ratio of the non-framework water molecules to the alumina molecules. Both claims require z to be between 0 and 40. Therefore, both formulas require that there be between 0 and 40 water molecules for each alumina.

Amoco contends that one of ordinary skill in the art would interpret these claims to be closed to other elements. Mobil insists that the compositional formulas do not render the claims closed. Mobil argues that the transitional term "having" in the claims indicates that they are open to the incorporation of other elements.

■ When a claim recites the transitional term "having", it generally indicates that the claim is open. 2 D. Chisum *Patents* § 8.06[1][b] (1991) (having is an open transitional term). An open claim covers any invention which has all the elements of the claim, regardless of whether the invention has elements in addition to those specified in the claim. *See Water Technologies Corp.,* 850 F.2d at 666 (open claim to a resin containing triiodide covers a resin containing triiodide and pentiodide). Therefore, this transitional term supports the proposition that the claims are open to alu-

---

**10.** Amoco also presented evidence from the Dwyer and Jenkins patent, DX 59, with regard to the meaning of aluminosilicate zeolite. As discussed in the section relating to the minimum aluminum requirement *supra,* this patent was filed in 1973, and the Court does not find it probative of what one of ordinary skill in the art would have understood in 1969. Even if the Court considered this evidence, it would not change the Court's construction of the term aluminosilicate zeolite as used in the '886 patent.

**11.** As discussed in the minimum aluminum content section *supra,* Y is defined in claim one as at least five. The Court has construed Y to have an upper limit on the order of 2000.

minosilicate zeolites containing other framework elements.

There is other evidence in the record to support this construction of the claims. For example, a retained sample which was made during the prosecution of the '886 patent contains trace amounts of boron in the aluminosilicate zeolite framework. D.I. 125 at 358, 408–09. Several of the patent examples teach that the synthesis be conducted in pyrex reaction vessels. Apparently, a small amount of the pyrex dissolves during the reaction and the boron in the pyrex becomes incorporated into the zeolite framework. D.I. 126 at 677.

While there is not any real disagreement about the claims covering an aluminosilicate zeolite containing traces of other framework elements, the parties strongly dispute whether composition formulas exclude substantial portions of other framework elements. Once a composition contains a great enough quantity of a substance which is not included in the compositional formula, it is arguable whether or not the material has the claimed formula. For example, assume a hypothetical zeolite sample were analyzed and found to have one alumina molecule, 5,000 boria molecules and 2,000 silica molecules. This zeolite would have a silica to alumina ratio of 2,000. One would have grave concerns about concluding that the formula in claim one truly represented the sample, even though the claim is open.

While the formulas in the claims list only alumina and silica as the oxides in the zeolite framework, the summary of the invention contains a more general formula. It provides in pertinent part:

ZSM-5 compositions can also be identified, in terms of mole ratios oxides, as follows:

$$0.9 \pm 0.2M_{2/n}O{:}W_2O_3{:}5\text{--}100YO_2{:}zH_2O$$

wherein ... W is selected from the group consisting of aluminum and gallium [and] Y is selected from the group consisting of silicon and germanium.

*Id.*, col. 2, lines 19–27. The summary of the invention goes on to state: "In a preferred synthesized form, the zeolite has a formula, in terms of mole ratios of oxides, as follows:

$$0.9 \pm 0.2M_{2/n}O{:}Al_2O_3{:}5\text{--}100SiO_2{:}zH_2O."$$

*Id.*, col. 2, lines 27–30. This contrast implies that the formulas reciting alumina and silica are narrower than the formula with the broader terms of W and Y. From this, one of ordinary skill in the art might construe the claim formulas to cover only samples which do not contain a significant amount of other framework elements.

Claim fifteen casts doubt on this interpretation of the summary of the invention. Claim fifteen is "a method of preparing a crystalline aluminosilicate zeolite as defined in claim 1 which comprises preparing a mixture containing ... an oxide of a metal selected from the group consisting of aluminum and gallium [and] an oxide of a metal selected from the group containing silicon and germanium." *Id.*, col. 15, lines 32–38. Claim fifteen does not expressly limit the amount of gallium or germanium that may be added to the reaction mixture and uses the broader terms W and Y in describing the components of the reaction mixture. Thus, claim fifteen blurs the distinction between "W and Y" and "Al and Si" which is maintained in the specification.

The cation oxide to alumina ratio is another source of ambiguity. As discussed in the background section *supra,* it is the substitution of aluminum for silicon in the zeolite framework which creates an electrical imbalance which must be balanced by non-framework cations. This is not a phenomenon that is unique to aluminum. An electrical imbalance will exist when any group IIIA element is substituted for silicon in the framework. D.I. 126 at 713–14. The group IIIA elements relevant to this opinion are boron, aluminum and gallium.

Each boron or gallium atom inserted into an aluminosilicate zeolite framework will also require a cation to balance the electrical charge associated with that boron or gallium. If the number of boron or gallium atoms in the aluminosilicate zeolite becomes substantial, then the ratio of the total number of cations, those associated with all of the group IIIA elements, to the

alumina molecules will become larger than the ratio of 0.7 to 1.1 recited in the claims.

Amoco argues that all of the cations in a zeolite should be counted in determining if the zeolite has the cation oxide to alumina ratio of 0.7 to 1.1 expressed in claim one. Amoco contends that the cation ratio is a limitation on the composition of the zeolite which excludes any group IIIA element in quantities which would cause the total cation to alumina ratio to exceed the claimed range. Mobil argues that only the cations associated with the aluminum should be counted in calculating this ratio. Under Mobil's theory, the cation to alumina ratio of claim one would be satisfied no matter how many other group IIIA elements were present in the framework of the zeolite because each aluminum will always be accompanied by a cation. Thus, Amoco interprets the cation to alumina ratio as limiting the amount of other group IIIA elements that may be present in the claimed zeolites while Mobil's interpretation of the ratio would not work any limitation.[12]

The Court notes that claim one specifies that "M is at least one cation having a valence n." PX 1, col. 14, line 54. This language indicates that if two or more different exchangeable cations were present in the sample, they should all be counted in calculating the cation to alumina ratio. The claim does not specify, however, whether cations associated with atoms other than aluminum should be counted in calculating the ratio.

Nothing in the remainder of the patent specifically addresses this question. A comparison of the broad and narrow formulas in the summary of the invention, however, reveals that the aluminum and silicon are substituted for W and Y without any change in the cation ratio. Thus, the broad formula calls for an apportionment of the cations between gallium and aluminum while the narrow formula compares all of the cations to aluminum. The differences in these formulas might lead one of ordinary skill in the art to conclude that the total number of cations should be compared against only aluminum to calculate the ratio in the narrower formula. This interpretation is contradicted, however, by claim fifteen. If claim one is construed to require the total number of cations to be compared to only the aluminum in the zeolite framework, then a zeolite made with gallium in accordance with claim fifteen might not be covered by claim one.

To resolve the effect of the failure of the formulas to list other framework elements and to determine the proper interpretation of the cation oxide to alumina ratio, the Court must consider sources in addition to the language in the patent. As discussed previously, the prosecution history indicates that the addition of the formula to claim one overcame the section 112 objections to claim one raised by the examiner. The meaning of the cation oxide to alumina ratio, however, was never specifically addressed in the prosecution history. Nor was there any issue raised with regard to whether gallium or germanium should be specifically mentioned in claim one. For example, the general formula in the summary of the invention was not inserted into claim one and rejected during the patent

12. An example may clarify this point. Assume a hypothetical zeolite is tested and it is found that the zeolite contains 1 million alumina molecules, 2 million boria molecules, 5 million silica molecules and 3 million sodium oxide molecules. As discussed previously, the silica to alumina ratio would be 5 (5,000,000/1,000,000 = 5). Both parties agree that two-thirds of the sodium oxide would be associated with boria and one-third would be associated with alumina.

Amoco contends that all of the sodium oxide should be compared to the alumina. This results in a cation oxide to alumina ratio of 3 (3,000,000/1,000,000 = 3). Because there is so much boria in the sample, the ratio would not be in the range of 0.7 to 1.1. Therefore, under Amoco's interpretation, the cation oxide to alumina ratio of the formula would not be satisfied and this zeolite would not be covered by the claims.

Mobil argues that the formula contemplates that one will apportion the cations between the alumina and boria before calculating the ratio. Only one-third of the sodium oxide would be compared to the alumina. This would result in a cation oxide to alumina ratio of 1 (1,000,000/1,000,000 = 1). This method of calculating the cation oxide to alumina ratio renders it insensitive to the presence of other framework group IIIA elements.

prosecution. The patent prosecution, therefore, is of little value in resolving this conflict.

The prior art is helpful in determining how one of ordinary skill in the art would interpret the absence of other elements in the formulas and the cation to alumina ratio. Claim one of the galliosilicate zeolite patent issued to Argauer in March of 1969 claims:

[a] synthetic crystalline sodium galliosilicate zeolite having a composition expressed in terms of oxide mole ratios as follows:

$$0.9 \pm 0.2 \quad Na_2O : yGa_2O_3 : z \quad Al_2O_3 : wSiO_2 : xH_2O$$

wherein z equals 0 to 0.9, y equals 0.1 to 1, y + z equals 1, w equals in excess of 3 to 6, and x equals 3 to 12. . . .

U.S. Patent Number 3,341,219, DX 180, col. 9, lines 59–62.

If z were 0, the lower end of the claimed range, there would be no aluminum in the zeolite. Thus, this claim recites alumina as one of the framework elements of the zeolite even though the claim contemplates that there may be no aluminum in the composition and even though the claim uses the open transitional term "having." Aluminum is extremely common in zeolites and, if any element could be presumed to be present without being specifically mentioned, the Court believes aluminum would be such an element. The Court finds the recitation of alumina in the formula to be persuasive evidence that one of ordinary skill in the art in 1969 would expect all framework elements to be listed in the compositional formula.

Claim one of the galliosilicate zeolite patent also contains a cation formula which explicitly compares the number of cation oxides in a zeolite to a mixture group IIIA oxides. The cation in the formula of claim one is expressed as $Na_2O$. By stating that y + z equals one, claim one specifies that the cation ratio compares the amount of $Na_2O$ to the sum of the ratios of gallium oxide and alumina.

Similarly, the alumino-borosilicate patent issued to Robson in June of 1967, claim five recites the following formula:

$$0.9 \pm 0.2 \quad M_{2/n}O : (1–Y) \quad Al_2O_3 : XSiO_2 : YB_2O_3$$

U.S. Patent Number 3,328,119, DX 119, col. 8, line 62. This formula, using a slightly different method, recites a cation ratio which compares the total number of cations to the alumina and boria in the framework of the zeolite.

Given the manner in which the cation oxide ratio was expressed in the prior art, the absence of any mechanism to apportion the cations in the formulas of the '886 patents would be likely to lead one of ordinary skill in the art to assume that the all of the cations should be compared to aluminum in calculating the cation to alumina ratio. This is especially true when the formula in the claims is contrasted with the broad formula in the summary of the invention.

The expert testimony was split on the issue of how one of ordinary skill in the art would interpret the formulas in the claims of the '886 patent. Dr. Cotton testified that the '886 patent teaches one of ordinary skill in the art that other elements could be substituted for aluminum and silicon in the framework. D.I. 126 at 662–63. He also testified that the theoretical ratio of cation oxide to alumina is one. However, because there is difficulty in measuring cations and because there are lattice imperfections, the measured ratio is never exactly one. *Id.* at 688–89; D.I. 138 at 3311–14. Dr. Cotton testified that it is not good zeolitic chemistry to assume that all of the cations are associated with aluminum in a zeolite which contains other group IIIA elements. D.I. 126 at 686. The proper way to proceed would be to "have some knowledge of how many aluminum atoms, boron atoms, gallium atoms, whatever other atoms might need an accompanying cation, look at the total number of cations and recognize that some of them go with this T-atom, some go with another one and so forth." *Id.* at 687.

Dr. Szostak agreed that the cations can be apportioned in zeolites containing more than one group IIIA element. However, she believed that the ratios expressed in the '886 patent referred to the ratio of the total number of cations compared to the

alumina. This expert testified that one of ordinary skill in the art of zeolites would interpret the formula recited in claim one to exclude substantial amounts of other framework elements because no other elements were listed and because large amounts of other group IIIA framework elements would throw the cation to alumina ratio out of the range of 0.7 to 1.1. D.I. 128 at 1038–41. This expert, who was too young to be a practicing zeolite chemist in 1969, relied upon literature references and patents to reach her conclusion.

Based primarily upon the language of the claims, the remainder of the patent and the patents that existed at the time the '886 patent issued, the Court concludes that the formulas in the '886 patent are exclusionary. The practice in the art was to list all substantial components of the zeolite framework in the formula even if that component might not be present in every manifestation of the patented composition. Given the broad formula in the specification which clearly claimed gallium and germanium as well as aluminum and silicon, and the use of the more narrow formula reciting only aluminum and silicon in claims one and three, the Court concludes that these claims do not cover compositions containing substantial amounts of framework elements other than aluminum, silicon and oxygen.

The Court finds that the cation oxide to alumina ratio limits the claims to compositions where the ratio of the total number of cation oxides compared to the number of alumina oxides is between 0.7 and 1.1. The Court notes that the cations can be assigned to their appropriate group IIIA element. However, the claims of the '886 patent do not suggest such an apportionment. In contrast, there are examples of formulas in the prior art which clearly indicate that cations are to be apportioned. Given the broad formula in the summary of the invention which relates the cations to either aluminum or gallium and the failure of the formulas in claims one and three to

use any type of apportionment, the Court concludes that apportionment was not necessary or contemplated. These formulas, read in the context of the entire patent and the prior art, would lead one of ordinary skill in the art to conclude that the claims did not describe compounds containing substantial amounts of other framework elements.[13] With regard to group IIIA elements, the Court defines substantial to mean an amount which would cause the total cation oxide to alumina ratio to exceed the claimed range of 0.7 to 1.1.

### (c) *Do the Claims Contemplate the Addition of Boron?*

■ Although the issue has been implicitly resolved by the Court's decision regarding the exclusionary nature of the formulas in claims one and three of the '886 patent, the Court will next consider whether the claims could properly be construed to cover MFI zeolites containing substantial amounts of boron. Amoco argues that even if the claims are open, they cannot fairly be construed to cover zeolites containing substantial amounts of boron. Mobil contends that the claims do cover MFI zeolites containing substantial quantities of boron.

As discussed previously, Mobil submitted evidence showing that a retained sample prepared during the prosecution of the '886 patent contained minor amounts of boron incorporated into the framework. This evidence is not probative of how one of ordinary skill in the art would have understood the claims of the '886 patent.

Boron is not mentioned in any of the claims of the patent nor in the specification. None of the examples teach the intentional addition of a boron containing compound to the reaction mixture. The phrase "group IIIA element", which is a set of elements including boron, is not used in the patent either. The broad formula in the summary of the invention expressly states that aluminum, gallium, germanium and silicon may be incorporated into the

---

**13.** The Court realizes that claim fifteen cannot be read in complete harmony with this interpretation of claims one and three. The language of claim fifteen standing alone, however, is insuffi-

cient for the Court to be persuaded that any other interpretation of the compositional formulas in claims one and three is appropriate.

MFI framework. Thus, an inspection of the patent does not expressly teach the addition of substantial amounts of boron to the MFI structure and certainly does not expressly claim such a compound. Nor does the prosecution history contain any reference to boron.

Boron incorporation into a zeolite framework was known in the art in 1969. A United States Patent issued to Robson in 1967 was directed toward alumino-boro-silicate zeolites. U.S. Patent Number 3,328,-119, DX 119. In contrast to the '886 patent, the Robson patent mentions boria repeatedly throughout the specification and includes a reference to boron in each claim. Similarly, the galliosilicate zeolite composition patent issued to Argauer in March of 1969 contains repeated references to gallium. U.S. Patent Number 3,431,219, DX 180.[14]

In light of the practice in the prior art, the failure of the '886 patent to expressly mention boron or a broad group which would include boron leads the Court to conclude that even if the claims of the '886 patent were construed to cover compounds containing substantial amounts of gallium and germanium, the claims could not be fairly construed to cover MFI zeolites containing substantial amounts of boron.[15]

In summary, claim one of the '886 patent is limited to aluminosilicate zeolites with the MFI structure which contain enough aluminum to have a silica to alumina ratio which is on the order of 2,000 or less. The claim is open to incorporation of minor amounts of other framework elements but the claim does not cover MFI aluminosilicate zeolites which contain enough boron or other group IIIA elements to cause the total cation oxide to alumina ratio to fall outside the claimed range of 0.7 to 1.1.

Claim three is limited to an upper silica to alumina ratio of 100. In all other respects the limitations of claim three are identical to those of claim one.

3. Claims of the '857 Patent

The '857 patent is entitled "Conversion with ZSM–5 Family of Crystalline Aluminosilicate Zeolites." United States Patent Number Re. 29,857, PX 729. The '857 patent is a reissue of patent number 3,790,471. It was reissued to Argauer and Landolt on December 5, 1978. The original claims of '857 patent and the original claims of the '886 patent were both filed in application serial number 865,472. After the patent office required a restriction of the claims, the '857 patent was prosecuted as a divisional of that application. Therefore, the '857 patent, like the '886 patent, is a c-i-p of abandoned application serial number 630,933.

Mobil contends that Amoco infringed claims one and two of the '857 patent. Claim one states:

[What is claimed is a] process for converting a hydrocarbon charge which comprises contacting the same under hydrocarbon conversion conditions with a catalyst resulting from thermal treatment of a crystalline aluminosilicate zeolite having a composition in terms of mole ratios of oxides as follows:

$$0.9 \pm 0.2 \ M_{2/n}O{:}Al_2O_3{:}Y \ SiO_2{:}z \ H_2O$$

wherein M is at least one cation having a valence n, Y is at least 5 and z is between 0 and 40, said thermally treated aluminosilicate zeolite having the X-ray diffraction lines of Table 1 of the specification.

Argauer '857 Patent, PX 729, col. 16, lines 35–47.

---

**14.** The experts who testified at trial were in disagreement with regard to whether the incorporation of boron into the MFI framework would have been obvious to one of ordinary skill in the art in light of the prior art and the reference to gallium in the '886 patent. The Court will consider this issue in depth when it analyzes the issue of infringement under the doctrine of equivalents. At this point the Court merely notes that what might be obvious in light of the teaching of a patent does not answer the question of what the patent claims.

**15.** An expert for Mobil testified that the patent did contain a reference to boron containing compounds, namely, the pyrex reaction vessels. D.I. 126 at 669–70. The Court finds, however, that the leaching of boron from pyrex into the zeolite sieve was not known during the relevant time period.

Claim two provides: "[What is claimed is the] process of claim 1 wherein Y is 5–100." *Id.*, col. 16, line 48.

Thus, claim one of the '857 patent is directed toward hydrocarbon conversion processes which contain at least the following elements: (1) the hydrocarbon charge must be contacted with a catalyst; (2) under hydrocarbon conversion conditions; and (3) the catalyst must be a thermally treated aluminosilicate zeolite having the structure and composition specified in the claim. Claim one of the '857 patent is the process analogue of claim one of the '866 composition patent. Similarly, claim two of the '857 patent is the process analogue of claim three of the '886 patent.

As one might expect, the only disputed element of the '857 patent claims is the element relating to the composition and structure of the catalyst. Fortunately, the analysis the Court conducted to resolve the scope of the '886 patent claims also resolves the scope of the '857 claims. Therefore, the Court construes claim one to cover any hydrocarbon conversion process which, under hydrocarbon conversion conditions, contacts the hydrocarbon with a thermally treated catalyst covered by claim one of the '886 patent. Similarly, claim two of the '857 patent covers any hydrocarbon conversion process which, under hydrocarbon conversion conditions, contacts the hydrocarbon with a thermally treated catalyst covered by claim three of the '886 patent.

### 4. Claims of the '872 Patent

■ The application for the '872 patent was submitted to the Patent and Trademark Office ("PTO") on September 13, 1973, and the patent issued to Morrison on December 24, 1974. U.S. Patent Number 3,856,872, PX 727. It is entitled "Xylene Isomerization." The abstract describes the invention as follows:

An improved catalyst for use in Octafining plaints is characterized by a zeolite of the ZSM–5 type of (sic) ZSM–12 or zeolite ZSM–21. With substitution of a zeolite catalyst for platinum on silica alumina, the process operates at very high space velocities as calculated with respect to the active zeolite component of the catalyst.

Morrison '872 Patent, PX 727, abstract.

Mobil alleges that Amoco infringes claim six of the patent which states:

[I claim a] process for the isomerization of xylenes in a mixture of xylenes with ethyl benzene which comprises contacting a $C_8$ aromatic fraction containing both xylenes and ethyl benzene in vapor phase admixed with hydrogen with a zeolite catalyst of the ZSM–5 type or zeolite ZSM–12 or zeolite ZSM–21 at a temperature of 550° to 900°F., a pressure of 150 to 300 pounds per square inch and a weight hourly space velocity with respect to said zeolite alone betwen (sic) 1 and about 200.

*Id.*, col. 12, lines 49–57.

Claim six is drawn to a process for isomerizing xylenes in a mixture of xylenes with ethyl benzene which has at least the following elements: (1) the mixture must be in the vapor phase; (2) the mixture must be admixed with hydrogen; (3) the mixture must be contacted with a zeolite catalyst of the ZSM–5 type or zeolite ZSM–12 or zeolite ZSM–21; (4) the temperature must be between 550° and 900°F; (5) the pressure must be between 150 and 300 pounds per square inch; and (6) the weight hourly space velocity with respect to the zeolite alone must be between 1 and about 200. PX 1241.

Only the meaning of the third element is disputed. Predictably, the parties dispute the meaning of a zeolite catalyst of the ZSM–5 type. Amoco argues that ZSM–5 type catalysts are only those catalysts using an aluminosilicate zeolite claimed in the '886 composition patent. Mobil contends that a catalyst of the ZSM–5 type are those catalysts made with a zeolite having the MFI structure.

The Court begins its analysis by noting that claim six refers to a zeolite catalyst of the "ZSM–5 type" or "zeolite ZSM–12" or "zeolite ZSM–21." Because only ZSM–5 receives the modifier of "type", the language of the claim implies that "ZSM–5 type" describes a larger group of zeolites than ZSM–5. In addition, claim six speci-

fies a "zeolite catalyst" rather than "an aluminosilicate zeolite catalyst." This also indicates that "ZSM–5 type" is not limited to the ZSM–5 zeolites claimed in the '886 patent.

The specification of the '872 patent states: "Catalysts of the ZSM–5 type include ZSM–5 as described in Argauer and Landolt Pat. No. 3,702,886, dated Nov. 14, 1972 and ZSM–11 as described in Chu Pat. No. 3,709,979 dated Jan. 7, 1973 and variants thereon." PX 727, col. 4, lines 50–55. The specification says ZSM–5 type catalysts include those zeolites *described* by the '886 patent. What a patent describes is not necessarily equivalent to what a patent claims. In addition, a ZSM–5 type zeolite also includes the zeolite ZSM–11 which was not described until 1973. Finally, the ZSM–5 type catalysts includes variants on the ZSM–5 and ZSM–11 zeolites. This statement in the specification would lead one of ordinary skill in the art to conclude that the inventor was using the term "catalysts of the ZSM–5 type" to include more than catalysts made with the ZSM–5 zeolites claimed in the '886 patent.

A review of the remainder of the patent reveals that the term zeolite is never modified by the term aluminosilicate. This can be interpreted two ways: (1) the inventor did not intend to be limited to only aluminosilicate zeolites; or (2) the inventor assumed the term zeolite implied that the material was an aluminosilicate. Without reference to sources outside the patent, it is difficult to interpret how one of ordinary skill in the art would have interpreted the failure of the patent to specify an aluminosilicate zeolite.

The term "variant" is not defined in the patent. Amoco suggests that variant refers to impregnating the ZSM–5 zeolite with hydrogenating metal or introducing a porous matrix, such as alumina or diluent solid into the zeolite. Amoco relies on lines 41 through 62 of column 7 of the '872 patent which discusses several preferred embodiments of the catalyst. The Court is not convinced that this portion of the specification supports such a definition of variant. The patent does not refer to variants of ZSM–12 or ZSM–21, yet the impregnation of the catalyst with metal is apparently preferred for all catalysts, not just those of the ZSM–5 type. PX 727, col. 7, lines 41–52. The remainder of the cited section discusses how to best achieve the high space velocities characteristic of the ZSM–5 type catalyst. This section of the patent refers to ZSM–5 in an alumina matrix as a "compound catalyst." This passage suggests that a ZSM-type catalyst is not equivalent to ZSM–5 compounded with alumina.

None of the witnesses who testified at trial discussed the prosecution history of the '872 patent. The Court has reviewed the prosecution history and found it to be of no value in resolving this issue. PX 728.

The prior art in 1973 obviously included the Argauer and Chu patents. Although this Court has construed the *claims* of the '886 patent to be limited to aluminosilicate zeolite compounds containing less than substantial amounts of other framework elements, it is clear that the specification of the '886 patent *describes* MFI zeolites which may contain significant amounts gallium and germanium. The Chu patent is directed toward ZSM–11 zeolites. Thus, a ZSM–5 type catalyst at least includes two zeolites which were different enough to be the subjects of different patents.

As discussed in the claim construction of the '886 patent section *supra,* the prior art contained several examples of zeolites containing substantial amounts of framework elements other than aluminum, oxygen and silicon. In addition to the '886 patent, Argauer's galliosilicate patent and Robson's aluminoborosilicate patent, DX 180 and DX 119 respectively, were in the prior art in 1973.[16] Therefore, it is likely that one of ordinary skill in the art would conclude that the absence of the modifier aluminosi-

---

16. Mobil also introduced an article published in *Materiale de Constructie* in 1973 which describes incorporation of boron into the molecular sieve with a faujusitic structure. PX 862. Because the publication does not specify the month in which it was published, the Court cannot determine if it would be prior art to the Morrison patent which was filed in September of 1973. Therefore, the Court will not consider this article in construing claim six of the '872 patent.

licate meant that ZSM–5 type zeolites included zeolites with substantial amounts of framework elements other than aluminum, silicon and oxygen.

The Octafining process is discussed extensively in the '872 patent. One of ordinary skill in the art would be likely to conclude that the '872 patent's contribution to the art was the knowledge that the shape selectivity of several different synthetic zeolites could be used to improve the yields in simultaneous xylene isomerization/ethyl benzene conversion reactions.

The prior art introduced at trial supports the proposition that one of ordinary skill in the art would not expect a catalyst of the ZSM–5 type to be limited to catalysts described only in the '886 patent. This prior art does not address whether one of ordinary skill in the art would interpret the phrase ZSM–5 type as synonymous with a zeolite having the MFI structure.

Three different expert witnesses called by Mobil testified that a ZSM–5 type zeolite is one which has the X-ray pattern of ZSM–5. As discussed previously, the X-ray pattern identifies the structure or topology of the zeolite. Dr. Hughes testified that his definition of a ZSM–5 type zeolite was a zeolite having the an X-ray pattern similar to the pattern described in the '886 patent and having some aluminum and silicon in the framework. D.I. 124 at 190–91. Mr. Schwartz testified that one of ordinary skill in the art in 1973 would understand a ZSM–5 type zeolite to be one with the same topology as ZSM–5. *Id.* at 250. Dr. Cotton testified that one of ordinary skill in the art, armed with the knowledge that a material was an aluminosilicate, would identify it as a ZSM–5 type material if the X-ray pattern matched the pattern in the '886 patent. D.I. 127 at 777–78.

Dr. Szostak testified that ZSM–5 type meant ZSM–5 or ZSM–11. Apparently this opinion was based upon a review of the prosecution history of the '872 patent and the fact that the term ZSM–5 type was not defined in the '886 patent. D.I. 128 at 1089–90. This witness did not specifically state how one of ordinary skill in the art would interpret the phrase ZSM–5 type.

Another expert witness called by Amoco, Dr. Cheetham, testified that there were differences in the X-ray diffraction patterns between ZSM–5 and ZSM–11. From this information, the witness concluded that defining a ZSM–5 type zeolite solely by its X-ray diffraction pattern would not be sound. D.I. 137 at 3017–18.

The Court finds the testimony of the experts called by Mobil more persuasive on this point. The Court found nothing in the prosecution history of the '872 patent which suggests that the term ZSM–5 type should be limited to only the compounds described in the ZSM–5 and ZSM–11 patents. The fact that the definition of the ZSM–5 type zeolite specifies zeolites with two different structures does not necessarily mean that a ZSM–5 type cannot be defined by structure alone. This could be an indication that the phrase ZSM–5 type is intended to cover two different zeolite frameworks.

Based upon the language of the patent, the prior art, and expert testimony, the Court concludes that one of ordinary skill in the art in 1973 would classify a zeolite as a ZSM–5 type zeolite if the zeolite had (1) the X-ray diffraction pattern specified in the '886 patent or the Chu patent; and (2) exhibited ion exchange capability or catalytic activity attributable to framework aluminum. Thus, one of ordinary skill in the art would define ZSM–5 type to include a broader range of zeolites than those described in the '886 patent.

5. Claims of the '573 Patent

The application for the '573 patent was filed on February 5, 1976, and the patent issued to Kaeding on September 20, 1977. U.S. Patent Number 4,049,573, PX 725. The patent is entitled "Zeolite Catalyst Containing Oxide of Boron or Magnesium." The summary of the invention provides that "[t]he present process involves ... a catalyst comprising a crystalline aluminosilicate zeolite, which zeolite has a silica to alumina ratio of at least about 12 and ... said catalyst having combined therewith boron oxide...." PX 725, col. 1, lines 11–21. The examples of the patent teach that

the claimed catalyst is prepared by reacting an already formed aluminosilicate zeolite with a source of metal oxide.

Claims one, two and eight are at issue in this case. Claim one states:

[I claim a] catalyst composition comprising a crystalline aluminosilicate zeolite, said zeolite having a silica to alumina ratio of at least about 12, a constraint index within the approximate range of 1 to 12, and having combined therewith:

1. between about 0.25 and about 25 percent by weight of boron oxide; or

2. between about 0.24 and about 5 percent by weight of boron oxide in combination with between about 2 and about 15 percent by weight of magnesium oxide; or

3. between about 0.25 and about 10 percent by weight of phosphorous oxide in combination with between about 0.25 and about 25 percent by weight of boron oxide or magnesium oxide; or

4. between about 0.25 and about 10 percent by weight of phosphorous oxide in combination with between about 0.25 and about 5 percent by weight of boron oxide and between about 2 and about 15 percent by weight of magnesium oxide.

*Id.*, col. 18, lines 13–32.

The catalyst described by claim one must have at least the following elements: (1) a crystalline aluminosilicate zeolite; (2) the zeolite must have a silica to alumina ratio of at least approximately 12; (3) the zeolite must have a constraint index in the approximate range of 1 to 12; and (4) the zeolite must be combined with one or more oxides as specified in the claim. Only number 1 of claim one, which specifies that the zeolite be combined with between 0.25 and 25 percent by weight of boron oxide, is relevant in this litigation.

■ The parties dispute whether claim one of the '573 patent covers zeolites which contain substantial amounts of other elements incorporated into the framework. Mobil contends that the patent covers an aluminosilicate zeolite containing the specified weight of boron, regardless of whether the boron is within the framework of the zeolite or merely imbedded in the pores of the crystal. Amoco contends that the claim covers only zeolites with aluminum, silicon and oxygen in the framework with the appropriate amount of boron present as a non-framework species.

Claim two states: "[I claim the] catalyst composition of claim one wherein said crystalline aluminosilicate zeolite is ZSM-5." *Id.*, col. 18, lines 33–34. Determining the scope of this claim requires determining the meaning of ZSM-5 as it is used in this claim.

Claim eight provides: "[I claim the] catalyst composition of claim 1 wherein said zeolite has combined therewith between about 0.25 and about 15 percent by weight of boron oxide." *Id.* at col. 18, lines 51–53. Therefore, a construction of claim eight is similar to a construction of claim one; only the amount of boron oxide that must be present is different.

The Court begins its analysis by noting that all of the claims of the patent include the modifier aluminosilicate to describe the zeolite. The patent does not contain a definition of aluminosilicate zeolite nor is it discussed in the prosecution history of the patent.

In 1974, a respected researcher in the field, Dr. Breck, published a book which stated: "actual incorporation of Boron into a zeolite structure has not been achieved." DX 1122 at 322. Dr. Szostak and Dr. Cheetham testified that one of ordinary skill in the art in the mid-seventies would not expect boron insertion into a zeolite framework. D.I. 128 at 965–68; D.I. 133 at 2047–50. It would be unlikely for one of ordinary skill in the art to interpret the term aluminosilicate zeolite more broadly in 1977 than in 1969. Therefore, the Court concludes that the term aluminosilicate zeolite refers to zeolites having only insubstantial amounts of framework elements other than aluminum, silicon and oxygen.

■ The next issue is whether anything in the patent would lead one of ordinary skill in the art to expect that the aluminosilicate zeolites in the claims contained substantial amounts of other elements in their frameworks. The patent is silent with re-

gard to how or where the metal oxide, such as boron oxide, is incorporated into the zeolite. The summary of the invention states only that "[c]ompounds which modify the active specified crystalline aluminosilicate zeolite in accordance with the present invention include boron oxide, magnesium oxide, a mixture of boron oxide and magnesium oxide, boron oxide and phosphorous oxide, magnesium oxide and phosphorous oxide or boron oxide, magnesium oxide and phosphorous oxide." *Id.*, col. 1, lines 21–27. There is no suggestion in the patent that the metal oxides become incorporated into the framework of the zeolite.

The issue of whether the metal oxides were incorporated into the zeolite framework was not addressed during the prosecution of the patent. PX 726. Therefore, the prosecution history is not helpful in resolving this question.

There was no evidence presented at trial that the prior art in 1976 contained any references suggesting that magnesium or phosphorous could be incorporated into a zeolite framework. Furthermore, the references suggesting that boron could be incorporated into a zeolite framework were limited. The Robson patent discussed boron incorporation by adding boron during the synthesis of the zeolite not after the zeolite was formed. DX 119. The Court was presented with no references from the prior art which suggested elements could be incorporated into a zeolite framework by using a process similar to that described in the '573 patent.

Dr. Olson and Dr. Oldfield testified that a sample prepared according to an example of the patent contained framework boron. D.I. 125 at 358–59, 410. This does not, however, address the issue of what was known or claimed in 1976. An expert called by Amoco testified that one of ordinary skill in the art would have understood the metal oxides to be in the pores of the zeolite rather than in the framework. D.I. 128 at 1097–1100.

Based upon the specification, the prior art and the expert testimony, the Court concludes that the claimed catalysts are aluminosilicate zeolites which were combined with metal oxides rather than zeolite catalysts containing substantial amounts of other framework elements. Therefore, the claims do not cover catalysts containing zeolites with substantial amounts of elements other than aluminum, silicon and oxygen in their frameworks.

In order for a catalyst to be covered by claim one of the '573 patent the catalyst must contain a zeolite with insubstantial amounts of framework elements other than aluminum, silicon and oxygen and contain between .25 and about 25 percent by weight of boron oxide incorporated with the zeolite. Furthermore, the zeolite must have a silica to alumina ratio of at least 12 and a constraint index of approximately 1 to 12. For a catalyst to be covered by claim eight of the '573 patent, the same elements must be met, except that the amount of incorporated boron oxide must be between .25 and 15 percent by weight. Claim two parallels claim one except it has the restriction that the aluminosilicate zeolite must be ZSM–5. This claim requires the zeolite to have the ZSM–5 structure and to contain insubstantial amounts of framework elements other than aluminum, silicon and oxygen.

Having completed a construction of all of the claims at issue in this litigation, the Court moves now to the second step of the infringement analysis: comparing the allegedly infringing products to the construed claims.

## B. *Analytical Techniques Used to Make the Comparison*

The parties relied on several analytical techniques to characterize the ZSM–5 zeolites, ZSM–5 catalysts, AMS–1B sieves and AMSAC catalysts. These techniques included X-ray diffraction, nuclear magnetic resonance (NMR), infrared spectrometry (IR) and temperature programmed desorption (TPD).

X-ray diffraction is a technique which is used to gain information about the structure of a zeolite. The basic idea behind X-ray diffraction is that when a sample such as a zeolite is bombarded with X-rays, the x-rays will be scattered off of the small

structural features in the crystal. This scattering of the X-rays produces a pattern. These patterns are interpreted by scientists and reveal information about the crystal structure of the sample. D.I. 126 at 616. Samples with the same crystal structure will have the same or similar x-ray diffraction patterns. *Id.* at 617.

While X-ray diffraction is primarily used to gain information about the structure of a compound, it can also be used to glean some information about the identity of the elements that make up the structure. Experts from both Mobil and Amoco agreed that as more boron is added to the MFI framework, the unit cell becomes smaller. *See* PX 1289; DX 1275; D.I. 137 at 2968–69. This smaller unit cell produces an X-ray diffraction pattern which is slightly shifted relative to the X-ray diffraction pattern of an MFI zeolite without boron in the framework.[17]

NMR is a technique that can be used to gain compositional and structural information about a sample. NMR involves the use of high power magnetic fields to study the nuclei of atoms in samples. The nuclei of certain atoms will behave like tiny ball magnets when placed in a strong magnetic field. In NMR, the instrument is basically a radio transmitter and radio receiver. The spectra obtained are plots of either emission or absorption of a radio wave of a certain frequency. Different elements respond at very different radio frequencies. D.I. 125 at 319–21.

There are several parameters that can be measured by NMR to gather information about the environment surrounding an atom of interest. The number of peaks in a spectrum of a sample is one parameter. Another parameter is the frequency of the peaks or signals in a spectrum. This parameter is also called the chemical shift. The width of this line, measured at one half of the height of the peak, also provides information about the sample. This width can be measured two ways: the spinning line width is the width of the peak measured when the sample is spinning very fast, approximately one third of a million revolutions per minute; the static line width is the width of the peak measured when the sample is not spinning. In general, spinning the sample narrows the peaks and provides better resolution of the spectrum. *Id.* at 322–23. The rate the signal decays can also be measured. This is called the $t_2$ value of the signal. Another parameter, which is quite complicated but useful to NMR experts, is called a quadropole coupling constant. *Id.* at 320–321.

IR involves irradiating a sample with varying frequencies of infrared light and measuring the absorbance of the light at particular frequencies. Unlike NMR, which can directly measure aluminum and boron, IR indirectly measures framework aluminum in zeolites. Scientists have learned that an absorption at 3610 cm$^{-1}$ is characteristic of a hydroxyl group attached to framework aluminum in a zeolite with the MFI structure. *Id.* at 451. Therefore, a signal at this frequency in an IR spectrum is a strong indication that the zeolite contains framework aluminum. IR spectroscopy is not a useful method for detecting framework boron. D.I. 133 at 2077.

TPD, like IR, does not directly measure the contents of the zeolite framework. TPD analysis involves treating a zeolite sample to ensure that all the exchangeable cations which may be present are replaced with a cation containing nitrogen, such as ammonium. The sample is heated, with the temperature rising at a controlled rate. Eventually, ammonia is released from the cations. The detector in the TPD equipment measures the amount of ammonia released and the temperatures at which the ammonia is released. Theoretically, cations associated with one framework element, such as aluminum, will release an ammonia at a different temperature than cations associated with another framework

---

**17.** Even though the Amoco materials may have slightly shifted X-ray diffraction patterns, Amoco does not dispute that the X-ray diffraction patterns fall within the ranges recited in Table I of the '886 patent.

element, such as boron. D.I. 132 at 1999–2002.[18]

In general, the AMSAC and ZSM–5 catalysts are more difficult to analyze than the ZSM–5 and AMS–1B zeolites. This is due to the aluminum that is present in the binder of the catalyst. A signal from this non-framework aluminum, sometimes called amorphous aluminum, often interferes with a signal from the aluminum in the zeolite portion of the catalysts. In an effort to overcome this problem, the experts have relied on two main techniques: physically removing the binder from the catalyst and electronically subtracting the signal due to the binder from the spectra.

At some point during the investigation of the materials, scientists from Amoco became concerned that certain techniques that were used to physically remove the binder actually caused an insertion of aluminum into the framework of the AMS–1B sieves. An expert called by Amoco presented evidence at trial which indicated that HCl extraction did cause aluminum insertion into the AMS–1B sieve framework. *Id.* at 1986–91; DX 1163, 1164, 1169, 1171. Amoco notified Mobil of this problem and an alternative method of removing the binder, through the use of acetyl acetone ("AcAc"), was developed. AcAc extraction of the binder from the catalysts neither inserts nor removes framework aluminum.[19]

## C. *Literal Infringement*

In order for Mobil to prevail on its claim that Amoco literally infringes Mobil's patents, Mobil must establish by a preponderance of the evidence that every limitation set forth in the claims is exactly present in the accused products and processes. *Jurgens*, 927 F.2d at 1560.

### 1. The '886 Patent

In order to establish that the AMS–1B sieves and AMSAC catalysts literally infringe claim one of the '886 patent, Mobil must prove that: the sieves and the zeolite portion of the catalysts have the X-ray diffraction pattern of table 1 of the '886 patent, the sieves and the zeolite portions of the catalysts meet the minimum aluminum limitation as described by silica to alumina ratios and the sieves and the zeolite portions of the catalysts do not have substantial amounts of other framework elements as indicated by the cation to alumina ratio.

Amoco admits that the AMS–1B sieves and the zeolite component of the AMSAC catalysts each have all of the X-ray diffraction lines within the error ranges of the X-ray diffraction lines of Table I of the '886 patent. PX 752, Requests No. 1 and No. 2. Therefore, Mobil must show that the sieves and the zeolite portion of the catalysts have the required silica to alumina ratio and cation oxide to alumina ratios.

### (a) *The AMS–1B Sieves*

■ The NMR evidence presented by one of Mobil's expert witnesses, Dr. Oldfield, is Mobil's strongest evidence on the issue of literal infringement. This NMR evidence indicates that the framework aluminum content of the sieves and the corresponding silica to alumina ratios are as follows:

---

18. The parties also conducted several catalytic tests. The Court will review these tests at the points in the opinion where the results of the tests are pertinent to the Court's analysis.

19. The expert used TPD and physical mixtures of AMS–1B sieves and alumina binder to show *the effect of AcAc and HCl extractions on the* zeolite portion of the AMSAC catalysts. A TPD plot of a mixture of AMS–1B and alumina has a peak which can be attributed to cations associated with framework boron and no appreciable peak that can be attributed to cations associated with framework aluminum. DX 1186. D.I. 132 at 2022–23. A TPD plot of the mixture after AcAc extraction of the alumina reveals the same peak attributable to the cations associated with the framework boron and little else. DX 1187; D.I. 132 at 2023–24. In contrast, a TPD plot of the mixture after extraction of the alumina with HCl is markedly different. DX 1188. The peak attributable to cations associated with framework boron is gone. The TPD plot reveals a broad peak with a Tmax of approximately 362°C. The expert testified that this peak was attributable to framework aluminum and concluded that the HCl extraction inserted aluminum into the framework of the AMS–1B sieve. D.I. 132 at 2024–25.

| Sample | Framework Al [20] | $SiO_2/Al_2O_3$ Ratio |
|---|---|---|
| AMS–1B–1 | 0.035 | 2600 |
| AMS–1B–2 | 0.036 | 2500 |
| AMS–1B–3 | 0.042 | 2100 |

PX 1264. Thus, Mobil's NMR evidence indicates that the silica to alumina ratio for the AMS–1B sieves is greater than 2000.

Mobil's evaluation of the sieves by NMR also indicates that the sieves contain substantial amounts of framework boron:

| Sample | Framework B [21] |
|---|---|
| AMS–1B–1 | 0.65 |
| AMS–1B–2 | 0.69 |
| AMS–1B–3 | 0.98 |

PX 1319.

Because of this high boron framework content, the cation oxide to alumina ratios of the sieves are much higher than $0.9 \pm 0.2$. Relying on TPD, Dr. Olson testified that the AMS–1B sieves had a cation oxide to alumina ratio which satisfied the requirement of claim one. He testified, however, that he considered only cations associated with the aluminum in calculating these ratios. D.I. 125 at 489; PX 1286, 770 at 4–5. Because the Court has determined that one of ordinary skill in the art would understand the cation oxide to alumina ratio expressed in claim one to refer to all of the cations, the ratios presented by Mobil's expert do not reflect the appropriate ratios. Dr. Szostak testified that if one assumed all of the aluminum atoms detected in the AMS–1B sieves were in the framework, then the cation oxide to alumina ratios would be between 17.3 and 35.5. DX 1139; D.I. 128 at 1038–39. Because this was the most credible evidence on this issue, Mobil has failed to show by a preponderance of the evidence that the AMS–1B sieves have the cation oxide to alumina ratio of claim one.

Even if the Court were to accept Mobil's NMR evidence over conflicting evidence presented by Amoco, the framework aluminum and boron contents established by Mobil's NMR studies reveal that the cation oxide to alumina ratio of the sieves does not meet the limitation in claim one of the '886 patent. In addition, the silica to alumina ratio of AMS–1B–1 and AMS–1B–2 is substantially higher than 2000. Because Mobil's most favorable evidence fails to establish that the AMS–1B sieves literally infringe claim one of the '886 patent, the Court finds that the AMS–1B sieves do not literally infringe claim one of the '886 patent.

### (b) *The AMSAC Catalysts*

■ The process used to make AMSAC catalysts from AMS–1B sieves is quite complicated. Initially, the AMS–1B sieves are placed in water. This mixture is added to an aqueous alumina sol which contains some acetic acid. The mixture is blended with a base, sodium hydroxide. The resultant wet gel is dried in an oven for eight to nine hours. The temperature in the oven eventually reaches 225 °C. A dried AMSAC powder is removed from the oven and is blended with water. The wet AMSAC is fed through an extruder and then dried at approximately 125 °C for six hours. Finally, the dried AMSAC is calcined in a high temperature oven. The temperature in the oven exceeds 900 °F. PX 1292; D.I. 124 at 126–29.

The witnesses for Amoco agreed that this formulation process causes approximately fifty percent of the AMS–1B sieve to dissolve or become amorphous material.

---

**20.** Per gram of zeolite in weight percent.

**21.** Per gram of zeolite in weight percent.

D.I. 134 at 2232, 2311–12. The parties agree that the catalytic activity of the AMS–1B sieves is very small in comparison to the catalytic activity of the AMSAC catalysts. *See, e.g.*, D.I. 128 at 1045–46. It is also undisputed that a correlation can be drawn between the activity of the AMSAC catalysts and the amount of boron in the AMS–1B sieve used to make the catalyst. *Id.* at 1050.

In spite of this area of agreement, the parties strongly dispute the source of the catalytic activity in AMSAC catalysts and whether they contain framework aluminum. Mobil insists that the activity of AMSAC catalysts is due to framework aluminum in the zeolite portion of the catalyst. Amoco argues that the catalytic activity of the AMSAC catalysts is due to a non-framework species and denies that AMSAC catalysts have a significant amount of framework aluminum in the zeolite portion of the catalysts. Both parties have presented expert testimony and the results of many different types of tests to support their respective positions.

Dr. Cotton testified that boron does not fit well into the MFI structure. He testified that acidic or hydrothermal treatments of a boron containing zeolite in an aluminum rich environment causes the boron to leave the zeolite framework. This creates a vacancy or hole in the framework which facilitates the introduction of aluminum into the framework. According to Dr. Cotton and Dr. Hughes, the AMSAC formulation process has acidic and hydrothermal treatment steps which cause the zeolite to lose framework boron and gain framework aluminum. This results in a material whose catalytic activity is due to the acidity associated with the aluminum in the zeolite framework.

Dr. Cheetham agreed that boron was not comfortable in a tetrahedral site in a zeolite framework. He disagreed, however, with the conclusion that the boron in the AMS–1B migrated out of the framework during the compositing of the sieve into AMSAC. He testified that he believed the active site in the AMSAC catalyst to be a non-framework cationic aluminum species in the pores of the zeolite portion of the catalyst. He testified that the aluminum species would be introduced by ion-exchange, D.I. 137 at 3002, and that the aluminum in the pores of the zeolite would stabilize the boron in the framework of the zeolite and that leaching of boron would not occur under the conditions used to formulate the AMSAC catalyst. *Id.* at 3058.

NMR studies done by Mobil's expert, Dr. Oldfield, reflect the following values for framework aluminum and boron in the sieve components of the AMSAC catalysts:

| Sample | Framework Al | Framework B |
|---|---|---|
| AMSAC–1203M | 0.90 | 0.03 |
| AMSAC–2400 | 0.61 | 0.05 to 0.14 |
| AMSAC–3400 | 0.65 | 0.07 |

D.I. 125 at 336–37, 356–57; PX 1265, 1288.[22] These results suggest that the aluminum content of the zeolite portion of the AMSAC catalysts is at least fifteen times greater than the aluminum content of the initial AMS–1B sieves. D.I. 125 at 338–39; PX 1266. This results in silica to alumina ratios for the AMSAC catalysts which vary between 100 and 140. These results, if correct, also indicate that the framework boron content of the zeolite portion of the catalysts is generally less than one fifth of

---

**22.** Both the aluminum and boron values were reported per gram of zeolite on a weight percent basis.

the boron content of the corresponding AMS–1B sieve. D.I. 125 at 356–57; PX 1319.

Dr. Oldfield based his conclusions upon several different tests. One difficulty presented by conducting NMR analysis for aluminum in the zeolite portion of an AMSAC catalyst arises from the presence of large amounts of aluminum in the alumina binder in the catalyst. The signal from the aluminum in the binder of the catalyst occurs at approximately the same chemical shift as the signal from the aluminum in the zeolite framework, therefore, the signal from the binder can possibly mask the signal coming from the aluminum in the zeolite framework. In an early test, he conducted NMR studies on AMSAC samples which had been chemically treated to remove the alumina binder.

In response to concerns from Amoco regarding the possibility that the extraction procedure inserted framework aluminum, Dr. Oldfield also tested AMSAC catalysts which had not been chemically treated to remove the alumina binder. In order to measure the aluminum in the zeolite portion of the catalyst, the expert used a technique called spin echo NMR. This technique allows the spectrum of the sample to be electronically edited to remove the signal that is caused by the alumina binder. D.I. 125 at 340–41. He testified that the values for framework aluminum obtained by this method were within experimental error limits of the values obtained by analyzing the samples that had been treated to remove the binders. *Id.* at 341–42.

Dr. Oldfield also testified that he conducted several studies to verify that the aluminum he measured was framework aluminum rather than an non-framework species trapped within the pores of the zeolite framework. Using samples of ZSM–5, AMS–1B, AMSAC and various non-framework aluminum species, he compared the values obtained from several NMR parameters. For example, a graph plotting the rate of decay values ("T2") against the static linewidth of these samples showed that the points for ZSM–5, AMS–1B and AMSAC fell in one cluster while the points for non-framework aluminum species fell in a different cluster.[23] PX 1262. The T2 values for the zeolite materials ranged from approximately 2 to 6 milliseconds and the static linewidths ranged from 7 to 13 parts per million. The T2 values for the amorphous materials ranged from approximately 0.5 to 2 milliseconds and the static linewidths ranged from 20 to 40 parts per million. The witness presented several graphs which showed the same type of pattern; the aluminum in ZSM–5, AMS–1B and AMSAC samples had very similar signals while the aluminum in non-framework aluminum species exhibited markedly different signals. Based upon these results the witness concluded that the aluminum in AMS–1B and AMSAC is in the framework of the zeolite. *Id.* at 352.

An expert witness called by Amoco, Dr. Veeman, explained to the Court some of the problems encountered in conducting boron and aluminum NMR studies of zeolites. Like Mobil's NMR expert witness, Amoco's NMR expert witness was an outside witness. The witness from Amoco was in agreement with the witness from Mobil when he testified that the aluminum found in the framework of a zeolite appears at approximately the same chemical shift as the aluminum found in many non-zeolitic materials. The witness testified that because the chemical shift for tetrahedral framework aluminum was so similar to the chemical shift for non-framework aluminum, he could not determine, based on NMR studies alone, if the aluminum in the AMS–1B sieves was in the framework of the zeolite or not. D.I. 131 at 1846.

Dr. Veeman conducted one aluminum spin echo NMR study. He compared the T2 values and the static line widths of two ZSM–5 catalysts and two AMSAC catalysts. DX 1257. He testified that when the samples were saturated with water, the T2 values of the samples would increase as

---

**23.** The witness also compared: the coupling constant to the spinning linewidth, PX 1260; the static line width to the MASS width, PX 1261; the coupling constant to the static linewidth, PX 1259; and, the rate of decay to the coupling constant and the static linewidth, PX 1263.

more water was added to the samples. Therefore, he conducted this experiment using samples that had an excess of water. D.I. 132 at 1868–69.

His results were reported in DX 1257 which depicted ZSM–5 catalysts in one grouping and AMSAC catalysts in another grouping. The ZSM–5 catalysts had T2 values between 4.5 and 6.5 milliseconds and static linewidths between 7.5 and 10 milliseconds. The AMSAC samples had T2 values between 2 and 3.5 milliseconds and static line widths between 12.5 and 13.5 parts per million. Based upon this study, the witness concluded that the aluminum in the AMSAC catalysts was different than the aluminum in the ZSM–5 catalysts.[24] Id. at 1878. The expert from Amoco suggested that the expert from Mobil obtained different results because the samples tested by Mobil's witness were insufficiently hydrated. Id. at 1879.

Dr. Veeman testified that boron NMR, unlike aluminum NMR, could be used to distinguish between framework and non-framework boron because the chemical shifts of these materials are distinct. He testified that a different problem existed when one tried to quantify the amount of boron in the framework of a zeolite by using NMR. D.I. 131 at 1812. While aluminum always adopts a tetrahedral coordination when it is in the framework of a zeolite, framework boron atoms in zeolites exist in two forms. They may adopt a trigonal or a tetrahedral coordination. Trigonal and tetrahedral framework boron have different chemical shifts. Id. at 1809–10. Therefore, to measure the total framework boron in a zeolite, one must measure the signal produced by the tetrahedral framework boron and the signal produced by the trigonal framework boron. Id. at 1810.

Dr. Veeman also testified that all of the trigonal boron in the AMS–1B sieves could be converted to tetrahedral boron if enough water was added to the sample. Id. at 1811. Then one could measure the tetrahedral framework boron signal alone to determine the amount of framework boron in the sieve. Id. at 1813. This process did not work as well for the AMSAC catalysts, however. Something in the binder of the catalyst or the pores of the zeolite apparently prevented the water from reaching the oxygen atoms associated with the framework boron. Id. at 1823. Wetting the AMSAC catalyst did not convert all of the trigonal framework boron to tetrahedral framework boron. The witness testified that if the binder of the catalyst was extracted, then wetting the remaining zeolite portion of the catalyst would cause the trigonal framework boron to convert to tetrahedral framework boron. Id. at 1825–26.

The expert witness called by Amoco testified that his Boron studies produced the following results:

| Sample | Framework B [25] |
| --- | --- |
| AMS–1B–1 | 0.2—0.4 |
| AMS–1B–2 | 0.3—0.7 |
| AMS–1B–3 | 0.4—0.7 |
| AMSAC 1203M | 0.2—0.4 |
| AMSAC–2400 | 0.4—0.8 |
| AMSAC–3400 | 0.4—1.0 |

**24.** The witness testified that he was unable to conduct additional studies of this type because he could not obtain enough time on the NMR instrument at his university. D.I. 132 at 1865–66. The witness did have unlimited access to Amoco's NMR facilities, however. Id. at 1866. During rebuttal, Mobil's NMR expert stated that the experiments could be run more quickly than Amoco's expert believed was possible. D.I. 136 at 2821.

The time crunch that Amoco's witness may have experienced is unfortunate. In the pretrial conference, the Court instructed counsel from Amoco to obtain an affidavit from the expert regarding his inability to adequately prepare for trial if counsel wanted the Court to consider a motion for a continuance. This instruction was reiterated in a teleconference following the pretrial. No such affidavit was ever presented to the Court. Therefore, the Court must assume that counsel were satisfied with the experiments conducted by the witness.

**25.** Per gram of sieve on a weight percent basis. Many of the results presented by the expert from Amoco were obtained from experiments conducted at the Amoco facilities in Illinois. The witness testified that he supervised these

DX 1258, 1259; D.I. 131 at 1835.

The results obtained by Dr. Veeman suggest that boron does not leach from the framework of the AMS–1B sieve during AMSAC production. Amoco's expert witness testified that his results regarding the boron content of the AMS–1B sieves were slightly lower than the results obtained by Mobil's witness. *Id.* at 1815. He disagreed with the results Mobil's witness obtained for the framework boron content of the zeolite portion of the AMSAC catalysts. *Id.* at 1841. Amoco's witness suggested that the boron content reported by Mobil was too low because the expert witness for Mobil failed to include a broad peak at minus 1 to minus 1.5 ppm, which is attributable to trigonal framework boron, in his measurements of the framework boron in the AMSAC catalysts. *Id.* at 1841–42.

Dr. Cheetham suggested that the discrepancies in the boron NMR results might be explained by the different ways the parties treated the AcAc extracted AMSAC samples. Mobil researchers ion exchanged the extracted AMSAC materials and Amoco researchers did not. This witness testified that is was not necessary to ion-exchange materials in order to study them by NMR. D.I. 134 at 2991–93.

In rebuttal to Amoco's experts, Dr. Oldfield testified that he did not think that incomplete hydration materially affected either the boron or aluminum NMR results. He testified that he knew that the T2 values for framework aluminum would increase as more water was added to the samples. He also testified that the T2 values for non-framework aluminum would not change as water was added to the samples. Because he was comparing ZSM–5, AMS–1B and AMSAC to amorphous aluminum materials, the expert from Mobil testified that a slight increase in the T2 values of the zeolite samples would not detract from his conclusion that the aluminum in the AMS–1B and AMSAC catalysts was framework aluminum.

Dr. Oldfield also testified that he did not believe that incomplete hydration effected the results of his boron NMR studies. D.I.

experiments from the Netherlands via frequent

136 at 2815–16. He testified that he conducted three different independent NMR studies to determine the boron content of the AMSAC materials. *Id.* at 2823–25. The values obtained for framework boron ranged between 0.11 to 0.17. *Id.* at 2824. He also testified that he believed the broad signal at approximately 0.5 to −1.5 parts per million was due to non-framework boron rather than framework trigonal boron. D.I. 136 at 2825.

Mobil's expert questioned the static linewidths presented by the expert for Amoco in DX 1257. *Id.* at 2791. Amoco's expert had relied on the T2 versus static line width measurements of AMSAC and ZSM–5 catalysts presented in DX 1257 to reach his conclusion that the aluminum in these materials is different. The expert from Mobil testified that the NMR spectra used to measure the linewidths of the samples were too noisy to allow anyone to accurately measure the linewidth by hand. *Id.* at 2792. The expert from Mobil testified that to accurately measure the linewidth of such a noisy sample, one had to digitize the data and obtain a computer simulated peak and measure the linewidth of the computer simulation. *Id.*

The linewidths reported on the data used to compile DX 1257 did vary. For example, the computer simulation measured the linewidth of one peak as 11.9. Mobil's expert manually measured the linewidth of the peak and obtained a value of 12 parts per million. D.I. 136 at 2848. An Amoco document had described this same signal as having a linewidth of 13.7 parts per million and the expert from Amoco had reported this peak as having a linewidth of 13.2 parts per million. *Id.* 2848.

Using the NMR spectra underlying the information presented in DX 1257, Dr. Oldfield testified that his computer values for the static linewidth of ZSM–5 catalysts were higher than those reported by Amoco and his values for the static linewidths of AMSAC catalysts were lower than those reported by Amoco. *Id.* at 2795–96. The expert from Mobil also testified that each

telephone contact.

data point would have a margin of error of plus or minus one half to one part per million. *Id.* at 2798–99. When he plotted the data points he obtained from the Amoco spectra and their associated error bars, the two groups of points presented on DX 1257 merged into one more diffuse group.[26] *Id.* 2796. The expert testified that all of these points were attributable to framework aluminum. *Id.* 2799. The expert concluded that the small differences in T2 and static line width values for the ZSM–5 catalysts and the AMSAC catalysts were due to the presence of non-framework boron in the AMSAC catalysts. *Id.* at 2807.

Dr. Oldfield supported this conclusion by citing an additional experiment. During the days between his direct testimony and his rebuttal testimony, the NMR expert from Mobil measured the T2 and static line width of a sample prepared according to the Kaeding patent. He found that the static linewidth of this sample was slightly broader than a ZSM–5 zeolite that had not been impregnated with boron. He also found that the boron impregnated ZSM–5 zeolite had a slightly shorter T2 time than the non-impregnated ZSM–5 zeolites. He testified that the data from this sample "just fell right on top of the AMSAC data." *Id.* at 2813.

The Court finds the testimony presented by the NMR expert called by Mobil is the more credible evidence. The Court believes that the multiple NMR techniques the expert used to obtain his values for framework boron are a strong indication that his results are sound. The expert's study of the aluminum in AMSAC utilizing multiple NMR parameters was persuasive. The Court also notes that the expert conducted many of the NMR studies himself and most of the results he relied upon were done in his own facility. The demeanor of this witness during trial also enhances the credibility of his testimony. The Court, therefore, finds that the NMR evidence supports the conclusion that the aluminum in the zeolite portion of the AMSAC catalysts is in the framework of the zeolite and sup-

ports the conclusion that approximately 80 to 95% of the boron in the AMS–1B sieves leaves the framework when the sieves are formed into the AMSAC catalysts.

As in NMR analysis, IR analysis of AMSAC catalysts is complicated by the presence of aluminum in the binder of the catalysts. An inside expert from Mobil, Dr. Olson, presented the results of Mobil's IR studies. He presented two different IR spectra of AMSAC 2400. One spectra was taken from an AMSAC catalyst that had the binder of the catalyst extracted by AcAc. The other spectra was actually a compilation of two spectra, the spectra of a cesium exchanged AMSAC was subtracted from an ammonium exchanged AMSAC in order to subtract the background due to the binder from the spectra. PX 1285; D.I. 125 at 491–92.

Dr. Olson testified that at low levels of framework aluminum, IR was not as quantitative as NMR. However, he testified that his IR studies indicated that the zeolite component of the AMSAC catalysts had at least ten times more framework aluminum than the starting AMS–1B sieves. *Id.* at 450. He testified that his results confirmed the NMR results obtained by the NMR expert called by Mobil.

An outside expert, Dr. Uytterhoeven, presented the results of Amoco's IR studies. This expert testified that if there is a significant amount of framework aluminum in a sample, then IR spectronomy is a technique that can detect the hydroxyl band associated with framework aluminum. D.I. 132 at 1977. He also testified that IR is not a method which can be used to measure the framework boron in a zeolite. D.I. 133 at 2098. The witness compared the IR spectra of a ZSM–5 zeolite with 0.77% aluminum, a ZSM–5 catalyst prepared according to Amoco's catalyst formulation process and Mobil's MVPI catalyst to the IR spectra of an AMS–1B and an AMSAC catalyst. The expert also presented spectra of the ZSM–5 and AMSAC cata-

---

**26.** In comparing DX 1257 with similar experiments presented by Mobil's expert, one must note that the scales on the graphs are different.

lysts which had been extracted with AcAc to remove the binder. DX 1156, 1159, 1160, 1162, 1163, 1164, 1166A.

The MVPI catalyst had the most pronounced band at 3610 cm-1, which Dr. Uytterhoeven testified is characteristic of a hydroxyl group attached to framework aluminum. The ZSM–5 sieve had a medium-sized signal. The ZSM–5 catalyst was made of 25% ZSM–5 zeolite and 75% alumina binder, therefore, the signal was necessarily smaller. However, the expert testified that the band at 3610 was clearly attributable to hydroxyl groups associated with framework aluminum. AcAc extraction of the ZSM–5 catalyst restored the signal to almost the same size as the signal obtained for the ZSM–5 zeolite. D.I. 132 at 1979–80.

In contrast, the IR spectrum of the AMS–1B material showed no appreciable signal in the 3610 cm-1 region. The expert called by Amoco testified that the absence of a signal indicated that the AMS–1B sieve did not contain framework aluminum. The IR spectrum of the AMSAC catalyst showed only a small broad peak at the 3610 cm-1 region. The witness testified that he did not believe that this peak was due to framework aluminum. *Id.* at 1983. An IR spectrum of an AcAc extracted AMSAC catalyst did not contain a peak that could be assigned to framework aluminum in the opinion of this expert. *Id.* at 1984.

Dr. Uytterhoeven also noted that the ZSM–5 catalyst and the AMSAC catalyst had similar activities. Because they had similar activities, he reasoned that if the activity in the AMSAC catalyst was due to framework aluminum, the signals at 3610 cm-1 should be comparable. The relatively small signal in the AMSAC catalyst led him to conclude that catalytic activity of the AMSAC catalyst was not due to framework aluminum. *Id.*

Dr. Uytterhoeven was critical of the Cesium spectral subtraction experiments conducted by the witness from Mobil. Amoco's expert testified that there was no need for such experiments because, if framework aluminum was present in a sample, the sensitivity of IR is good enough to detect it. *Id.* at 1993. Based upon other peaks present in the spectrum presented in PX 1285, Amoco's expert expressed doubts about whether the spectral subtraction via a cesium exchange was an appropriate technique to use on such samples.[27] *Id.* at 1993.

In rebuttal, Dr. Hughes testified that one limitation of IR analysis is that IR does not directly measure framework aluminum, rather it measures the hydroxyl groups associated with framework aluminum. D.I. 138 at 3105. He disagreed with the criticisms of Mobil's IR technique. Dr. Hughes reviewed several Amoco IR spectra and testified that Amoco also used spectral subtraction in some of its experiments which Amoco did not put into evidence during trial. *Id.* at 3107. This witness also testified that he believed that the criticisms of Amoco's witness regarding Mobil's cesium exchange were unfounded. *Id.* at 3108.

In addition, Dr. Hughes testified that Amoco's IR spectra contained evidence of framework aluminum in the AMSAC catalysts. He reviewed several of Amoco's IR spectra of AMSAC 3400 and concluded that the sieve component of AMSAC 3400 contained framework aluminum. *Id.* at 3112–20; PX 1499 through PX 1504. The witness also presented an exhibit which was a composite of several Amoco IR spectra of AcAc extracted AMSAC 3400. PX 1507. The witness noted that the 3610 cm-1 band became smaller as the length of the AcAc extraction increased. Since the parties agree that AcAc extraction does not remove framework aluminum, he concluded that something in the binder of the AMSAC

---

**27.** The witness also questioned the reliability of the results presented by Mobil's expert because the scale on some of the spectra had been expanded which made the peak appear larger. D.I. 132 at 1994. A different expert called by Mobil testified that scale expansion is a standard technique in IR spectronomy. D.I. 138 at

3107. The Court notes that both parties have presented IR evidence on exhibits which do not have identical scales. In evaluating the evidence, the Court has continually noted the differences in scale and understands the relationship between the scale and the relative size of the signal.

catalyst poisoned the aluminum sites during the AcAc extraction. D.I. 138 at 3120–21.

The Court begins its assessment of the IR evidence by noting that the IR spectra of the ZSM–5 zeolites and ZSM–5 catalysts have strong signals in the 3610 cm–1 region which all experts agree are due to framework aluminum. The IR spectra of the AMS–1B sieves have a very small signal in the 3610 region. Because the AMS–1B sieves do not contain an alumina binder, the Court concludes that the preponderance of the IR evidence suggests that there is a small amount of framework aluminum in the borosilicate sieves. As discussed in the NMR section *supra*, this is not enough aluminum for the sieves to literally infringe claim one of the '886 patent.

The AMSAC IR spectra contain small, broad peaks in the 3610 cm–1 region. Because there is an alumina binder present, the signal cannot be easily assigned to framework aluminum or to aluminum in the binder of the catalyst. Furthermore, because IR measures hydroxyl groups attached to framework aluminum, it is not clear whether the small peaks are an indication that there is little or no framework aluminum, as Amoco's expert concluded, or that the aluminum is present but masked by some other species, as Mobil's rebuttal expert suggested. Therefore, the Court concludes that the IR evidence, standing alone, is not persuasive evidence of the presence or absence of framework aluminum in the AMSAC catalysts. Because IR cannot be used to measure framework boron, it provides no evidence regarding the presence or absence of framework boron in the zeolite portion of the AMSAC catalysts.

TPD, like IR, does not directly measure the framework elements of zeolites. The same experts who presented the IR evidence also presented the TPD evidence. Dr. Olson did not directly testify about TPD studies. He did, however, use TPD to generate the cation oxide to alumina ratios presented in PX 1286. Upon cross-examination, he confirmed that a TPD plot on page 156 of PX 770 was used to obtain some of the information presented in PX 1286. This TPD plot of AMS–1B indicated that the peak generated by the cations associated with framework boron was approximately one hundred times larger than the peak generated by cations associated with framework aluminum. D.I. 125 at 485–86. Dr. Olson did not present any TPD data on the ZSM–5 or AMSAC catalysts.

In contrast, the outside expert called by Amoco, Dr. Uytterhoeven, presented detailed TPD data on ZSM–5 zeolites and catalysts as well as the AMS–1B zeolite and AMSAC catalysts. The expert testified that these materials had the following approximate temperature maximum ("T max") values:

| Material | T max °C |
| --- | --- |
| AMS–1B | 170 |
| AMSAC | 450 |
| ZSM–5 | 380 |
| ZSM–5 catalyst | 370 |

DX 1172. The expert testified that these values would vary by plus or minus ten to fifteen degrees. D.I. 132 at 2003.

Dr. Uytterhoeven presented a TPD plot of ZSM–5 zeolite which exhibited a large sharp peak at approximately 380 °C. DX 1174. The TPD plot of ZSM–5 catalyst exhibited a shallow peak with a T max at approximately 373 °C. DX 1176. He testified that these peaks were within the experimental range of each other and were caused by cations associated with framework aluminum. D.I. 132 at Tr. 2015. The TPD plot of AMS–1B presented by the expert had a sharp peak at approximately 168 °C. DX 1180. The expert testified that this peak was caused by the presence of cations associated with framework boron. This plot showed only a tiny blip at 380 °C indicating that there were relatively few cations associated with framework aluminum atoms in the AMS–1B sieve. D.I. 132 at 2006–08. The TPD plot of AMSAC had a broad shallow peak with a T max at approximately 453 °C. DX 1181. Based upon the differences between the TPD plot

of ZSM–5 catalyst and the TPD plot of AMSAC, the expert testified that the site of catalytic activity in the AMSAC catalyst is different than the site of catalytic activity in the ZSM–5 catalyst. *Id.* at 2015.

Dr. Uytterhoeven testified about some TPD results which were based upon AcAc extracted samples. An AcAC extracted AMSAC catalyst was exchanged with an ammonia containing cation which was small enough to enter the pores of the zeolite. The TPD plot of this sample exhibited more of a plateau than a peak and the expert testified that the T max ranged from 432 to 545 °C. DX 1182; D.I. 132 at 2016. Another AcAc extracted AMSAC sample was exchanged with an ammonium containing cation which was too large to fit into the micropores of the zeolite portion of the catalyst. The expert for Amoco also presented a TPD plot of this sample. DX 1183. Based upon the results of these two plots, he concluded that almost all of the ion exchange sites in the AMSAC catalysts are not within the micropores of the zeolite. D.I. 132 at 2021.

Upon cross-examination, Dr. Uytterhoeven conceded that while the TPD plots of unextracted and AcAc extracted AMSAC did not contain a peak attributable to cations associated with framework aluminum, these TPD plots did not exhibit any peak which would be attributable to cations associated with framework boron either. D.I. 133 at 2070. The witness verified that TPD would be incapable of detecting cations associated with low levels of framework aluminum in the AMSAC catalysts. *Id.* at 2071–72.

The Court finds some of the TPD evidence to be persuasive. The Court concludes that the TPD plots of both parties strongly support finding that the AMS–1B sieves contain substantial amounts of boron and minimal amounts of aluminum.

The TPD plots of the AMSAC catalysts, however, do not provide evidence of either the presence of framework boron or framework aluminum. Although the extracted and unextracted AMSAC TPD spectra have different T max values than the ZSM–5 spectra, an interpretation of only the TPD spectra does not resolve whether this difference is due to differences in the framework elements or due to different non-framework species present in the zeolite pores. The Court notes that the large cation versus small cation experiment supports the position that a major portion of the catalytic sites in the AMSAC catalyst are not in the pores of the zeolite. However, this conclusion is at odds with most of the other testimony presented by Amoco's witnesses who testified that the catalytic site had to be inside the pores due to the shape selectivity of the AMSAC catalysts. *See, e.g.,* D.I. 137 at 3014. Therefore, the Court concludes that the TPD evidence, taken alone, does not tend to show the absence or presence of framework aluminum or framework boron in the AMSAC catalysts.

Mobil introduced evidence which indicated that the X-ray diffraction pattern of AMS–1B was shifted relative to the X-ray diffraction pattern of AMSAC–2400. PX 1289. An expert for Mobil testified that this indicated that the unit cell size of the zeolite in AMSAC is slightly larger than the unit cell size of AMS–1B. The expert testified that this supported the conclusion that the boron leaves the framework of the AMS–1B when it is composited into AMSAC. D.I. 138 at 3252–53.

Amoco introduced X-ray diffraction evidence which indicated that the X-ray diffraction pattern of AMS–1B was not shifted relative to the pattern of AMSAC–2400. DX 1273. Amoco also introduced X-ray diffraction patterns which indicated that the patterns for AMSAC and AMS–1B were shifted relative to the pattern for ZSM–5. DX 1274, 1275, 1276. Dr. Cheetham testified that he used the unit cell volume obtained by X-ray diffraction and a computer fitting program to estimate the number of boron atoms in the unit cells of AMS–1B and the zeolite portion of AMSAC. DX 1283. He testified that his results showed that there were approximately four boron atoms in the unit cell of each

material.[28] The expert testified that X-ray diffraction evidence supported his theory that boron is not removed from, nor aluminum inserted into, the AMS–1B sieves when the sieves are formed into AMSAC catalysts. D.I. 137 at 2994–97.

Each expert was critical of the other party's X-ray diffraction work. The expert from Amoco used an internal standard in conducting his work to ensure that the patterns he was comparing were on the same absolute scale. Amoco's expert noted that Mobil did not use such an internal standard. *Id.* at 2966. Dr. Cotton testified that the modern X-ray diffraction machines are very accurate at this range and the use of an internal standard to calibrate the equipment is not necessary. The witness also testified that he had seen X-ray patterns obtained by Amoco where no internal standard had been used. This witness called by Mobil testified that the X-ray diffraction patterns of the AMSAC catalysts presented by Amoco were too broad and noisy to provide meaningful information. He testified that he would not make any comparisons based upon these X-ray patterns. D.I. 138 at 3255–56.

Based upon the quality of the X-ray patterns and the testimony presented by the expert witnesses, the Court finds that the X-ray diffraction evidence presented by Mobil is more reliable. The Court concludes that the X-ray diffraction evidence supports the conclusion that significant amounts of boron in the AMS–1B sieves leave the framework and significant amounts of aluminum are inserted into the framework when the sieves are formed into AMSAC catalysts.

Several expert witnesses called by Amoco discussed an experiment in which the catalytic activity of an AMSAC catalyst was measured after increasingly longer periods of extraction with AcAc. The results of this experiment were presented in DX 1203 and DX 1204. Witnesses from both Mobil and Amoco agreed that AcAc extraction of the alumina binder does not insert or remove framework aluminum.

An expert witness called by Amoco testified that the catalytic activity of the AMSAC markedly decreases as the catalyst is subjected to longer periods of ACAC extraction. D.I. 128 at 1065. In contrast, a ZSM–5 catalyst subjected to the same extraction shows very little decrease in catalytic activity. *Id.* From these experiments, Dr. Szostak concluded that the site of the catalytic activity in the AMSAC catalyst was a non-framework species which was being washed away during the ACAC extraction. *Id.* The witness concluded that the source of the catalytic activity in the AMSAC catalyst was not framework aluminum. An inside witness from Amoco, Dr. Kutz, testified that after these samples had been extracted with AcAc, they were not ammonium exchanged before calcination. After calcination, the samples were tested for catalytic activity. D.I. 134 at 2341. Dr. Kutz testified that she did not believe ammonium exchange was necessary because the calcination of the sample at 900 °F would consume all of the AcAc. D.I. 136 at 2472. She also testified that it was not standard practice for Amoco to ammonium exchange its AMSAC catalysts before testing their catalytic activity. D.I. 134 at 2352–53.

In rebuttal, Dr. Olson testified that it was standard practice in the zeolite catalyst field to ion exchange a catalyst after a treatment such as AcAc extraction and before catalytic testing to ensure that all of the sites in the catalyst were in their hydrogen or active form. D.I. 138 at 3186–87. He testified if such an exchange were not done, one will get an incorrect assessment of the full catalytic potential of the material. *Id.* at 3187.

Dr. Olson stated that he believed the results of the successive AcAc extraction did not indicate a washing away of the active site in AMSAC catalysts. He testified that due to the small crystallite size of the AMSAC catalyst, one would expect to see a much more rapid drop off of catalytic activity if the sites were being washed away. The expert also noted that if the

---

**28.** The precise values the expert quoted were 3.5 ± 0.5 for the AMS–1B sieve, 4.5 ± 1.0 for the unextracted AMSAC and 4.1 ± 1.0 for the AcAc extracted AMSAC.

sites were being washed away, one would expect the catalytic activity to drop to zero. The data indicates that the activity levels off and does not drop to zero even after 160 hours of extraction with AcAc. *Id.* at 3183–84.

Dr. Olson testified that he believed that the data represented a poisoning of the active sites by an agent in the binder rather than a removal of the sites. *Id.* at 3184. He testified that the curve presented in DX 1204 was similar to the cesium poisoning curve presented in PX 1323. To obtain the curve depicted in PX 1323, the Mobil expert added cesium to the AcAc treated AMSAC until the catalytic activity went to zero. D.I. 125 at 460. He believed that the curve in the AcAc extraction experiment never went to zero because the amount of poisoning agent in the binder was limited. D.I. 138 at 3184–85.

Dr. Olson presented the results of an experiment he had done in order to support this hypothesis. PX 1530. The expert used an AMSAC 2400 sample and extracted the binder according to the procedure used by Amoco. The unextracted catalyst had an 8.3% ethyl benzene conversion rate. Under the same conditions, the extracted sample had a conversion rate of 3.5%. He testified that this data was similar to the data presented by Amoco. D.I. 138 at 3189, 3191. Dr. Olson then repeated the AcAc extraction but inserted a standard ion-exchange step before testing the catalytic activity of the material. The catalytic activity of the ion-exchanged extracted sample was 8.3%. The expert testified that this was essentially equal to the activity of the unextracted AMSAC catalysts. *Id.* at 3189–91.

Dr. Olson testified that the ion-exchange procedure he used was very mild and would not insert aluminum into the framework of the zeolite portion of the AMSAC catalyst. He stated that the ion exchange involved initially treating the catalyst with ammonia gas to convert the sites to the ammonium form which protects the sites when they are contacted with the ammonium nitrate solution. The exchange was conducted at room temperature, at a neutral pH, and the contact time was only two hours. The expert testified that all of these conditions were used to ensure that no aluminum would be added to the framework of the zeolite. In addition, he submitted samples of the extracted catalyst before and after ion-exchange to Dr. Oldfield, Mobil's NMR expert. *Id.* at 3193–94. Spin echo NMR testing indicated that there was no detectable change in the framework aluminum content of the material. *Id.* at 3196.

Based upon this experiment, Dr. Olson concluded that the active sites in the AMSAC catalyst were not washed away by AcAc extraction. If the sites had been washed away, the catalytic activity could not have been restored by ion exchanging the AcAc extracted catalysts. He believed that the catalytic activity in the AMSAC catalysts was due to framework aluminum in the zeolite portion of the materials. He testified that AcAc extraction merely temporarily poisoned these sites; it did not remove them. *Id.* at 3192.[29]

**29.** During cross-examination, Dr. Olson converted all of the values depicted on PX 1530 to the approximate values which would be obtained if the experiments were run with a weight hourly space velocity of fifty. When this conversion was done, the ion exchanged extracted AMSAC had a ethyl benzene conversion rate of 9.5 and the non-ion-exchanged unextracted AMSAC had a value of 8.1. D.I. 138 at 3209, 3216. Thus, the ion-exchanged extracted sample had a catalytic activity which was higher than catalytic activity of the non ion-exchanged, unextracted sample.

Dr. Olson conceded that he did not measure the catalytic activity of an ion-exchanged, unextracted AMSAC catalyst as part of this experiment and did not compare the catalytic activity of an unextracted ion-exchanged AMSAC to the catalytic activity of an extracted ion-exchanged AMSAC. *Id.* at 3224. The expert testified that he did not exchange this material because he was trying to duplicate Amoco's experiment. He hypothesized that had he ion-exchanged the unextracted AMSAC, the values for the two samples might have been the same. *Id.*

Counsel for Amoco attempted to show that an ion exchanged unextracted AMSAC would have an ethyl benzene conversion rate of 24.5%. Comparing 24.5% to the value obtained for the ion-exchanged extracted AMSAC with a value of 9.5% would show that the AcAc extraction did significantly reduce the catalytic activity of the AMSAC catalyst. Counsel asked the witness to derive the 24.5% conversion rate by converting a result obtained from a catalytic run done by

The Court concludes that the catalytic measurements of AcAc extracted AMSAC catalysts support the finding the AcAc extraction of the alumina binder poisons rather than removes the active sites in the AMSAC catalyst. Therefore, this data supports a conclusion that the site of the catalytic activity of the AMSAC catalysts is in the framework of the zeolite.

Mobil also introduced several articles from scientific journals and documents from Amoco which indicate that boron leaches from AMS–1B sieve under acidic conditions or hydrothermal conditions. See, e.g., PX 496 (Amoco report); PX 632 (Amoco document); PX 668 (Amoco report); PX 779 (1988 journal article); PX 781 (1985 journal article).[30] Witnesses called by Mobil testified that the conditions used to make AMSAC from AMS–1B would be severe enough to cause boron to leach from the framework and insert framework aluminum. D.I. 124 at 151–52; D.I. 126 at 740–41. An expert called by Mobil disagreed with Amoco's theory testifying that no tetrahedral aqua aluminum species was known to exist in nature. D.I. 138 at 3298–3300.

Several of Amoco's witnesses denied that the conditions of formulation of the catalyst were severe enough to cause loss of boron or aluminum insertion. One expert called by Amoco, however, conceded that he would classify a treatment which dissolved approximately 50% of a zeolite as more severe than the HCl extraction which inserted aluminum into the framework of the AMS–1B sieve. D.I. 133 at 2073–74. As previously discussed, the parties agree that approximately 50% of the AMS–1B sieve is lost during the formulation of the AMSAC catalyst.

All of the evidence presented on this issue cannot be reconciled. The Court finds, however, that Mobil has established by a preponderance of the evidence that when AMS–1B is composited into AMSAC, boron leaches from the sieve and aluminum is inserted into the framework. The aluminum NMR spectra, boron NMR spectra, X-ray diffraction patterns, expert testimony regarding the restoration of the AMSAC catalytic activity after AcAc extraction and the severity of the compositing process which dissolves about 50% of the AMS–1B sieve all support this finding. The Court notes that the IR and TPD evidence do not support this finding but this does not mean that Mobil has failed to carry its burden. As the Court has noted supra, neither the IR nor the TPD strongly support either party's position regarding the AMSAC catalysts.

Having made the findings that boron migrates from the AMS–1B sieves and aluminum is inserted into the sieve during the production of AMSAC catalysts, the Court will now consider whether the zeolite portion of the AMSAC catalysts have the silica to alumina and cation oxide to alumina ratios required by the claims of the '886 patent. The NMR results obtained by Mobil establish that the AMSAC catalysts have silica to alumina ratios within the limits of claim one of the '886 patent. Therefore, the Court finds that AMSAC 1203M, AMSAC 2400 and AMSAC 3400 literally meet the silica to alumina ratio of claim one of the '886 patent.

According to the NMR evidence presented by Mobil, the zeolite portions of the AMSAC catalyst contain the following approximate relative amounts of framework aluminum and framework boron.

Mobil which was not relied upon by Mobil at trial. The witness complied with counsel's request but testified that the point Amoco's counsel was relying upon was an error. The witness testified that he believed the temperature was incorrectly reported. Id. at 3228–29, 3238–40.

The testimony of the witness regarding the time periods when he was conducting work at various temperatures, the fact that all of the other temperatures reported in the Mobil document were at significantly higher temperatures and the witness' demeanor at trial convince the

Court that the data point relied upon by Amoco's counsel is an error. The Court finds the evidence clearly indicates that a comparison between the data point relied upon by Amoco's counsel and the evidence presented in PX 1530 would not be meaningful.

30. The journal articles were admitted for only the limited purpose of showing that they were written; they are not admissible to prove the results stated in the articles.

| Material | Framework B to Framework Al ratio [31] |
|----------|------------------------------|
| AMSAC 1203M | approx. 1 B for each 11 Al |
| AMSAC 2400 | approx. 1 B for each 1.7 to 4.4 Al |
| AMSAC 3400 | approx. 1 B for each 4 Al |

In the AMSAC 1203, the amount of framework boron is a little less than 10% of the amount of framework aluminum. In the AMSAC 3400 catalyst the amount of framework boron is approximately one-quarter of the amount of framework aluminum. In AMSAC 2400 the amount of framework boron ranges from one-quarter to almost one-third of the amount of framework aluminum. The Court finds that AMSAC 2400 and AMSAC 3400 materials contain enough framework boron that one of ordinary skill in the art at the time would not consider these materials to be aluminosilicate zeolites. The relative boron content of the AMSAC 1203M is substantially lower than in the other two AMSAC catalysts and, therefore, represents a much closer case. The Court finds, however, that one of ordinary skill in the art at the time would expect that the presence of this amount of framework boron would be indicated in the language of the claims. For example one would expect a phrase similar to "aluminosilicate zeolite containing boron in the framework" as exhibited in the Robson patent or borosilicate by analogy to the Argauer galliosilicate patent.

Mobil has failed to show by a preponderance of the evidence that AMSAC 1203M or the other AMSAC catalysts have the cation oxide to alumina ratios required by claims one and three of the '886 patent. Dr. Olson testified about only AMSAC 2400 and reported a cation oxide to alumina ratio of 1.06. D.I. 125 at 454; PX 1286. The expert used a method called CRAMPS to determine this value. As discussed *supra,* when this expert determined the cation oxide to alumina ratio of the AMS–1B sieves by TPD, he apportioned the cations between the aluminum and boron. The Court cannot determine from the expert's report whether the value obtained by CRAMPS also reflects such an apportionment. PX 770 at 3–4, 133–34. Dr. Cheetham testified that the AMSAC catalysts did not have the cation to oxide ratios of the claims of the '886 patent. D.I. 138 at 3011.

Therefore, the Court finds that Mobil has failed to prove that the zeolite portions of the AMSAC catalysts have the required cation oxide to alumina ratio. The Court finds that the AMSAC catalysts do not literally infringe claim one of the '886 patent.

2. The '857 Patent

The Court has construed claim one of the '857 patent to be limited to hydrocarbon conversion processes which use a compound covered by claim one of the '886 patent. Because the Court has found that the AMS–1B sieves and AMSAC catalysts do not literally infringe claim one of the '886 patent, the Court finds that the AMS–1B sieves and AMSAC catalysts do not literally infringe claim one of the '857 patent.

3. The '872 Patent

Claim 6 of the '872 patent is drawn to a process for xylene isomerization. As discussed in the claim construction section *supra,* the claim has six elements.[32] It is undisputed that Amoco's xylene isomerization/ethyl benzene conversion process meets five of the six elements. The parties dispute whether or not AMSAC catalysts are catalysts of the ZSM–5 type. The Court has construed a ZSM–5 type catalysts as one which contains a zeolite having: (1) the X-ray diffraction pattern of the '886 patent or the Chu patent; and (2) exhibiting ion-exchange capabilities or cata-

---

**31.** The Court obtained these ratios by converting the percent by weight values presented in PX 1265 and PX 1288 to milliequivalents of aluminum and boron according to the information presented in DX 1252 and DX 1253.

**32.** These elements are identified in the claim construction section *supra.*

lytic activity which is attributable to framework aluminum.

Amoco admits that the AMS–1B sieves and the zeolite portion of the AMSAC catalysts have X-ray diffraction lines within the error ranges described on Table I of the '886 patent. PX 752, Request No. 1. There is little dispute that both the AMS–1B sieves and AMSAC catalysts exhibit catalytic activity although the catalytic activity of the AMS–1B sieves is quite low. DX 1141. Amoco admits that the AMS–1B sieves contain over 200 ppm aluminum. PX 743, Request No. 18. Mobil argues that this aluminum is in the AMS–1B framework. Amoco insists that it is not. The Court has previously made findings regarding the presence of framework aluminum in the AMS–1B sieves and the phenomena of boron leaching and aluminum insertion into the AMS–1B framework during the AMSAC formulation process. *See* literal infringement of '886 patent section *supra.* The remaining question is whether or not the framework aluminum is the source of the catalytic activity.

Dr. Olson testified that a cesium poisoning experiment he conducted indicated that the catalytic activity of the AMSAC catalysts was due to framework aluminum. He stated that cesium selectively binds to the most acidic sites in a zeolite which means that cesium would preferentially bind to aluminum rather than boron as long as aluminum sites were available. D.I. 126 at 600. Each site which is bound to cesium will not contribute to the catalytic activity of the zeolite. Therefore, as more cesium is added to a zeolite, its catalytic activity will decline. D.I. 125 at 459.

Dr. Olson testified that he added cesium in incremental amounts to samples of AMSAC 2400 and AcAc extracted AMSAC 2400. He found that when the catalytic activity of the materials equaled zero he had added an amount of cesium equal to the framework aluminum content of the materials. PX 1322, 1323; D.I. 125 at 459–

62. Dr. Uytterhoeven questioned whether cesium would preferentially bind to framework aluminum. D.I. 132 at 1995. However, the testimony by Dr. Olson regarding cesium's preference for aluminum sites was corroborated by testimony from Dr. Cotton. D.I. 126 at 711. The Court finds that the cesium poisoning experiment supports a finding that the framework aluminum is the source of the catalytic activity in the AMSAC catalysts.

The Court also finds that the evidence presented by Dr. Olson regarding the restoration of the catalytic activity of an AcAc extracted AMSAC catalyst by ion exchange supports a finding that the source of the catalytic activity in the AMSAC catalysts is framework rather than non-framework aluminum.[33] If the catalytic activity were due to non-framework aluminum, as Amoco contends, then AcAc extraction would wash away the aluminum and catalytic activity could not be restored by a mild ion exchange.

Dr. Szostak presented evidence that there was a correlation between the activity of the AMSAC catalysts and the boron content of the starting AMS–1B sieve. DX 1142; D.I. 128 at 1054. She also presented evidence that a catalyst formulated from AMS–1B has substantial activity while a catalyst formulated from silicalite showed very little catalytic activity.[34] DX 1144. From this evidence, the expert concluded that the boron in the AMS–1B sieves was an important factor in the catalytic activity in AMSAC catalysts. D.I. 128 at 1054–58.

Experts called by Mobil testified that this evidence is consistent with boron promoting aluminum insertion into the zeolite portion of the AMSAC catalysts. As the Court has previously discussed, as boron migrates from the zeolite framework, it leaves vacancies which can be filled by aluminum. *See* literal infringement of the '886 patent *supra.* The Amoco experts did not present any evidence showing a

---

**33.** This experiment is described in detail in the section of the opinion which discusses literal infringement of the '886 patent.

**34.** Some scientists use the word silicalite to describe a zeolite with the MFI structure which contains no framework elements in addition to aluminum, silicon and oxygen and has a silica to alumina ratio of 2,000 or greater.

correlation between the boron content of the zeolite portion of the AMSAC catalysts and the activity of the AMSAC catalysts. The Court finds that this evidence does not support Amoco's argument that framework boron and non-framework aluminum is the source of the catalytic activity in the AMSAC catalysts.[35]

Based upon all of the evidence before the Court, the Court finds that Mobil has established by a preponderance of the evidence that the activity of the Amsac catalysts is attributable to framework aluminum. The Court finds that the AMSAC catalysts are ZSM-5 type catalysts. Therefore, the Court finds that Amoco literally infringes claim six of the '872 patent by using the AMSAC catalysts in a simultaneous exylene isomerization ethyl benzene conversion process.

### 4. The '573 Patent

▆ The Court has construed claim one of the '573 patent to be drawn to a catalyst containing an aluminosilicate zeolite with insubstantial amounts of framework elements other than aluminum, silicon and oxygen. The zeolite portion of the catalyst must be impregnated with between 0.25 and 25 percent of boron oxide by weight. Finally, the zeolite must have a silica to alumina ratio of at least twelve and a constraint index of approximately one to twelve. Claim two of the '573 patent depends from claim one and requires that the crystalline aluminosilicate zeolite be ZSM-5. Claim eight also depends on claim one and requires the zeolite to be combined with approximately 0.25 to 15 percent by weight of boron oxide.

The parties do not dispute that the AMS-1B sieves and AMSAC catalysts have alumina silica ratios of at least twelve. Mobil introduced unrebutted evidence showing that the AMS-1B sieves and zeolite por-

tions of the AMSAC catalysts have the claimed constraint index.[36] PX 1283; D.I. 125 at 440. Mobil has also introduced evidence indicating that the non-framework boron in the AMS-1B sieves and AMSAC catalysts falls within the ranges specified in claims one, two and eight. PX 1320. This evidence has not been seriously disputed by Amoco. The Court finds that Mobil has established by a preponderance of the evidence that the Amoco materials meet these limitations of the claims.

The real dispute is whether the Amoco materials are aluminosilicates as required by the claims. The Court has already made findings regarding the amounts of framework boron and aluminum in the AMS-1B sieves and AMSAC catalysts. The AMS-1B sieves contain too much framework boron and too little framework aluminum to have been considered aluminosilicates by one of ordinary skill in the art. Based upon the relative amounts of framework boron and aluminum in the zeolite portions of the AMSAC catalysts, the Court has already found that the zeolite portions of the AMSAC catalysts would not be considered aluminosilicates by one of ordinary skill in the art. Therefore, the Court finds that the AMSAC catalysts do not literally infringe claims one, two and eight of the '573 patent.

### D. *Doctrine of Equivalents and Pioneer Status*

▆ Infringement under the doctrine of equivalents is an equitable action. It is applicable in situations where there has been no literal infringement but a finding of infringement is appropriate to prevent "what is in essence a pirating of the patentee's invention." *Loctite Corp.*, 781 F.2d at 870; *see also Hormone Research Foundation, Inc. v. Genentech*, 904 F.2d

---

**35.** Amoco also relies on the results presented in DX 1204 regarding the effect of AcAc extraction on the catalytic activity of AMSAC to support the proposition that the active site in the AMSAC catalysts is non-framework aluminum. As the Court has discussed in great detail in the literal infringement of the '886 patent section, the Court finds that this evidence does not support such a conclusion.

**36.** Amoco contends that this limitation is meaningless because all zeolites with the MFI structure will have the claimed constraint index. However, the Court need not consider whether the constraint index is a redundant limitation because it is clear the that Amoco materials meet this requirement.

1558, 1564 (Fed.Cir.1990), *cert. dismissed,* — U.S. —, 111 S.Ct. 1434, 113 L.Ed.2d 485 (1991). Determining whether a patent is infringed under the doctrine of equivalents requires a court to balance the policies of avoiding "a fraud on the patent" with the need for certainty regarding the scope of the patent grant. *Sun Studs, Inc. v. ATA Equipment Leasing, Inc.,* 872 F.2d 978, 987–88 (Fed.Cir.1989) (quoting *Graver Tank & Mfg., Co. v. Linde Air Prods. Co.,* 339 U.S. 605, 607–08, 70 S.Ct. 854, 855–56, 94 L.Ed. 1097 (1950)). Under the doctrine of equivalents, an accused product or process may infringe a patent if it performs substantially the same function in substantially the same way to give substantially the same results. *Genentech,* 904 F.2d at 1564. The doctrine of equivalents should not be used, however, to redraft the claims of a patent. *Id.*

■■■ The range of equivalents a patent is entitled to receive depends upon the nature of the patent. A broad breakthrough invention, often called a pioneer invention, is entitled to a broader range of equivalents than a modest improvement in a crowded field. *Sun Studs,* 872 F.2d at 987. Very few patents cover inventions as profound as Howe's sewing machine, Morse's electrical telegraph or Bell's telephone. *See Westinghouse v. Boyden Power Brake Co.,* 170 U.S. 537, 562, 18 S.Ct. 707, 718, 42 L.Ed. 1136 (1898). Each patent can be placed on the continuum between minor improvement and pioneer invention and is entitled to a corresponding scope of equivalency. *Sun Studs,* 872 F.2d at 987.

### 1. The '886 and '857 Patents

Mobil has alleged that Amoco infringes claims one and three of the '886 patent and claims one and two of the '857 patent under the doctrine of equivalents. Mobil has also alleged that the '886 and '857 patents cover pioneering inventions and therefore are entitled to a broad range of equivalents. The parties agree that prior to Mobil's invention of ZSM-5, no known material exhibited the MFI structure. The parties also agree that the shape selectivity attributable to the MFI structure is very useful for a variety of hydrocarbon conversion reactions.

Dr. Hughes, an outside expert called by Mobil, testified that the first significant contribution to the art was Mobil's discovery in the 1960's that certain zeolites could be used to crack petroleum products. This witness testified that the second major advance in the zeolite catalyst art was Mobil's invention of the ZSM-5 family of zeolites. D.I. 124 at 58–59. This expert stated that the ZSM-5 zeolites stimulated over a thousand scientific publications. *Id.* at 60–61. He testified that twenty years after their discovery, the ZSM-5 zeolites were still stimulating research and development around the world. *Id.* at 98.

Mobil's vice-president of technology, sales and licensing, Mr. Green, testified that nine industrial processes are based upon ZSM-5 catalysts. In addition to xylene isomerization/ethyl benzene conversion, ZSM-5 is used in a variety of other processes including methanol to gasoline conversion. PX 1253. He testified that over forty chemical and petroleum companies have taken a license at one time or another to use the ZSM-5 zeolites. PX 1250; D.I. 127 at 823–26. He also testified that Mobil has received over 350 million dollars from other companies who wish to practice under these patents. *Id.* at 828–29.

Mobil also introduced many scientific articles which referred to ZSM-5 as a breakthrough in the zeolite field or a major advance in the zeolite field. *See, e.g.,* PX 1020, 1105, 1110, 1119, 1176. Although many of these articles were written by scientists at Mobil, a significant number of the articles were not. Mobil also introduced the July, 1989, volume of *Scientific American* into evidence which has a computer generated picture of the MFI structure on the cover. PX 970.

Dr. Satterfield, an outside expert called by Amoco, testified that ZSM-5 was not a pioneer invention because it did not create any new industries or products. D.I. 125 at 410–23. He also testified that ZSM-5 occupies only a "very small portion of the universe" of industrial catalysts. D.I. 130

at 1430. According to Dr. Satterfield, zeolite Y is the predominate zeolite being used commercially today if one wants to measure predominance in terms of pounds of catalyst used. *Id.* This expert also testified that ZSM–5 in not currently the dominant catalyst in xylene isomerization/ethyl benzene conversion. *Id.* at 1441.

The Court finds that although it is not Bell's telephone, Mobil's ZSM–5 represents a distinct step in the art of zeolite catalysis. The MFI structure exhibits a shape selectivity which is useful for a variety of commercially important conversion reactions. Although greater quantities of zeolite A and Y are consumed on a yearly basis, ZSM–5 is used in a wider variety of commercial processes. In addition, the MFI structure can be synthesized with very small amounts of aluminum in the framework. A low concentration of framework aluminum increases the acidity of the framework aluminum sites and makes the zeolite a more active catalyst. D.I. 124 at 88. The low aluminum content of the ZSM–5 zeolite also contributes to its thermal stability. Thus, ZSM–5 exhibited three advantages important to the zeolite catalysis art: shape selectivity of certain important hydrocarbon conversion reactions, increased activity of the acidic framework aluminum sites and increased stability. Therefore, the Court will afford the '886 and '857 patents a moderately broad range of equivalents in conducting the doctrine of equivalents analysis.

 As an initial matter, the Court must consider whether the doctrine of prosecution history estoppel limits the equivalents the Court may assign to these patents. This doctrine "precludes a patentee from asserting equivalents that would resurrect subject matter given up during prosecution to overcome rejections based upon prior art." *Hi–Life Products, Inc. v. American Nat. Water–Mattress Corp.*, 842 F.2d 323, 325 (Fed.Cir.1988). In order to determine whether the doctrine is applicable, a court must determine why the action

before the PTO was taken. *See, e.g., id.; Mannesmann Demag Corp.*, 793 F.2d at 1285.

 The prosecution history indicates that the compositional formula and the term aluminosilicate zeolite were added primarily to overcome a section 112 rejection.[37] The examiner insisted that a zeolite must be defined by a structure and a composition. PX 723 at 68. The section 102 rejection by the examiner related to his concern that the X-ray pattern of ZSM–5 did not define a structure which was different than the structure of zeolite beta. *Id.* at 70. Thus, the addition of the compositional formula and the term aluminosilicate zeolite were added to overcome an indefiniteness rather than prior art rejection.

An action taken to overcome an indefiniteness rejection does not necessarily create a prosecution history estoppel. *Mannesmann Demag Corp.*, 793 F.2d at 1285; *Caterpillar Tractor Co. v. Berco, S.p.A.*, 714 F.2d 1110, 1115 (Fed.Cir.1983). The Court finds that the prosecution history does not estop Mobil from asserting that the '886 and '857 patents cover MFI zeolites with compositions which are not literally aluminosilicates or literally within the compositional formulas of the claims. If the Court were to strictly construe these limitations, the effect would be to allow others to add inert or inactive elements to the framework of an MFI zeolite to avoid the patent while reaping benefits of the shape selective structure and the high catalytic activity associated with the framework aluminum. Such a result would be a piracy of the invention.

Loosening the compositional requirements does not mean, however, that Mobil is entitled to coverage of any zeolite with the MFI structure. The Court has reviewed the other zeolite composition patents presented at trial and notes that all the claims specify a composition as well as a structure. Based upon this review and the prosecution history, the Court finds that the doctrine of equivalents cannot be

**37.** Claim three, which originally contained a compositional formula, was not rejected under section 112.

used to construe Mobil's claims as covering all zeolites with the MFI structure without regard to composition; therefore, the silica to alumina ratios in claims one and three of the '886 patents are critical. Because the shape selectivity is controlled by the structure of the zeolite, basing a finding of equivalents on shape selectivity alone would be tantamount to a finding that these patents cover all zeolites with the MFI structure. While a zeolite must exhibit the same shape selectivity as ZSM-5 to be considered an equivalent of ZSM-5, the Court finds that this alone is not enough to make the material the equivalent of ZSM-5. Another important feature of ZSM-5 zeolites is that they derive their catalytic activity from strongly acidic regions associated with framework aluminum. D.I. 124 at 88. If an MFI zeolite with the claimed silica to alumina ratio fails to literally infringe the claim due to the presence of other framework species, the Court believes such a zeolite is the equivalent of ZSM-5 if the activity of the compound is substantially due to the acidic sites associated with the framework aluminum. Therefore, for an MFI zeolite with an appropriate silica to alumina range to be the equivalent of ZSM-5, the zeolite must: (1) function as a catalyst; (2) in substantially the same way as the ZSM-5 catalysts that is using the shape selectivity attributable to the MFI structure and through activity attributable in substantial part to framework aluminum; and (3) achieve substantially the same result, that is, hydrocarbon conversion.[38]

### (a) The AMS-1B Sieves

■ The AMS-1B sieves have the MFI structure but do not satisfy the silica to alumina ratio of either claim one or three of the '886 patent. See literal infringement section supra. Furthermore, it is undisputed that the AMS-1B sieves have never been used as commercial catalysts. Although one expert called by Mobil testified that the catalytic activity of the sieves would be quite good if reactions were run at high temperatures, the majority of the witnesses described the catalytic activity of the sieves as poor. Based upon this evidence, the Court finds that Mobil has failed to establish by a preponderance of the evidence that the AMS-1B sieves function as catalysts. Although the AMS-1B sieves have some acidic sites due to impurity levels of aluminum in the silicon source, the vast majority of acidic sites in the AMS-1B sieves are weakly acidic sites associated with framework boron. Therefore, the Court finds that the AMS-1B sieves do not function in substantially the same way as the ZSM-5 zeolites. The AMS-1B sieves do achieve hydrocarbon conversion albeit at very low levels. The Court finds that Mobil has failed to establish that the AMS-1B sieves are the equivalents of ZSM-5. Therefore, the AMS-1B sieves do not infringe claims one and three of the '886 patent nor claims one and two of the '857 patent under the doctrine of equivalents.

### (b) The AMSAC Catalysts

■ The zeolite portions of the AMSAC catalysts have the MFI structure. The zeolite portions of all of the AMSAC catalysts satisfy the silica to alumina ratio of claim one of the '886 patent. The zeolite portion of AMSAC 1203M also satisfies the silica to alumina ratio of claim three of the '886 patent. See literal infringement sections supra.[39] It is undisputed that the AMSAC catalysts function as catalysts. Amoco has admitted using these catalysts in is commercial xylene isomerization/ethyl benzene conversion facilities. D.I. 107, Exhibit G, Nos. 24, 25, 26.

Mobil introduced evidence at trial which established that the AMSAC catalysts exhibited the same shape selectivity as the ZSM-5 catalysts. D.I. 125 at 433–41. Although the boron in the AMS-1B sieves

---

38. The ratio must fall between five and one hundred to infringe claim three of the '886 patent and clam two of the '857 patent. The ratio must fall between five and two thousand to infringe claim one of the '886 patent and claim one of the '857 patent.

39. This is not to infer that the Court is resorting to literal infringement analysis for the determination of equivalents but is considering the silica to alumina ratio as one factor for the analysis determination.

may cause the pores in the dry AMS–1B sieves to be one or two percent smaller than the pores in the ZSM–5 zeolite, no expert identified a molecule which would be excluded from the AMS–1B sieve but admitted into the ZSM–5 zeolite as a result of this difference. The Court has found that the source of the catalytic activity in AMSAC catalysts is framework aluminum. *See* literal infringement of '872 patent *supra*. The Court finds that the AMSAC catalysts function as catalysts in substantially the same manner as ZSM–5 because the AMSAC catalysts utilize the shape selectivity associated with the MFI structure and have catalytic activity which is substantially due to sites associated with framework aluminum in the zeolite component of the catalysts.[40]

The final question is whether the AMSAC catalysts and the ZSM–5 catalysts obtain substantially the same results. An inside expert from Mobil presented evidence comparing the selectivity in xylene isomerization/ethyl benzene conversion of the AMSAC catalysts with several different of the ZSM–5 catalysts. PX 1280, 1282, 1283; D.I. 125 at 433–40. In each case the data results obtained from the AMSAC catalysts were bracketed by the results obtained from the ZSM–5 catalysts. Based upon this evidence, the expert testified that the catalysts produced substantially the same results.

Amoco has admitted that the AMSAC catalysts are used in its commercial xylene isomerization/ethyl benzene conversion processes. Amoco formerly used a ZSM–5 catalyst for this purpose. Dr. Satterfield testified that the AMSAC catalysts gave better results than the ZSM–5 catalysts in these processes. DX 838, 839, 841; D.I. 136 at 2581. The expert stated that the small improvements in performance correlate to a savings of millions of dollars for Amoco. D.I. 130 at 1467. He presented information about the performance of new, regenerated and old AMSAC catalysts. Because the techniques used to collect this data were not known at the time the MVPI catalysts were installed in the Amoco facilities, the data does not contain any information about the performance of fresh MVPI catalysts. D.I. 136 at 2583. The exhibits depict very small differences. For example, the difference in xylene isomerization activity is less than two percent. Given these small differences, the Court finds that a comparison of performance of only old MVPI catalysts to all types of AMSAC catalysts limits the probative value of these exhibits.

Dr. Szostak presented other evidence indicating that one member of the ZSM–5 family performed in a substantially different manner than AMSAC in a variety of catalytic tests. DX 1145, 1146, 1147; D.I. 128 at 1079–82. The ZSM–5 catalyst had a framework aluminum content in the range which Mobil alleges is present in the AMSAC catalysts. Based upon these studies, Dr. Szostak concluded that the results achieved by ZSM–5 catalysts and the AMSAC catalysts were significantly different. *Id.* at 1083. Dr. Kutz from Amoco testified that the zeolite crystallite size was not the same in each of these catalysts. D.I. 134 at 2289–90. She agreed that crystallite size could affect the selectivity of a catalyst. *Id.* at 2329–30.

The Court finds that the tests presented by Amoco indicate that framework or nonframework boron modifies the performance of the AMSAC catalysts relative to the ZSM–5 catalysts. The presence of boron may produce a catalyst which performs in a superior manner to a specific ZSM–5 catalyst in certain situations. The comparison of single members of the ZSM–5 catalysts to AMSAC catalysts does not provide persuasive evidence that the results obtained by these catalysts are substantially different. Therefore, the Court finds that Mobil has established by a preponderance of the

---

**40.** Amoco argues that ZSM–5 and AMSAC catalysts do not function in substantially the same way because boron was not recognized as the equivalent of aluminum in the zeolite field. This argument is not relevant because the activity in the AMSAC catalysts is associated with framework aluminum. Because the activity in AMSAC catalysts is substantially due to the framework aluminum, then the presence of other framework elements will not avoid infringement.

evidence that the AMSAC catalysts achieve results which are substantially the same as results achieved by the ZSM–5 catalysts.

The Court finds that the AMSAC catalysts perform substantially the same function in substantially the same way to achieve substantially the same results. The Court finds that under the doctrine of equivalents, Amoco infringes claims one and three of the '886 patent and claims one and two of the '857 patent by using AMSAC 1203M catalysts in xylene isomerization/ethyl benzene conversion reactions. The Court also finds that Amoco infringes claim one of the '886 patent and claim one of the '857 patent under the doctrine of equivalents by using AMSAC 2400 and AMSAC 3400 in xylene isomerization/ethyl benzene conversion reactions.

2. The '872 Patent

Strictly speaking, the doctrine of equivalents is inapplicable to claim six of the '872 patent because the Court has already found literal infringement of this claim. In the interests of providing a complete record, however, the Court will set out the doctrine of equivalents analysis for this claim.

Mobil contends that the '872 patent is a pioneer invention and its VPI process is one embodiment of the '872 invention. The parties do not dispute that the MVPI process is similar to the Octafining process with the exception that the MVPI process uses a ZSM–5 type catalyst. Mr. Green testified that in the period from 1975 through 1980, MVPI captured 57% of the xylene isomerization capacity of the United States and 44% of the worldwide capacity for xylene isomerization. D.I. 127 at 831–32. By 1980, 14 units were licensed to use MVPI. *Id.* at 831. He testified that this was a remarkable rate of changeover to a new technology. *Id.* at 832. As of 1989, 10 units were licensed to practice MHTI, another embodiment of the '872 invention and 2 units were licensed to practice MVPI. *Id.* at 890–91.

Mr. Schwartz testified that the '872 patent introduced a new reaction mechanism into the art of xylene isomerization because it allows simultaneous xylene isomerization

and ethyl benzene conversion without the use of a napthene pool intermediate. D.I. 124 at 237. This expert testified that the '872 patent marked a distinct step in the progress of the art. D.I. 125 at 276–77. He also testified that the value of the MVPI process was that it allowed existing Octafining facilities to achieve greater yields of para xylene and eliminated the need to build new plants. D.I. 124 at 238. Mobil also introduced Amoco documents which contained statements indicating that MVPI was a "major breakthrough" and "a great improvement in paraxylene technology." *See, e.g.,* PX 192, 681.

Amoco argues that the '872 patent is not a pioneer patent. Dr. Satterfield testified that the '872 process was not the first process to accomplish simultaneous xylene isomerization and ethyl benzene conversion. He testified the '872 process was not the first xylene isomerization process to use an aluminum containing catalyst nor the first to use an acidic catalyst, D.I. 130 at 1436, nor was it the first xylene isomerization process to use a zeolite. *Id.* at 1436–37. The witness also testified that the '872 process has not displaced other commercial xylene isomerization processes; UOP is licensing a competing xylene isomerization process.

■ The Court finds that the '872 patent covers a very profitable process for xylene isomerization. Although the process is more than a mere improvement, it is not a pioneer invention. The process covered by the '872 patent relies upon a previously known process with one important change, the addition of a ZSM–5 catalyst. The '872 patent has not supplanted all of the competing xylene isomerization processes. The process has not generated any new industries or technologies. Nor has the patent stimulated research and articles in the manner of the '886 patent. Therefore, the Court finds that the '872 patent is entitled to a limited scope of equivalents.

■ Even with a limited scope of equivalents, the Court would find that Amoco's use of the AMSAC catalysts to be the equivalent of claim six of the '872 patent.

Amoco uses AMSAC in a process with the same function as that described in claim six, simultaneous xylene isomerization and ethyl benzene conversion. The temperature, pressure, hydrogen flow and weight hourly space velocity are similar. PX 739, 744; D.I. 124 at 253–54. Furthermore, the catalysts in each process are substantially the same. They both use the shape selectivity of the MFI structure and the activity of the catalysts is primarily due to the region associated with framework aluminum. As the Court has discussed in the previous section, the presence of framework and non-framework boron in the AMSAC catalysts does not substantially add to the catalytic activity of the materials.

Finally, as the Court has found in the previous subsection, Amoco obtains substantially the same results with the process of isomerization using the AMSAC catalysts as the results obtained when the process covered by claim six of the '872 patent is used.

Therefore, if the Court had not found literal infringement of claim six of the '872 patent, the Court would find that Amoco's use of the AMSAC catalysts infringes this claim under the doctrine of equivalents.

3. The '573 Patent

▮ The '573 patent is directed toward aluminosilicate zeolites which have been impregnated with boron oxide, magnesium oxide and/or phosphorous oxide. Mobil has not alleged that the '573 patent is a pioneer.[41] Aside from Mobil's allegations that Amoco has used these compositions, Mobil has introduced no evidence to show that compositions covered by the patent have been used commercially. Therefore, the Court concludes that the claims of this patent are entitled to only a narrow range of equivalents. Claims one and eight cover aluminosilicate zeolites of a certain constraint index which have been impregnated with various amounts of boron oxide. To be the equivalent, a zeolite must: (1) func-

tion as a catalyst; (2) in substantially the same way, that is, by using an aluminosilicate zeolite with the appropriate constraint index in combination with the claimed amount of non-framework boron; and (3) achieve substantially the same results, such as the conversion of aliphatic hydrocarbons to aromatic hydrocarbons with low coke formation and high thermal stability. To be the equivalent of the compositions covered by claim two, the zeolite must meet these three criteria and possess the MFI structure.[42]

(a) *The AMS–1B Sieves*

▮ As the Court has previously found, the AMS–1B sieves do not function as catalysts. Therefore, the first prong of the equivalence test is not met. In addition, the AMS–1B sieves contain large quantities of framework boron in comparison to their framework aluminum. Given the limited scope of equivalents this patent is entitled to and given the perception at the time that boron incorporation into a zeolite was difficult or impossible, the Court finds that a zeolite containing such substantial amounts of framework boron is not the equivalent of aluminosilicate zeolite as the term is used in the '573 patent. Therefore, the second prong of the equivalence test is not satisfied. Finally, Mobil has not introduced any evidence indicating that the AMS–1B sieves can be used to achieve the results described in the '573 patent. The Court finds that the AMS–1B sieves do not infringe claim one, two or eight of the '573 patent under the doctrine of equivalents.

(b) *The AMSAC Catalysts*

▮ The AMSAC catalysts do function as catalysts. Therefore, the first prong of the analysis is satisfied. The parties agree that some of the boron in the AMSAC materials is not in the framework. The zeolite portion of the AMSAC catalysts do contain significant amounts of framework aluminum and might be considered aluminosilicates. The Court need not decide this

41. At the pretrial conference, Mobil moved to amend the pleadings to allege that this is a pioneer patent. The Court denied Mobil's motion.

42. The presence of magnesium and/or phosphorous is not relevant to this case.

issue, however, because Mobil has failed to establish that the AMSAC catalysts achieve substantially the same results as the claimed compositions. For example, the catalysts in the patent are described as useful in producing "light olefinic hydrocarbons and mononuclear aromatics" from "lower monohydric alcohols having up to four carbon atoms, their either derivatives or mixtures of any of these." PX 725, col. 1, lines 8–14. Mobil did not introduce any evidence suggesting that the AMSAC catalysts could be used to accomplish these reactions. Therefore, the Court finds that the AMSAC catalysts do not infringe claims one, two or eight of the '573 patent under the doctrine of equivalents.

### E. *Willful Infringement*

■■■■ Mobil has alleged that Amoco willfully infringed the patents at issue in this litigation. A party seeking to establish that an infringer willfully violated the patent rights of another must prove the bad faith of the infringer by clear and convincing evidence. *Shatterproof Glass Corp. v. Libbey–Owens Ford Co.*, 758 F.2d 613, 628 (Fed.Cir.), *cert. dismissed,* 474 U.S. 976, 106 S.Ct. 340, 88 L.Ed.2d 326 (1985); *American Standard, Inc.*, 722 F.Supp. at 106. In determining whether infringement has been willful, a court should consider the totality of the circumstances. *Rite–Hite Corp. v. Kelley Co.*, 819 F.2d 1120, 1125 (Fed.Cir.1987). Factors to consider include: the infringer's deliberate copying of the ideas or designs of another, the infringer's knowledge of the patent rights of another, any good faith belief of invalidity or non-infringement formed by the infringer after an investigation of the patent rights of another and the infringer's behavior as a litigant. *Bott v. Four Star Corp.*, 807 F.2d 1567, 1572 (Fed. Cir.1986), *cert. denied,* 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 533 (1988); *American Standard,* 722 F.Supp. at 106.

■■■■ If a potential infringer has actual knowledge of another's patent rights, as Amoco does in this case, it has a duty to exercise due care to determine whether or not its contemplated activity will violate the patent rights of another. *Bott,* 807 F.2d at 1572. To meet this duty, the potential infringer must conduct an investigation and form a good-faith belief that the patent is invalid or that it is not infringed. *Windsurfing International, Inc. v. Fred Ostermann GmbH,* 668 F.Supp. 812, 814 (S.D.N.Y.1987); *see also Bott,* 807 F.2d at 1572. This usually involves obtaining competent legal advice before beginning any activity which may be infringing. *Bott,* 807 F.2d at 1572.

■■■■ Mobil bases its argument of willful infringement upon a variety of evidence. Mobil argues that Amoco copied the Mobil patents at issue in this suit. Mobil introduced deposition excerpts and Amoco documents into evidence which indicate that the Amoco scientist who invented the AMS–1B sieves began his project by following the examples in the '886 patent. PX 1342 at 130; PX 13. Mobil also introduced Amoco documents which indicated that this scientist intended to "break" Mobil's patents. PX 47, 147.

It took Mobil approximately ten years to commercialize ZSM–5. PX 192 at 2. Mobil argues that Amoco was able to commercialize the AMSAC catalyst in only three years discovery because Amoco did no original research but merely copied Mobil's patents. A witness from Amoco, Dr. Pohlmann, testified that Amoco did not copy the ZSM–5 technology that was patented by Mobil. He stated that Amoco has a long-standing corporate policy of non-infringement. D.I. 136 at 2558. In making AMS–1B and AMSAC, Amoco was attempting to develop a proprietary non-infringing catalyst. Amoco spent approximately 5 million dollars in the development of the AMSAC catalysts. *Id.* at 2528. He testified that three years from discovery to commercial use of the AMSAC catalyst was a reasonable time period. *Id.* at 2526. Dr. Pohlmann suggested that it took Mobil ten years to commercialize the ZSM–5 technology because Mobil did not actively pursue its commercialization.

Although one or two of the scientists at Amoco used the term "breaking" the Mobil patent or "breaking into" the ZSM–5 tech-

nology, the Court finds that in 1976 and 1977 Amoco was legitimately attempting to design around the Mobil patents. It is clear that scientists from Amoco were using the information in the Mobil patents to aid them in developing their own AMSAC catalysts. Amoco's activity did not, however, amount to a copying of the compounds and processes protected by Mobil's patents.

Dr. Pohlmann testified that Amoco has a common practice of discussing new inventions with its patenting and licensing department and relying on these opinions in order to determine whether or not to proceed with a project. From December of 1976 through May of 1986, the in-house patenting and licensing department sent opinions to the Amoco personnel in charge of the AMSAC catalyst program.[43] D.I. 136 at 2544; DX 969, 971, 973, 976, 978, 979, 980. In 1982 and in 1984, outside counsel sent opinions to Amoco regarding the issues of validity and infringement of the Mobil patents. D.I. 136 at 2554; DX 981, 982. Thus, Amoco continually sought the advice of counsel regarding whether or not the AMS-1B sieves and AMSAC catalysts infringed any of Mobil's patent rights. *Id.* at 2546-47.

Amoco also undertook an investigation of its AMS-1B sieves and AMSAC catalysts. In February of 1977, Amoco management personnel decided that the AMS-1B sieves must be characterized by methods other the X-ray diffraction to determine whether or not the boron was in the framework of the sieve. PX 75. An expert from Amoco testified that she spent between ten and forty percent of her time over an eight year period working on experiments to characterize the AMS-1B sieves and AMSAC catalysts. D.I. 134 at 2330-31. Amoco also hired outside consultants to help with this project.

As the Court has previously discussed, the IR studies conducted by Amoco revealed that if the IR of a ZSM-5 catalyst were compared with the IR of an AMSAC catalyst with similar activity, the IR spectra of the ZSM-5 catalyst showed a signal associated with framework aluminum that was much larger than the signal found in the AMSAC catalysts. *See* literal infringement of '886 patent *supra.* The Court finds that if one were presented only with this evidence, one could reasonably conclude that the majority of the activity of the AMSAC catalyst was not due to framework aluminum.

**43.** Mobil filed a motion in limine to exclude the contents of Amoco's attorney opinions on the ground that Amoco did not waive the attorney-client privilege with respect to these opinions until immediately before the pre-trial conference. Mobil also contends that Amoco did not identify all of the opinions it introduced into evidence when Amoco answered Mobil's interrogatories. Mobil argued that the late waiver of the privilege unfairly deprived Mobil of obtaining fact discovery regarding these opinions. Mobil also contends that producing the attorney opinions without producing all attorney-client privileged documents relating to invalidity or non-infringement constitutes an impermissible partial waiver of the privilege.

Amoco insists that it did notify Mobil of all of the opinions that it would rely upon at trial. Amoco contends that its answer to Mobil's interrogatory makes it clear that Amoco would waive the privilege with respect to these opinions at trial. Amoco argues that it properly maintained the privilege with respect to these documents until there was no prospect of a future settlement of the case. Amoco denies that waiving the privilege with respect to the attorney opinions requires a general waiver of

all privileged material. Amoco argues that Mobil was not prejudiced by the opinions because they were produced to Mobil two months before trial. Amoco also argues that because Mobil did not object to these opinions at the pretrial conference, Mobil is barred from objecting to the motions at a later date.

The Court took the motion under advisement and allowed the testimony and cross-examination of Amoco's witness subject to the testimony and exhibits being struck if the Court granted Mobil's motion.

Although both parties argue that Amoco's answer to Mobil's interrogatory clearly supports their position, the Court finds the interrogatory and answer to be ambiguous. The Court finds that Amoco's failure to clearly waive the privilege before the close of discovery prevented Mobil from taking any appropriate discovery regarding the opinions or from ascertaining that all of the documents relating to the opinions had been produced. The Court finds that a party's hopes for settlement do not justify a failure to comply with a discovery schedule.

The Court will grant Mobil's motion in limine and will not consider the contents of the opinions in deciding the willfulness issue.

Nor did the TPD evidence and NMR evidence obtained by Amoco establish that the AMSAC catalysts contained substantial amounts of framework aluminum. When Mobil presented its original results regarding the HCl extracted AMSAC catalysts to Amoco, Amoco studied Mobil's technique and produced evidence that the extraction techniques used by Mobil inserted framework aluminum into the zeolite portion of the AMSAC sieves. It was not unreasonable for Amoco to rely upon its own data and conclusions and refuse to accept Mobil's position based upon the evidence obtained from the HCl extracted AMSAC samples.

In December of 1990, Mobil presented Amoco with spin echo NMR evidence of unextracted AMSAC samples which showed that there were substantial amounts of framework aluminum in the zeolite portion of the AMSAC catalysts. Amoco used the time between December of 1990 and trial in February of 1991 to verify the spin echo NMR work. Amoco's expert was able to repeat one of the experiments done by the Plaintiff's expert. As the Court has previously discussed, this expert drew a different conclusion from his spin echo NMR work. Even though the Court ultimately reached a different conclusion than the one reached by Amoco, this does not negate a finding that Amoco had reached a good faith determination of noninfringement after a thorough investigation of its AMS–1B sieves and AMSAC catalysts.

In spite of the characterization difficulties of the catalysts, Mobil's apparent position is that given the conditions of the AMSAC preparation, Amoco knew or maintained a studied ignorance regarding the leaching of boron from and insertion of aluminum into the AMS–1B sieves. Mobil also contends that Amoco should have known that framework aluminum rather than framework boron was the source of the catalytic activity in AMSAC catalysts. In addition to expert testimony, Mobil cites a few reports by Amoco scientists and some literature references to support this proposition. D.I. 124 at 131, 145–47; D.I.

127 at 740–41; PX 217, 624, 263, 264, 532, 781.

Having the advantage of a three week trial with meticulously organized evidence presented by skilled counsel, it would be tempting for the Court to look at these indications of aluminum insertion and boron leaching and with the benefit of hindsight decide that any competent scientist should have known that the aluminum content of AMS–1B sieves was being dramatically increased during the catalyst formation process. To do so would be error. Amoco did not have the benefit of hindsight when the various results became available. The Court finds that these indicia of boron leaching and aluminum insertions do not provide clear and convincing evidence that Amoco shirked its duty to investigate whether or not its activity infringed Mobil's patents.

Mobil also contends that Amoco's bad faith can be gleaned from the fact that it deliberately hid its infringing activity from Mobil. A marketing executive for Mobil testified that when Amoco asked Mobil to remove its MVPI catalyst from the Amoco facility in 1980, Amoco told Mobil that the removal was for operational reasons. D.I. 127 at 840. Amoco instructed its plant operators not to mention to Mobil that the facilities were to be recharged with AMSAC catalysts. D.I. 136 at 2618.

Mobil also introduced Amoco documents which suggested that researchers at Amoco were aware that boron leached from the framework of the AMS–1B sieves and took pains to avoid making this information public. PX 702. A witness who testified on behalf of Mobil suggested that another Amoco scientist made presentations using IR spectra which de-emphasized the possibility that the AMSAC catalysts contained framework aluminum. D.I. 138 at 3122–29, 3134, 3139; PX 1505, 1506.

Dr. Pohlmann testified that Mobil was not told about the AMSAC catalyst installation because the catalyst was a proprietary material. D.I. 136 at 2530–31. He denied there was any attempt to trick Mobil into believing that the Amoco plant was being shut down. *Id.* Dr. Kutz testified that she

did not want to discuss the boron leaching at the scientific conference because she did not understand what was causing it. She also testified that the conditions which caused the boron leaching were not related to the commercial production of AMSAC catalysts. D.I. 134 at 2322–23. The testimony regarding the IR spectra in the poster paper was put on during Mobil's rebuttal so Amoco did not have the opportunity to respond to it.

In spite of Amoco's explanations, this evidence is troubling to the Court. It is possible to draw inferences of an intent to deceive Mobil and/or the scientific community from this evidence. On the other hand, Amoco had no obligation to disclose its AMSAC catalyst to Mobil. Amoco is also entitled to choose which of its research results it believes are worthy of publication. The Court cannot find by clear and convincing evidence that Amoco knowingly attempted to conceal infringing activity.

Finally, Mobil contends that Amoco's actions throughout the litigation indicate that it is infringing in bad faith. Mobil cites Amoco's refusal to admit that the AMS–1B sieves have the X-ray lines of the '886 patent until shortly before trial. Mobil also refers to Amoco's model of AMS–1B which was destroyed during the discovery period in this action.

Amoco contends that it admitted that the AMS–1B sieves and zeolite portions of the AMSAC catalysts have the lines of the '886 patent in order to simplify the issues to be tried.[44] An expert witness called by Amoco has testified that dry AMS–1B sieve has an X-ray diffraction pattern that is perceptively different than ZSM–5 although the AMS–1B pattern falls within the error ranges claimed by the '886 patent. D.I. 137 at 2969. Another witness called by Amoco testified about the melting of the AMS–1B model. He testified that the model meltdown was the result of a cooling fan failure and purely accidental. D.I. 136 at 2783.

The Court finds nothing in Amoco's behavior as a litigant which would support a finding of willful infringement. Because of their preclusive effect, a party has a legitimate interest in answering requests for admissions cautiously and only after the scope of the admission is clear. The Court believes that there is a significant difference between "having the X-ray diffraction lines of table I" and having x-ray diffraction lines "falling within the error ranges of the X-ray diffraction lines of table I." PX 743–A, 752–A. Ideally, Amoco would have explained this distinction in its first answer to Mobil's request for admissions rather than answer with a simple denial. Given a case of this size with its attendant enormous discovery burden, the Court infers no bad faith on the part of Amoco.[45]

The Court hesitates to justify the argument by making a finding on the melted model. In the interests of providing a comprehensive record, the Court finds that clear and convincing evidence indicates that the melting of the model was accidental. No bad faith can be attributed to Amoco as a result of this unfortunate event. The Court concludes that there is no evidence to suggest that Amoco's behavior as a litigant supports a finding of willful infringement.

The Court finds that Mobil has failed to show by clear and convincing evidence that Amoco willfully infringed the '886, '573 and '872 patents.

## V. VALIDITY

Amoco has asserted several affirmative defenses regarding the validity of the four patents at issue in this litigation. Amoco

---

**44.** The Court notes that for the purposes of determining infringement, whatever motivated Amoco to make the admission is irrelevant. The admission satisfies the requirement that the AMS–1B sieves and AMSAC catalysts have the x-ray diffraction lines described in the '886 patent.

**45.** Mobil also contends that Amoco assured Mobil that the X-ray patterns of AMS–1B and ZSM–5 were different. Mobil argues that Amoco's subsequent admission means that the earlier assurance was in bad faith. Due to the boron in the framework of AMS–1B and due to the fact that table I does not describe every x-ray diffraction line of the MFI structure, it is possible for the patterns to be different in detail, but grossly the same. Therefore, the Court infers no bad faith from Amoco's position.

contends that the '886 patent and the '857 patent are invalid under 35 U.S.C. § 102(b). Amoco asserts that the '872 and '573 patents are invalid under 35 U.S.C. § 103. Finally, Amoco argues that all of the patents are invalid under the first and second paragraphs of 35 U.S.C. § 112.

 Mobil's patents are entitled to a statutory presumption of validity. 35 U.S.C. § 282; *Hybritech, Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1375 (Fed.Cir.1986), *cert. denied*, 480 U.S. 947, 107 S.Ct. 1606, 94 L.Ed.2d 792 (1987). Amoco bears the burden of proving invalidity by clear and convincing evidence. *Hybritech*, 802 F.2d at 1375; *Phillips Petroleum Co.*, 673 F.Supp. at 1293. This is true whether Amoco is asserting prior art or technical defenses. *Hybritech*, 802 F.2d at 1375 (prior art defenses, 35 U.S.C. §§ 102, 103); *Ralston Purina Co. v. Far-Mar-Co., Inc.*, 772 F.2d 1570, 1574 (Fed.Cir.1985) ("party asserting invalidity based on 35 U.S.C. § 112 bears no less a burden and no fewer responsibilities than any other patent challenger").[46]

A. *Section 102(b)*

 Section 102(b) provides in pertinent part that one is entitled to a patent "unless ... the invention was ... described in a printed publication in ... a foreign country ... more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b). Amoco argues that the '886 and '857 patents are invalid under section 102(b) because a Venezuelan patent application which qualifies as a printed publication was available to the public more than one year prior to the effective application date of the '886 and '857 patents.

Unlike the United States which allows only inventors to apply for a patent, under Venezuelan law an assignee of an invention may file a patent application. When an application is filed, it is listed in three indices. First, it is logged in a date book of the Patent Office and given a inscription regis-

tration number. D.I. 130 at 1557. Next, an application card is started. This card will reflect the history of the application as it develops. *Id.* Finally, the application is added to the appropriate assignee card. Each assignee card lists all of that assignee's Venezuelan patents and patent applications. *Id.*

After the application is indexed, the Patent Office issues an abstract of the application to the applicant and orders publication of the abstract. *Id.* at 1558. It is the responsibility of the applicant to publish the abstract three times in a local paper of Caracas. The publications are supposed to be at ten day intervals. *Id.* After the publications in the local newspaper are complete, the Patent Office publishes a notice of the pending application in the official bulletin. A sixty day opposition period runs from the time of the bulletin publication. If there is no opposition, the grant of the patent will be announced in another bulletin. *Id.*

On April 14, 1967, Mobil filed its first United States patent application directed toward the ZSM-5 zeolites and their uses. PX 724. Mobil filed a very similar application in Venezuela on March 28, 1968. DX 710, 710-A, 480. On October 2, 1968, the first of three newspaper notices announcing the pendency of Mobil's Venezuelan patent application was published in a Caracas paper, *La Religion*. DX 711, 712, 713. On October 10, 1969, Mobil filed a continuation-in-part application of its original patent application. PX 723. In November of 1969, notice of Mobil's pending Venezuelan application was published in the official Industrial Property Bulletin. DX 727. The 1967 United States patent application and the Venezuelan patent application were abandoned. The United States continuation-in-part application eventually issued as the '886 patent. A divisional application of the continuation-in-part was reissued as the '857 patent.

Amoco argues that the Venezuelan patent application qualifies as a printed publi-

---

**46.** At one point, Amoco also asserted that the '872 patent was invalid because it named the wrong inventorship entity. Amoco did not present any evidence or arguments regarding this defense at trial. The Court considers this defense to be waived.

cation and it became available to the public on October 2, 1968. Amoco contends that the '886 and '857 patents have an effective filing date of October 10, 1969, rather than the parent filing date of April 14, 1967. Therefore, Amoco asserts, these patents are invalid by virtue of Mobil's Venezuelan application.

Mobil argues that the Venezuelan patent application is not a printed publication within the meaning of section 102(b). Even if the application is a printed publication, Mobil contends it was not available to the public until the notice was published in the official bulletin. Finally, Mobil asserts that the '886 and '857 patents are entitled to the 1967 filing date of the abandoned parent application.

■ Although older decisions considered whether a reference was "printed" and "published", the modern approach focuses on whether the reference was accessible to interested members of the public. *In re Wyer*, 655 F.2d 221, 226 (C.C.P.A. 1981). The reference need not actually be printed or published. The key question is whether a "perceptible description of the invention, in whatever form it may have been recorded" was available to the public. *Id.* After accessibility is proven, the question of whether an interested member of the public actually received the information is irrelevant. *Constant v. Advanced Micro–Devices, Inc.*, 848 F.2d 1560, 1569 (Fed. Cir.), *cert. denied*, 488 U.S. 892, 109 S.Ct. 228, 102 L.Ed.2d 218 (1988).[47]

Access involves factual issues such as classification and indexing. *Wyer*, 655 F.2d at 226. The Court of Appeals for the Federal Circuit has held that a single catalogued copy of a thesis, shelved in one university library was a printed publication under section 102(b). *In re Hall*, 781 F.2d 897, 899–900 (Fed.Cir.1986). In contrast, three theses were held to be inaccessible because they were indexed only by the authors' names which bore no relationship to the subject matter of the theses. *In re*

*Cronyn*, 890 F.2d 1158, 1161 (Fed.Cir. 1989).

Although the office has no subject matter indexing system, the Court heard convincing testimony that the abstract printed in the local Caracas newspaper and the official bulletin links the application number and a brief description of the subject matter of the application to the name of the assignee. With this information, the application can be easily located because the applications are indexed by assignee name. The Court also heard testimony that individuals who already know that a company is involved in a certain area of research can use the assignee indexing system to determine what applications have been filed by that company.

This situation is distinguishable from the author shoe box indexing system in *Cronyn*. In *Cronyn* there was no logical connection between the author and the subject matter of the thesis. In this case, the abstracts provide that missing link. The Court finds that although it is not an ideal system for retrieving information, members of the public can readily locate Venezuelan patent applications of interest.

Although the patent applications are not printed, members of the public may receive copies. By statute, plain copies of patent applications are to be given interested members of the public at no charge. D.I. 130 at 1565. Because the copy machine in the registry was often inoperable in 1969, information in the patent applications was transcribed in longhand or with a portable typewriter. Portable photocopiers were also used. D.I. 131 at 1694–95. A Venezuelan patent agent called by Amoco testified that in 1969 his firm used either portable typewriters or portable photocopiers to take information from the patent applications. He believed that the more likely method was the portable photocopier. *Id.* at 1647.

The more difficult issue is determining the point when the Venezuelan patent ap-

---

**47.** In addition to being accessible, the reference must teach the patented invention. With the aid of the reference, one of ordinary skill in the art must be able to make the claimed invention without further experimentation. *In re Hall*, 781 F.2d 897, 899 (Fed.Cir.1986). The parties agree that the Venezuelan patent application meets this criterion.

plications became accessible to the public. Amoco contends the Venezuelan patent applications are open to the public at least as early as the first local newspaper publication. Mobil argues that the applications are not publicly available until publication in the official bulletin. The Venezuelan patent attorney who testified for Amoco, Mr. Bentata, stated that the patent statute requires that patent applications be accessible to the public from the date they are filed. Thus, Mobil's application would have been available to a member of the public on March 28, 1968. D.I. 130 at 1571. He relied upon article 40 of the statute which states that:

> The Registrar is compelled to let the books, indexes, documents, dockets, acts and plans available at the Registry Office be shown to anyone who may so request them, without charging any fee for such work, or for allowing the parties to take plain copies that they may wish. Excepted from this provision are the files of the patents of invention which may have been preserved in secrecy in accordance with the Law.

Patent & Trademark Law in Venezuela 1955, Bolet & Terrero translation, PX 1197, Article 40. He stated that the statute governing patents was a specific law which would overrule any general law regarding the secrecy of government files. D.I. 130 at 1575. The patent attorney testified that the exception of secrecy extends only to those patent applications which the Government has determined relate to national security. He said that this exception embodied in Article 16 has never been invoked since the passage of the patent statute.[48] *Id.* at 1567.

Mr. Bentata brought certified copies of two patent applications which he had obtained from the Registry. One copy was obtained between the second and third pub-

lication of the abstracts in the local Caracas newspaper. *Id.* at 1617; DX 718 through 721, 907. The other certified copy was obtained after the three local publications but prior to the publication in the official bulletin. D.I. 130 at 1617–18; DX 723, 724, 725, 908, 909. These copies were obtained in 1988. He testified that in 1969, it was no harder to get patent applications before the official bulletin publications. He stated it is actually more difficult to do so now because "Government offices are being made aloof over discussion of the sort that we are carrying on here." D.I. 130 at 1619. The witness testified that to make simple copies, however, one did not have to make a request to the Registrar. Those copies could be obtained from the personnel who worked at the office. D.I. 131 at 1666.

Upon cross-examination, he indicated that these patent applications he obtained were prosecuted by his brother who has the same surname as the witness. He and his brother do not work at the same law firm, however. *Id.* at 1635–36. He agreed that the Registrar of the office in 1969 was not the same person as the Registrar of the office in 1988. *Id.* at 1665. He also agreed that some practitioners have interpreted the Venezuelan patent law to require secrecy until the patent abstract is published. He testified that he believed these practitioners were in error. *Id.* at 1672–74.

Another witness called by Amoco, Mr. Haynes, worked in the Registry Office. He began working at the Ministry of Development in 1952 and became an office supervisor. The witness worked in the office which maintained the index card system. *Id.* at 1690–92. He testified that the Registrar did not routinely handle the files. *Id.* at 1696. If anyone requested access to a pending patent application, he would give

---

**48.** Article 16 provides:

When an invention or discovery may interest the State, or may be considered basically of public interest, the National Government may, by reason of social or public interest, decree the expropriation of the right of the inventor or discoverer, adhering to the requisites which the Law on the matter provides for the expropriation of property.

In the publications which have to be issued for this purpose, the subject matter of the invention or discovery shall be omitted, and it shall solely mention that same is covered by the terms of this Article.

PX 1197, Article 16.

them a copy of the application if the person showed him that the abstract had been published at least once in a Caracas paper. *Id.* at 1693. He testified that this was not only his personal practice but also the custom of the office.

Upon reviewing the newspaper notices of the Mobil patent application, he testified that a member of the public could have obtained copies of that application on October 2, 1968. *Id.* at 1697–98.

Upon cross-examination, the witness agreed that currently there are signs posted in the Registry Office. The Court interpreter translated one of these signs in the following manner:

> In large type letters, it says on top: "Notice." Then it says: "The public in general is hereby notified that information is—will only be information on patent applications, improvements, models, industrial drawings and introduction will be given out on those which have been published in the Bulletin of Industrial Property." And on the bottom right it says: "The Director."

*Id.* at 1732; PX 1432. The witness stated, however, that these signs were not posted during 1968 and were not posted until after he retired from the office in 1988. D.I. 131 at 1729–32, 1735.

Another witness called by Amoco, Mr. Sylvester, had been patent counsel at a large United States corporation with a subsidiary in Venezuela. He was patent counsel from 1967 to 1972. From 1972 until 1988, he was the assistant general counsel in charge of all industrial property—patents, trademarks and copyrights. *Id.* at 1739–40, 1745. His company was active in the zeolite field with a particular interest in zeolite A. *Id.* at 1767. The witness testified that his involvement in this litigation began when his child, now counsel for Amoco, remembered that he used to take business trips to South America. *Id.* at 1782.

He testified that it was the practice of his company to monitor the foreign patent and patent applications of competitors. Monitoring of foreign patent applications was important because many countries do not have an examination proceeding. These patents might have a scope which severely limited the prospective or present business activities of his company. *Id.* at 1743. In addition, it was known "from time immemorial" that competitors might be involved in technical subject matter areas which were interesting to his company. *Id.* at 1759.

When his company wanted to find out about its competitor's technical developments, his department would prepare a circular letter which would be sent to foreign associates. This letter would ask the associates to determine whether the competitor had filed any patents within a certain time frame. *Id.* at 1744. The witness stated that the countries to which the circular letter was sent would vary but always included Belgium, Trinidad, Venezuela and El Salvador. *Id.* at 1745. The letters were always sent to Venezuela because patents and patent applications were readily available from that country.

His experience was that patent applications were available from Venezuela within two to three weeks after they were requested. *Id.* at 1745–46. The witness testified that in the late sixties, the factory superintendent of his company's Venezuelan subsidiary would send the results of his searches of the patent notices in the Caracas papers to the company's New York office. *Id.* at 1749–52. Occasionally, the factory superintendent would call the New York office if he thought the application was of particular interest. *Id.* at 1753. If the New York office was interested in the application, the office would ask the factory superintendent to have the company's Venezuelan patent attorney obtain copies of the application or parts of the application. *Id.* at 1754. The company also subscribed to the official bulletin as a means of monitoring pending Venezuelan applications. *Id.* at 1756–57.

The witness brought several documents from his company's files including: (1) a cablegram dated March 20, 1974, which acknowledges the receipt of a letter of March 6, 1974; and (2) the March 6, 1974, letter with a copy of the claims of a com-

petitor's pending patent application attached. Relying upon the documents, the witness testified that his company received a copy of the competitor's claims on March 14, 1974. The abstract of this particular patent application was not published in the official bulletin until April 30, 1974. *Id.* at 1764–67; DX 742, 743, 744. During cross-examination, he conceded that he did not know if the copy of the claims actually came from the Office of the Registry or the office of the competitor's Venezuelan patent attorney. However, he testified that he assumed his company's Venezuelan patent attorney was reputable and that the copies were obtained in a legal manner. D.I. 131 at 1776–78. He also conceded that he did not have any evidence of receiving copies of pending applications prior to the official bulletin publication in the years 1968 or 1969. *Id.* at 1779.

Mobil's principle witness on this issue did not appear at trial. Mobil introduced the deposition testimony of a Venezuelan patent attorney, Ms. Crespo Vesquez, who was the Registrar of the Industrial Property Office from June, 1968, until November, 1969, and again in 1974. PX 1354 at 10. The witness testified that while she was the Registrar in 1968 and 1969 she had administrative duties over the operation of the office. *Id.* at 13.

She stated that copies of the Mobil patent application were not available to the public until the abstract had been filed in the official bulletin on November 10, 1969. *Id.* at 15. She testified that the "principle of secrecy" governs patent applications. *Id.* at 17. Although Article 40 of the patent law prescribes that indexes, books, files and documents must be accessible to the public, it has an exception for "patent inventions which may have been preserved in secrecy with the Law." This witness testified that the secrecy applied to all patents. *Id.* at 18.

She stated that this principle is "ratified, reproduced by Article 31 of the organic law of the ministry of July 20, 1956 ... which provides that the archives of the ministry, by their nature, are reserved to official business; and that their consulting on the part of other officials or of private persons depends on the previous authorization of the pertinent ministry; in this case, the Ministry of Development." *Id.* at 17. The witness also based her interpretation upon articles 32 and 33 of the organic law of the ministry, a general law governing ministries in Venezuela.[49]

Article 32 provides:

It is forbidden for officials and employees of the Ministries to keep any papers from the Archives, to take or publish any copy of them, without prior authorization by the respective Minister. It is equally forbidden to reveal any secrets about any matters processed in the present or the past in their respective offices.

PX 1199 at 59.

Article 33 provides in pertinent part: ·

Certified copies requested by interested parties or by any authority, will be issued only through an express order by the Minister and will be signed by the respective Director or by the Head of the office, whenever the Office functions separately from the Administration.

*Id.*

The former Registrar testified that in her opinion it was not possible in 1968 to legally obtain copies of pending patent applications until after they had been published in the bulletin. PX 1354 at 31–32. She testified that applications which had been noticed in the official bulletin were kept in different filing cabinets than applications which had not been noticed. *Id.* at 36. The witness stated that while she was the Registrar in 1968, no member of the public requested access to a pending application before it was published in the bulletin. She conceded, however, that she did not personally hand over the files to people who requested them. *Id.* at 33–34.

The other witness called by Mobil, Mr. Kalikow, had been international patent

---

**49.** Apparently, this law was repealed in 1982 and replaced with the organic law of administrative procedures. PX 1354 at 22–23.

counsel of a large corporation from 1963 through 1986. D.I. 136 at 2870. This company had a large subsidiary in Venezuela. *Id.* at 2876. The witness testified that he believed that Venezuelan patent applications were made public on the day they were published in the official bulletin. *Id.* at 2879. He testified that he never asked a foreign associate to obtain a copy of a pending Venezuelan patent publication before it was published in the official bulletin because he thought it might be illegal. *Id.* at 2881. He also testified that he never asked a foreign associate to conduct a search of the pending Venezuelan patent applications because he believed the indexing system was useless for conducting searches. *Id.* at 2887.

On cross-examination, Mr. Kalikow indicated that his company was not really interested in litigating patent matters in Venezuela and, therefore, never bothered to search the patent applications there. *Id.* at 2896. He also testified that he was not aware of the assignee index cards when he was international patent counsel. *Id.* at 2898. He also conceded that he had never been told it was impossible to obtain a pending Venezuelan patent application before the bulletin date; he had never asked for one. *Id.* at 2903.[50]

The Court notes that the language of article 40 of the Venezuelan Law of industrial property is ambiguous enough to support the two different interpretations offered by Venezuelan lawyers called by Amoco and Mobil. Article 40 does not specifically state whether it is referring to Article 16 of the Venezuelan Law of industrial property or to Articles 30 and 31 of the organic law of the ministries. In contrast, Article 18 of the industrial property statute contains a specific cross-reference to Article 17 of the industrial property statute. PX 1197, Exhibit 2 at 4. Similarly, Article 12 contains a specific cross-reference to Article 11. *Id.* at 2.

Given the ambiguity of the statute, the disagreement among the Venezuelan lawyers regarding its interpretation and the absence of certified copies of patent applications obtained prior to the official bulletin publications during the 1968–69 period, the Court finds that Amoco has not shown by clear and convincing evidence that in 1969 copies of Venezuelan patent applications could be legally obtained by members of the public before they were published in the official bulletin. Therefore, the Court concludes that the '886 and '857 patents are not invalid under section 102(b).

▮ Although it is not required to decide this issue, the Court will determine if the '886 and '857 patents are entitled to the filing date of the abandoned parent patent application. Section 120 of title 35 provides that a patent applicant is entitled to rely on the filing date of a previously filed application if that application meets the written description and enablement requirements of the first paragraph of section 112. *Phillips*, 673 F.Supp. at 1288. The written description inquiry is "whether the disclosure of the application relied upon 'reasonably conveys to the artisan that the inventor had possession at that time of the later claimed subject matter.' " *Ralston Purina Co.*, 772 F.2d at 1575 (quoting *In re Kaslow*, 707 F.2d 1366, 1375 (Fed.Cir. 1983)). In order to meet the enablement requirement, a patent application must contain a description which enables one of ordinary skill in the art to make and use the claimed invention without undue experimentation. *Phillips*, 673 F.Supp. at 1291.

In the present case, the abandoned parent application expressly discloses the X-ray diffraction pattern of ZSM-5 and silica to alumina ratios of 20 to 60. DX 480 at 8. The application also states that ZSM-5 is characterized by relatively high silica to alumina ratios. *Id.* at 10. ZSM-5 zeolites made according to the examples in the abandoned application have silica to alumina ratios of in the range of approximately

---

50. Throughout the course of the trial, counsel for Mobil made a point of asking each expert witness whether or not he or she had ever relied upon or cited a pending Venezuelan patent application. None of the witnesses answered the question in the affirmative. Because actual access need not be shown under a 102(b) analysis, this testimony is not relevant to the Court's analysis.

30 to 55. DX 480 at 17–20. The abandoned application also discloses that the ZSM–5 zeolites are useful as selective adsorbents and as catalysts for hydrocarbon conversion reactions. *Id.* at 17. The application does not disclose, however, the substitution of germanium and gallium in the MFI structure.

Thus, the abandoned parent patent application explicitly discloses a silica to alumina range of 20 to 60 in contrast to the '886 patent which explicitly discloses a range of 5 to 100 and claims ranges of "5 to 100" and "at least five." The Court has construed claims one and three of the '886 patent to be limited to MFI zeolites which do not contain substantial amounts of framework elements other than silicon, aluminum and oxygen. Therefore, the issue is whether the narrower range of silica to alumina ratios supports the subsequent claims to aluminosilicate zeolites with broader silica to alumina ranges.

 The disclosure of one example may not support a claim to a specific range. *In re Lukach,* 442 F.2d 967, 969, 58 CCPA 1233 (1971). However, there is no requirement that a specification "describe its invention *in haec verba* in order to comply with the description requirement of section 112." *Phillips,* 673 F.Supp. at 1290 (citing *Standard Oil Co. v. Montedison, S.P.A.,* 664 F.2d 356, 364 (3rd Cir.1981)). The Court finds that the range of 30 to 60 in the abandoned application is not significantly different than the range of 5 to 100 recited in the '886 patent specification. The Court finds that abandoned patent application would have disclosed to one of ordinary skill in the art that the inventors were in possession of the claimed subject matter.

Because the Court has construed claims one and three to be limited to aluminosilicate zeolites with the MFI structure, it is clear that one of ordinary skill in the art would be able to make the invention without undue experimentation if he or she followed the examples in the abandoned application. The Court finds that the abandoned patent application meets the enablement requirement of section 112. The '886 and '857 patents, therefore, are entitled to

rely upon the filing date of the abandoned parent application which is April 14, 1967. Even if the Venezuelan patent application was legally available to the public on October 2, 1968, it would not invalidate claims one and three of the '886 patent nor claims one and two of the '857 patent.

### B. *Section 103*

 Amoco has alleged that claim six of the '872 patent and claims one, two and eight of the '573 patent are invalid under 35 U.S.C. § 103 because they would have been obvious to one of ordinary skill in the art in light of the prior art. Section 103 provides in pertinent part:

> A patent may not be obtained ... if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

35 U.S.C. § 103. The legal question of obviousness can be resolved only after the following factual issues have been decided: (1) what is the scope and content of the prior art; (2) what is the difference between the prior art and the claims at issue; and (3) what is the level of ordinary skill in the art. *Graham v. John Deere Co.,* 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966). Secondary considerations such as commercial success, long felt but unsolved needs and the failure of others to solve the problems should be considered if they are present. *Id.* at 17–18, 86 S.Ct. at 693–694. Considering all of this evidence, the Court must determine whether the subject matter of the disputed claims would have been obvious to one of ordinary skill in the art at a time just before the invention was made. *American Standard,* 722 F.Supp. at 124. As with all defenses of invalidity, Amoco bears the burden of showing these claims are invalid by clear and convincing evidence. *See Andrew Corp. v. Gabriel Electronics, Inc.,* 847 F.2d 819, 823 (Fed.Cir. 1988), *cert. denied,* 488 U.S. 927, 109 S.Ct. 312, 102 L.Ed.2d 330 (1988).

### 1. The '872 Patent

■ The patent application for the '872 patent was filed on September 13, 1973, and the patent issued on December 24, 1974. PX 727. As discussed in great detail in the claim construction section *supra,* claim six of the patent covers a process for simultaneous xylene isomerization and ethyl benzene conversion which uses a catalyst of the ZSM–5 type. The scope of the prior art was also discussed in the claim construction section. The prior art contained the Octafining process which accomplished simultaneous xylene isomerization and ethyl benzene conversion. The prior art also contained the '886 patent which described ZSM–5 zeolites and stated that they were "outstanding useful" in reactions such as "isomerization of polyalkyl substituted aromatics, e.g., ortho xylene and disproportionation of aromatics, such as toluene." PX 1, col. 4, lines 33, 40–41. The Court has made findings regarding the characteristics of one of ordinary skill in the art at the time of the patent application. See the claims construction section *supra.*

The main difference between claim six of the '872 patent and the prior art is the use of a ZSM–5 type catalyst. As discussed in the doctrine of equivalents section *supra,* that change resulted in a different reaction mechanism. The process generates greater yields of para-xylene compared to Octafining. It also allows the process to be conducted with a lower consumption of hydrogen and at higher weight hourly space velocities.

Amoco did not introduce any prior art which was not before the examiner when the '872 application was filed. Rather, Amoco relies on the similarity between the Octafining process and the process described in claim six to support the allegation of obviousness. Dr. Satterfield testified that claim six would have been obvious to one of ordinary skill in the art upon reading the '886 patent. D.I. 130 at 1453.

The Court does not find this testimony to be persuasive. The Octafining process was known as early as 1958. The '886 patent was granted in November of 1972. Mobil scientists knew the contents of the '886 patent several years earlier. In spite of research at many companies, there is no evidence that anyone was interested in using ZSM–5 in a simultaneous xylene isomerization/ethyl benzene conversion process until Mobil began licensing the MVPI process in 1975. Although the '886 patent would suggest to one of ordinary skill in the art that ZSM–5 would be a good catalyst for xylene isomerization or ethyl benzene conversion, it does not refer to simultaneous xylene isomerization/ethyl benzene conversion. Nor does it suggest that this reaction could be carried out without going through a napthene pool intermediate. The '886 patent does not suggest to one of ordinary skill in the art the magnitude of the improvement claim six of the '872 patent would afford over Octafining.

Secondary considerations also suggest that claim six was not obvious. If there is a nexus between the merits of a claimed invention and its commercial success, then commercial success can be a strong factor favoring non-obviousness. *American Standard,* 722 F.Supp. at 135. The patentee bears the burden of coming forward with enough evidence to establish a *prima facie* case of a nexus. The nexus can be established by showing that the commercially successful invention is disclosed and claimed in the patent. *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.,* 851 F.2d 1387, 1392–93 (Fed.Cir.), *cert. denied,* 488 U.S. 956, 109 S.Ct. 395, 102 L.Ed.2d 383 (1988).

From 1975 through 1980, MVPI, an embodiment of claim six, was used in facilities which were responsible for 57% of the xylene isomerization capacity of the United States and 44% of the xylene isomerization capacity of the world. D.I. 127 at 831–32. Competitors, including Amoco, recognized the value of the process and licensed the MVPI process from Mobil. From 1975 through 1985, MVPI was used to produce about 34 billion pounds of para-xylene. Amoco documents state that the MVPI process "debottle-necked" about 30 million pounds of para-xylene per year and that "[t]he absence of the napthene interme-

diate mechanism in Mobil's VPI process resulted in several advantages over the formerly used Amocofining catalyst including higher yields and more valuable by-products." PX 742, Admission Numbers 27, 28. The Court finds that Mobil has established that the MVPI process has enjoyed great commercial success.

In addition, the commercial success is attributable to the invention described in the patent. Several embodiments of claim six are described in the specification of the '872 patent. *See, e.g.,* PX 727, Tables II, III, IV. The Court finds that Mobil has established the nexus between claim six of the '872 patent and the commercial success of MVPI. The Court also finds that the rapid changeover from Octafining to MVPI during 1975 through 1980 is evidence of the dissatisfaction in the art with the Octafining process and indicates that the MVPI process filled a need in the art for a process which had greater throughput and produced a higher yield of desired products.

Dr. Satterfield testified that the long felt need in the art was met by Octafining not MVPI. D.I. 140 at 1434. He also stated that the commercial success of the MVPI process was solely due to the catalyst not the process described in claim six of the '872 patent. *Id.* at 1459.

The Court finds that this conclusory testimony does not rebut the commercial success established by Mobil. This is not a case where the commercial success was due to an extraneous factor such as advertising or brand name loyalty. There is no requirement that an invention fill the largest or first "long-felt need" in the art in order to be found commercially successful. Nor is the commercial success of an invention diminished because one element of the invention is the key to its success. The claimed invention as a whole must be considered in conducting an obviousness analysis. Considering all of the evidence, including the evidence of commercial success, the

Court concludes that Amoco has failed to show by clear and convincing evidence that claim six of the '872 patent is invalid for obviousness under section 103.

### 2. The '573 Patent

■ The application for the '573 patent was filed in September of 1977. As discussed in greater detail in the claim construction section *supra,* claims one, two and eight of the '573 patent describe improved catalysts compositions. The improvements include high catalytic activity, high thermostability and low coke formation rate. PX 725, col. 2, lines 12–27. The patent teaches that these catalysts achieve their superior results due to impregnation with certain amounts of boron oxide and/or other metal oxides.

Amoco relies upon several references to support its allegation that impregnating an aluminosilicate zeolite with boron oxide in order to achieve these results would have been obvious to one of ordinary skill in the art in 1977. One reference is a Russian patent for an improved process of producing caprolactam from cyclohexanonoxeme. DX 143. The Russian patent teaches that the addition of the hydrogen form of zeolite type X containing up to 8% boric acid will improve the output and increase the quality of caprolactam produced from cyclohexanonoxeme. *Id.* at 2. This reaction apparently takes place at 110–155 °C and at standard atmospheric pressure. *Id.* at 5.

Although the Russian patent recites an amount of boron oxide that would be covered by claims one, two and eight of the '573 patent, it does not suggest the specific ranges recited in those claims. Nor has Amoco introduced any evidence to connect the production of caprolactam from cyclohexanonoxeme to the types of reactions discussed in the '573 patent. Caprolactam is not a member of any of the classes of compounds discussed in the '573 patent.[51] PX 725 abstract. There is no evidence that

---

**51.** The abstract discussed converting "lower monohydric alcohols and their ethers, especially methanol and dimethyl ethers, to a hydrocarbon mixture rich in $C_2$–$C_3$ olefins and mononuclear aromatics with hugh selectivity for para-xylene

production." PX 725, abstract. Caprolactam, or 2–ketohexamethylenimine, is not a member of any of these groups of compounds. *See Merck Index* # 1736 (10th ed. 1983).

one of ordinary skill in the art, knowing the benefits of boron oxide incorporation in caprolactam production, would find it obvious that boron oxide addition to zeolites would improve the yields and the throughput of the reactions discussed in the '573 patent. In addition, the Russian patent does not discuss the thermal stability of the zeolite or any reduction of coking problems.[52]

The second reference cited by Amoco is a United States Patent which issued to Gladrow, et al, in 1967. DX 170. This patent teaches that when synthetic aluminosilicate zeolites are to be used as catalysts, their alkali metal oxide content must be reduced. The patent states that this is accomplished by ion exchange treatment with solutions of ammonium salts or salts of metals in various groups. Boron and magnesium are specifically mentioned as preferred metals. DX 170, col. 2, lines 27–40. The patent teaches that combining these exchanged zeolites with an unwashed hydrogel produces a catalyst of higher activity than catalysts prepared according to other methods known in the prior art. Thermostability and low coke formation are not discussed.

An example of the ion-exchange procedure described stirring a mixture of an uncalcined zeolite in the sodium form in an aqueous solution of magnesium sulfate at room temperature for three hours. The stirring is stopped and the solids are allowed to settle. The liquid is poured out, fresh magnesium sulfate solution is added and the procedure is repeated two more times. Finally, the solids were rinsed with water. DX 170, col. 6, lines 10–23. The exchanged zeolite is mixed with unwashed hydrogel and the mixture is spray dried. *Id.*, col. 3, lines 54–56. After several additional steps, the final catalyst, "crystalline aluminosilicate particles suspended in and distributed throughout a matrix of amorphous, porous, silica alumina", is completed. DX 170, col. 5, lines 47–49.

The invention of '573 patent is quite different. Examples in the '573 patent recite adding a previously exchanged zeolite in the hydrogen form to an aqueous solution of magnesium acetate, boric acid and/or phosphoric acid. The mixtures are held at 60 to 90 °C for fifteen to eighteen hours. The temperature is then raised and the water is evaporated. Finally, the catalyst is calcined at approximately 500 °C. *See, e.g.,* PX 725, col. 14, lines 63–66.

The Court finds nothing in the Gladrow patent which would have made the compositions described in the '573 patent or the methods for producing making those compounds obvious to one of ordinary skill in the art.

The final reference cited by Amoco is a United States Patent issued to Garwood, et al, in 1967. DX 174. This patent discloses a continuous cyclic process for upgrading hydrocarbon oils. *Id.,* col. 7, lines 65–66. The method removes impurities such as nitrogen, sulfur and oxygen compounds from the hydrocarbon charge. *Id.,* col. 2, lines 42–47. A very simplistic description of the invention follows. The process requires two aluminosilicate zeolite beds. In the first bed, the aluminosilicate zeolite has been loaded with a non-volatile treating agent, such as boron or germanium. The second aluminosilicate bed does not initially contain a treating agent. A hydrocarbon charge containing impurities is passed over the first bed. The treating agent reacts with the impurities and becomes a volatile compound. The volatile treating agent and impurities are carried with the hydrocarbon charge to the second bed where the treating agent and accompanying impurities are adsorbed by the aluminosilicate. This process removes the impurities from the hydrocarbon charge. *Id.,* col. 4, lines 27–75.

The Garwood and '573 patents are concerned with different types of reactions. The boron serves different functions in each invention. In the Garwood process, the treating agent is removed from one aluminosilicate zeolite bed and is adsorbed

<hr />

52. Presumably these problems are not encountered in this reaction because it proceeds at a relatively low temperature.

**1498**

unto a second bed. There is no analogue in the '573 patent. The Garwood patent does not discuss such improvements as increased thermostability or low coking which are discussed in the '573 patent.

The process for preparing the catalysts in each patent is different. Preparation of the catalysts described in the '573 patent has been discussed *supra*. In the Garwood patent, the treating agent is combined with the zeolite by milling and heating. *Id.*, col. 3, lines 53–57. The Garwood patent does not suggest the specific ranges of boron oxide claimed in the '573 patent. Although the Garwood patent states that boron and other metals or metal oxides may be used as a treating agent in combination with an aluminosilicate zeolite, the Court finds nothing in the patent that would make the catalysts described in the '573 patent obvious to one of ordinary skill in the art.

An expert called by Amoco testified that there were no differences between these three patents and the compositions claimed in the '573 patent. D.I. 128 at 1114. The Court does not find this testimony persuasive in light of the Court's own analysis.

Mobil relied only upon Amoco's alleged infringement of the '573 patent as evidence of commercial success. Because the Court has found that Amoco's borosilicate sieves and AMSAC catalysts do not infringe the '573 patent, there are no secondary considerations for the Court to analyze. An absence of such factors, however, does not require a finding of obviousness. *See Datascope Corp. v. SMEC, Inc.*, 776 F.2d 320, 327 (Fed.Cir.1985), *cert. denied*, 493 U.S. 1024, 110 S.Ct. 729, 107 L.Ed.2d 747 (1990). Even if the Court considers the combined teachings of the references cited by Amoco, the Court concludes that Amoco has failed to establish by clear and convincing evidence that the '573 patent is invalid on the ground of obviousness.

## C. *Section 112*

Amoco alleges that if Mobil's patents are construed to cover Amoco's materials, then the patents are invalid under 35 U.S.C.

§ 112. Section 112 provides in pertinent part:

The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same....

The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

35 U.S.C. § 112.

### 1. The '886 and '857 Patents

■■■ Amoco contends that claim one of the '886 patent and claim one of the '857 patent are invalid for failing to comply with the written description requirement of section 112. Amoco argues that if the inventors of these patents believed that their inventions extended to compositions with silica to alumina ratios of over 2000, they would have explicitly said so. Amoco suggests that the specification "teaches away" from these high ratios by stating that the particularly preferred range is 10 to 40. Amoco also argues that the claims of these patents fail to particularly point out and claim the subject matter of the invention because the term aluminosilicate, as construed by Mobil, is ambiguous.

■■■ A specification need not exactly describe the invention to meet the written description requirement of section 112. The silica to alumina ratio of claim one, "at least five", does include the ratio of 2000. As discussed in the claim construction section *supra*, there is nothing in the patents which implies that silica to alumina ranges of greater than 100 are not possible. The Court finds that there is nothing in the ratio to teach away from the claimed invention. The term aluminosilicate, which may be ambiguous now, was not at the time the inventions were made. The Court finds that Amoco's arguments are not supported by clear and convincing evidence. The Court finds that Amoco has failed to prove that the claims of the '886 and '857 patents,

as construed by the Court, are invalid under section 112.

### 2. The '872 Patent

█ Amoco argues that claim six of the '872 patent is invalid under section 112 for failing to particularly point out and distinctly claim the invention because the term "ZSM–5" type is ambiguous. Citing *Ex parte Attig*, 7 U.S.P.Q.2d 1092 (Bd.Pt. App.1986), Amoco contends that, as a matter of law, "ZSM–5 type" is an impermissibly indefinite term.

In *Ex parte Attig*, the Board of Patent Appeals upheld an examiner's rejection of claims which were drawn to processes using a ZSM–5 type of zeolite. *Id.* at 1093. The patent application was filed in 1983. The prior art contained several patents which used the term ZSM–5 and the patents did not use the term in a consistent manner. The Board stated "clearly the art of record in this case, all of it cited by appellants themselves, in the aggregate serves to render the term *in*definite rather than definite." *Id.* at 1093 (emphasis in the original).

*Ex parte Attig* is not controlling in this case. When the '872 patent was filed in September of 1973, the prior art did not contain such a rash of references to the "ZSM–5 type." Consequently, the term was not indefinite at that time. *Ex parte Attig* is also distinguishable because a patent application is not cloaked with a statutory presumption of validity. The Court finds that Amoco has failed to show by clear and convincing evidence that claim six of the '872 patent is invalid under the second paragraph of section 112.

### 3. The '573 Patent

█ Amoco contends that the claims of the '573 patent are invalid under section 112 if the term aluminosilicate is construed to cover materials containing framework boron. Amoco argues that such a construction would run "afoul of all of the requirements of paragraphs 1 and 2 of § 112." D.I. 141 at 42.

The Court did not construe the claims of the '573 patent in a manner which covered catalysts containing substantial amounts of framework boron. Amoco has not introduced any evidence to suggest that the claims, as construed by the Court, are invalid under section 112. Therefore, the Court finds that Amoco has failed to prove by clear and convincing evidence that the claims of the '573 patent are invalid under section 112.

### VI. LICENSE AGREEMENT

█ In December of 1976, Amoco entered into an agreement drafted by Mobil which granted Amoco a license to practice Mobil's VPI process. D.I. 127 at 835; D.I. 136 at 2505; D.I. 107, Exhibit B–1 (hereinafter "License"). In addition to the license to practice the MVPI process, the parties entered into a lease whereby Mobil leased MVPI catalyst to Amoco. *Id.* at Exhibit B–2 (hereinafter "Lease"). The MVPI catalyst was retrieved by Mobil when it was removed from Amoco's facilities. The license agreement between the parties has never been expressly terminated. D.I. 127 at 852. Amoco, however, has stopped paying royalties to Mobil under the licensing agreement.

Amoco argues that even if its AMS–1B sieves and AMSAC catalysts are found to be the equivalents of ZSM–5, the license agreement precludes a finding of infringement. Amoco contends that in addition to granting Amoco the express right to use the ZSM–5 compositions in the MVPI process, the license agreement also expressly includes a license to make ZSM–5. Amoco relies on section 3.3 of the license which states: "Nothing herein shall be construed to require LICENSEE to obtain VPI Catalyst from MOBIL for use in a VPI Unit operated by LICENSEE pursuant to this Agreement." License, § 3.3. Mobil has never licensed any third parties to make the VPI catalyst. D.I. 127 at 817, 866–67. Amoco contends that unless this language is interpreted to grant Amoco the right to make the VPI catalysts for use in the VPI process, section 3.3 of the license agreement is a nullity. Alternatively, Amoco argues that if the license agreement does not allow licensees to make their own VPI

catalyst, the license agreement ties the VPI process to the VPI catalyst.

Mobil argues that the license agreement does not cover the right to make ZSM–5 catalysts. Mr. Green testified that Mobil almost exclusively licenses only its ZSM–5 process technology. He testified that Mobil is not interested in licensing others to manufacture ZSM–5 compositions and catalysts. *Id.* The witness denied that the lease and license were tied. *Id.* at 833–34, 866–67. He stated that the lease and license agreements are separately negotiated. *Id.* at 833. The marketing executive testified that section 3.3 of the license agreement was intended to allow licensees to obtain VPI catalysts from any authorized user, use their own catalysts in countries where Mobil has no composition patents or, in the event that Mobil licensed a third-party to manufacture VPI catalysts, to allow licensees to obtain VPI catalysts from an authorized manufacturer. *Id.* at 839–40.

The lease agreement states that "Mobil is not willing at this time to permit others to acquire title to or control of samples of the VPI catalysts, but Mobil is willing to lease the VPI catalysts under terms and conditions which will safeguard MOBIL's confidential proprietary information concerning the VPI Catalysts and prevent sampling of the VPI catalysts." Lease at 1. The lease provided that title to the VPI catalyst would remain with Mobil. Lease, § 1.02. There is nothing in the lease agreement which suggests that Mobil intended to grant the lessee the right to manufacture the VPI catalysts.

Under the license agreement, Mobil granted Amoco a "world-wide, non-exclusive license ... under Mobil patent rights to practice the VPI Process." License, § 3.1. The license agreement defines the VPI process as "a catalytic process for isomerizing xylenes, which comprises contacting a vapor phase mixture of hydrogen and $C_8$ aromatics in the presence of a VPI catalyst" under certain conditions. Li-

cense, § 1.2. The license defines a VPI catalyst as "a catalyst suitable for use in the VPI Process which comprises a ZSM–4, 5, 11, 12, 35 or 38 crystalline aluminosilicate zeolite." License, § 1.3. Mobil patent rights are defined as "all patents and patent applications throughout the world ... owned or controlled by MOBIL ... to the extent and only to the extent such Patent Rights cover the VPI Process (including techniques and apparatus for carrying out said Process, the use of the VPI Catalyst in said Process, but expressly excluding catalyst compositions and methods of catalyst manufacture.)." License, § 1.6. Thus, the license agreement expressly excludes the right to make catalyst compositions.

The Court finds that the express language of the license requires a finding that the license does not grant Amoco the right to make compositions covered by the '886 patent. Amoco's interpretation of section 3.3 cannot stand in light of the express language to the contrary in section 1.6 and the testimony of Mobil's marketing executive. Therefore, the license agreement provides no defense to the Court's finding of infringement of the '886 patent under the doctrine of equivalents.

Amoco's conclusory arguments regarding a tying arrangement are not persuasive. This is not a case where a patent owner is misusing a patent by tying the sale of a staple item of commerce to the licensing of a patent. *See, e.g., Senza–Gel Corp. v. Seiffhart,* 803 F.2d 661 (Fed.Cir. 1986). Amoco presented no analysis of patent misuse via tying to the Court.[53] Amoco produced no evidence to rebut the testimony from Mobil's marketing executive denying any tieing arrangement. Both the MVPI process and the VPI catalysts are patented by Mobil. Neither the process nor the catalysts could be considered a staple item of commerce. Mobil chose to license the process patents and lease materials covered by the composition patents. The Court will not alter the plain language

---

**53.** Amoco has not expressly argued, for example, that the VPI catalysts are a staple item of commerce. Even if such an argument had been

presented, the record would not support such a finding. There is no indication that the VPI catalysts have a substantial non-infringing use.

of the lease and license agreement based upon vague allegations of tying.

■ The license agreement does not protect Amoco from a finding of infringement with regard to the '872 and '857 patents. While the license agreement between Mobil and Amoco has never been expressly terminated, the Court finds that Amoco is in default of the license agreement under section 6.3ᵇ because Amoco stopped making royalty payments to Mobil. While a valid license will protect a licensee from claims of infringement for activities within the scope of the license, Amoco has cited no authority for the proposition that a defaulting party may assert the license to preclude a finding of infringement. Nor would the Court expect Amoco to find any authority for this position. Simply stating the argument reveals its fallacy.

In conclusion, the Court finds that the lease and license agreement do not preclude findings that Amoco infringed Mobil's '886, '857 and '872 patents. The issues of the amount of damages and other remedies available to Mobil by virtue of Amoco's infringement and default under the license agreement will be addressed in another segment of this litigation.

## VII. EXCEPTIONAL CASE

■ Mobil has asked this Court to make a finding that this is an exceptional case within the meaning of 35 U.S.C. § 285. Section 285 provides that "[t]he court in exceptional cases may award attorney fees to the prevailing party." The award of attorney fees is discretionary but must be premised upon an express finding of exceptional circumstances. *Bayer Aktiengesellschaft v. Duphar International Research B.V.*, 738 F.2d 1237 (Fed.Cir.1984). Factors to consider in determining if there are exceptional circumstances include: willful infringement, unjustified litigation and misconduct during litigation. *Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448, 455 (Fed.Cir.1985).

These factors are not present in this case. The Court has previously made a finding that there was no willful infringement *supra*. The litigation in this case and

the defenses presented by Amoco, although ultimately unsuccessful, were justified. The issues presented were close and the litigation of close issues serves a valuable function in the patent system. The conduct of the parties during litigation and discovery was exemplary. Although there were some discovery disputes and a few eleventh hour motions, the Court finds them to be minor in proportion to the size and complexity of the case. During trial, counsel and their staffs cooperated with the Court and with each other in a manner that the Court rarely witnesses. The Court finds that this case is the exception; it was not, however, an exceptional case.

## VIII. CONCLUSION

The Court has found that Amoco's use of the AMSAC catalysts in the simultaneous xylene isomerization/ethyl benzene conversion process literally infringes claim six of the '872 patent. The claims of the '886, '857 and '573 patents are not literally infringed.

AMSAC 1203M infringes claims one and three of the '886 patent under the doctrine of equivalents. The use of AMSAC 1203M for hydrocarbon conversion infringes claims one and two of the '857 patent under the doctrine of equivalents. AMSAC 2400 and AMSAC 3400 infringe claim one of the '886 patent under the doctrine of equivalents. The use of AMSAC 2400 and 3400 infringes claim one of the '857 patent under the doctrine of equivalents. The AMS–1B sieves do not infringe the claims of the '886 or '857 patent under the doctrine of equivalents. The '573 patent is not infringed under the doctrine of equivalents.

Mobil has failed to establish by clear and convincing evidence that Amoco wilfully infringed the '872, '886 or '857 patents. The Court declines to find that this is an exceptional case.

Amoco has failed to prove that the '886 and '857 patents are invalid under 35 U.S.C. § 102(b). Amoco has not proven that the '872 and '573 patents are invalid under 35 U.S.C. § 103. Amoco has failed to prove that the claims of any of the four

patents, as construed by the Court, are invalid under 35 U.S.C. § 112. The Court has found that Amoco has defaulted on the license agreement between the parties and, therefor, the license is no defense to a finding of infringement.

The issue of Mobil's remedies, including damages, will be considered in a subsequent phase of this litigation.